IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MARYLAND
BALTIMORE DIVISION

SHEIRA BROWN,                  §
Plaintiff,                     §
                               §
v.                             §  Case No. 1:21-cv-00096-JRR
                               §
HARFORD BANK,                  §
Defendants.                    §

ORAL AND VIDEO DEPOSITION

OF MICHAEL ALLEN

JANUARY 18, 2023


        ORAL DEPOSITION OF MICHAEL ALLEN, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on JANUARY 18, 2023, from 2:02 p.m. to 5:31 p.m., before
VANESSA P. POMPA, CSR in and for the State of Texas,
reported by stenographic method, Via Zoom video
conference, San Antonio, Bexar County, Texas pursuant to
the Federal Rules of Civil Procedure, and the provisions
stated on the record or attached hereto, and pursuant to
Texas Governor's Orders regarding the COVID-19 State of
Disaster, Section 22.0035(b) of the Texas Government
Code.

1                      APPEARANCES
2    FOR PLAINTIFF:
3         Mr. Matthew McMullen              (Via Zoom)
          Ms. Leslie Tyroch
4         Hilliard Martinez Gonzales LLP
          719 S. Shoreline Blvd.
5         Corpus Christi, Texas  78401
6    FOR DEFENDANT:
7         Mr. Scott H. Marder               (Via Zoom)
          Thomas & Libowitz, P.A.
8         25 S. Charles Street, Suite 2015
          Baltimore, Maryland  21201
9
     ALSO PRESENT:
10
          Ryan Ligon,                       (Via Zoom)
11        Video Technician;
12        Michael Allen,                    (Via Zoom)
          the Witness; and
13
          Vanessa P. Pompa, CSR             (Via Zoom)
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                        INDEX

 2                                          PAGE

 4   Appearances                               2

 5   MICHAEL ALLEN

 6       Examination by Mr. McMullen           4

 7   Signature and Changes                   126

 8   Reporter's Certification                128

 9                   EXHIBIT INDEX

10   1  Notice of Deposition                  18

11   2  Copies of Checks                      29

12   3  Brian Claffee Report                  61

13   4  Harford Bank Check Cashing Guidelines  --

14   5  Interoffice Memorandum                 --

15               REQUESTED DOCUMENTS

16   NONE

17                CERTIFIED QUESTIONS

18   NONE

19

20

21

22

23

24

25
```

Page 4

1          VIDEOGRAPHER:  Okay, we are on the record.

2    The date is January 18th, 2023, the time is 2:02 p.m.

3    eastern time beginning the corporate representative

4    deposition of Michael Allen.

5              Will the attorneys present please state

6    the appearances for this record.

7              MR. MC MULLEN:  Yes, sir.  This is Matthew

8    McMullen and Leslie Tyroch is with me.  We are attorneys

9    for the plaintiff Sheira Brown.

10             MR. MARDER:  Scott Marder on behalf of

11   Harford Bank.

12             VIDEOGRAPHER:  And then will the court

13   reporter please swear in the witness.

14                  MICHAEL ALLEN,

15   having been first duly sworn, testified as follows:

16                  EXAMINATION

17   By Mr. McMullen:

18        Q.   Thank you, Mr. Allen.  As you know, I represent

19   plaintiff Sheira Brown in an action against Harford

20   Bank.  Before we get into the substance here I just

21   wanna cover the ground rules.  Is this your first

22   deposition or have you been deposed in the past?

23        A.   I've been deposed in the past.

24        Q.   Roughly how many times have you been deposed?

25        A.   Just once years ago.

1    Q.    Okay.  So the ground rules is that -- and I

2  believe you were in attendance for Mr. Claffee's

3  deposition.  The same ground rules apply.  The court

4  reporter -- she is charged with trying to make the most

5  accurate transcript that we can.  And so I usually try

6  to get some agreement with the witness in advance.  The

7  first item that we wanna agree on is not to overtalk one

8  another.  So I won't pose a question until you've

9  finished your answer and you won't answer until I finish

10  the question.  Can we agree on that?

11    A.    Yes.

12    Q.    Can we agree that -- well, there will be a time

13  when more likely than not that I either need to clarify

14  or confirm some body language or -- or something you've

15  said.  And it may take the form is that a yes or is that

16  a no.  That's not to be a bully, it's just to confirm

17  your testimony.  Unless instructed by counsel you can

18  answer the question that is presented.  And as you would

19  have noticed in Mr. Claffee's deposition, usually you're

20  just gonna wanna pause before answering so that

21  Mr. Marder has an opportunity to object.

22           The only agreement that I seek on that

23  point is every answer you provide is if you know.  And

24  so there's no need to qualify the questions or -- or

25  generally objections.  The answers you provide are if

1    you know.  If you don't know let me know that.  If the

2    question is confusing or I need to rephrase it just let

3    me know and I'll do my best to do the same.  Can we

4    agree on those things?

5         A.   Yes.

6         Q.   Same rules apply as far as breaks.  If there is

7    a break -- you can certainly ask for one.  We generally

8    will try to do once an hour.  More than that is

9    acceptable as well.  I wanna be sensitive to your

10   comfort.  So if you need anything from a com -- comfort

11   perspective just let me know.  And the only ground rule

12   there is if there is a question pending we just want the

13   answer to that question before the break.  Can we agree

14   on that?

15        A.   Yes.

16        Q.   Excellent.  And, Mr. Allen, what is your

17   position with Harford Bank?

18        A.   President of the bank.

19        Q.   How long have you been the president of Harford

20   Bank?

21        A.   Since July 1st of 2019.

22        Q.   Thank you.  Prior to assuming that role were

23   you an employee or an officer of Harford Bank?

24        A.   I was.

25        Q.   And what was your position at that time?

**Gwendolyn Parker & Associates**
**214-747-8007**

1     A.     Chief operating officer, executive vice

2   president since April 1st of 2016.

3     Q.     How long -- Are you still considered an officer

4   of Harford Bank?

5     A.     Yes.

6     Q.     How long in general have you been an officer of

7   Harford Bank?

8     A.     Since April 1st, 2016.

9     Q.     Prior to April 1st of 2016 did you have a

10   different role with Harford Bank?

11     A.     I did not.

12     Q.     Where did you work prior to Harford Bank?

13     A.     Immediately prior?

14     Q.     Yes, please.

15     A.     Yeah, I worked for Penn State University.

16     Q.     And what was your role there?

17     A.     I was the head of the Graham -- Graham

18   Entrepreneurial Leadership program.

19     Q.     How long were you an employee or an officer of

20   Penn State?

21     A.     I was there for approximately a year, a little

22   less than a year.

23     Q.     Other than your experience with Harford Bank,

24   do you have on your resume employment with other banks

25   or other financial institutions?

1    A.    Since 1985, yes.

2    Q.    You spent one year at Penn State University.

3 Would it be fair to say you have 36 years of experience

4 working in -- in the banking sector?

5    A.    Correct.

6    Q.    And among those 36 years also 36 years of

7 retail banking professional experience?

8    A.    Yeah, I -- I guess it depends on how you're

9 defining retail banking but yes, I've worked for

10 commercial banks for my entire career, yes.

11   Q.    And just so we understand retail banking from

12 your perspective, do you have a -- a brief explanation

13 for what we -- what retail banking is for the jury?

14   A.    Well, in -- internally we tend to look at the

15 branch network as the retail side of the organization.

16 So when you refer to retail banking we're typically

17 talking about branch transactions.

18   Q.    So that is another way to say that perhaps --

19 you can tell me if you agree -- is the bank has brick

20 and mortar facilities or -- or branches.  And when we

21 talk about retail banking we're talking about that

22 sector of the business, is that accurate?

23   A.    Typically when you talk to a banker that's

24 typically what you're -- what you're referring to, yes.

25   Q.    Okay.  Online banking would be distinct from

Page 9

1   retail banking, in other words?

2       A.    It depends but generally associated with or a

3   subset of retail banking.

4       Q.    Understood.  They may have some overlap but

5   generally speaking those are two different branches of

6   banking, is that right?

7       A.    Two variations of one branch is how I would

8   look at it, I think.

9       Q.    Understood.  And, sir, what prior to -- well,

10  not even prior to what -- what is your education

11  background?

12      A.    I -- I went to Penn State University back in

13  1980 through 1984.

14      Q.    And you graduated with a bachelors degree?

15      A.    I left -- I left just short of getting my

16  bachelors degree.

17      Q.    Do you -- do you have a bachelors degree?

18      A.    I don't.

19      Q.    Have you obtained any other secondary education

20  other than the education you received at Penn State?

21      A.    Oh, yeah, over the years.  Many college

22  courses, banking courses, banking schools, a variety --

23  a variety of different things.

24      Q.    Other than -- and just so -- just on the topic

25  of degrees do you have a bachelors degree in general?

1      A.   No.

2      Q.   But you've -- since your time at Penn State

3  you've sought out education through college courses sort

4  of as -- as you needed to, is that accurate?

5      A.   As I needed to or was -- was interested in

6  doing, yes.

7      Q.   As you were so inclined?

8      A.   Yeah.

9      Q.   In the -- generally speaking if you -- well,

10  your course work at Penn State was that within a major

11  at Penn State?

12      A.   Yes, it was political science.

13      Q.   The college courses you obtained after 1984,

14  generally speaking, were those more tailored to the

15  financial or banking industry?

16      A.   Some, yeah, some were just personal interest.

17      Q.   Were those also at Penn State?

18      A.   No, mostly FAS University, the College of Notre

19  Dame, some other -- some other universities over time.

20  I don't think I took any more Penn State courses after

21  that.

22      Q.   Do you have any or have you ever had any

23  certifications that you either maintained or sought

24  at -- or sought?

25      A.   No, not something that would -- that would

1   require, you know, continuing education credits or

2   anything like that.  Nothing of that formality.

3        Q.   And I think we touched on this already.  You

4   have 36 years of professional experience in the banking

5   industry?

6        A.   Correct.

7        Q.   Do you -- would you say that you have an

8   expertise more specific than the banking industry, do

9   you have, for example, a -- are you a subject matter

10  expert in any aspect of the banking industry?

11       A.   I think years of experience in virtually all

12  aspects of banking.  So I started my career in credit

13  analysis, became a commercial credit -- commercial

14  lending officer for several years, and then have just

15  moved through chief credit officer, chief lending

16  officer.  I've been head of banking, chief operating

17  officer, had the retail side reporting up through me for

18  many years in different capacities.

19       Q.   Among your years of experience in professional

20  -- your professional experience in banking would it be

21  safe to say that you have years of experience in how

22  customers access banking services?

23       A.   Yes.

24       Q.   You have years of experience in considering

25  how, for example, customers engage with bank tellers?

1    A.    Yes, I was a teller.

2    Q.    When were you a teller?

3    A.    That was my first job while I was in school.  I

4    worked as a teller for Mid State Bank & Trust back in

5    1985.

6    Q.    After leaving Penn State?

7    A.    No, I was still at Penn State at that point.

8    Q.    Okay.

9    A.    I got my first real banking job and just left,

10   I went and did that and never -- never went back.

11   Q.    You started as a teller and now you are

12   president of the bank, is that right?

13   A.    Correct.

14   Q.    Not too shabby.  You have been experienced with

15   -- well, and you may have heard this discussion with --

16   when you observed Mr. Claffee's depo.  You have

17   experience then with the reasons why a customer may cash

18   a check over making a deposit, is that right?

19   A.    Of course.

20   Q.    And, for the jury, in your perspective what is

21   the significance of the distinction between cashing and

22   depositing?

23                  MR. MARDER:  Can I have that question read

24   back, please.

25                  THE REPORTER:  The question was:  And for

1  the jury in your perspective what is the significance of

2  the distinction between cashing and depositing?

3              MR. MARDER:  Objection, beyond the scope

4  of the three areas designated in the 30(b)(6) deposition

5  notice.

6      A.   So the -- a deposit obviously is -- is

7  depositing money into an account for future use.

8  Cashing a check is to use the funds as a result of

9  that -- emanating from that instrument immediately.

10     Q.   Thank you.  Why in your experience as a banking

11 professional might a customer choose to cash a check?

12             MR. MARDER:  Same objection.

13     A.   Any -- yeah, any number of reasons.

14             MR. MARDER:  Hey, Matt, so that I don't

15 have to object at various times are you okay with me

16 having a standing objection to any questions that go

17 beyond the scope of the 30(b)(6) notice?

18             MR. MC MULLEN:  I'm -- on its face I don't

19 have a problem with that.  I'm just wondering how we --

20 are you still gonna note your objection just as a --

21             MR. MARDER:  No, that's the point.  That's

22 the point.  If you will stipulate that objections to

23 questions beyond the scope are preserved without me

24 having to raise the objections here it'll save us time

25 and I won't have to do it.  Otherwise I'll have to raise

1    it every time.

2              MR. MC MULLEN:  Sure.  Can we stipulate

3    that by saying objection, form that includes -- just so

4    that every single question isn't subject to this but

5    objection, form suffices?

6              MR. MARDER:  Yeah, I would stipulate that.

7    I would stipulate that objection, form would include

8    questions beyond the scope of the deposition notice.

9              MR. MC MULLEN:  Yeah, I think that's

10   workable to me.  We can -- we can enter that

11   stipulation.

12             MR. MARDER:  Sounds good.

13        Q.   (BY MR. MC MULLEN)  All right, Mr. Allen, we

14   were talking about the significance of -- to a customer

15   if they can't -- or why a customer may choose to cash a

16   check.  My question to you was why might a customer in

17   your -- in your experience choose to cash a check versus

18   make a deposit?

19             MR. MARDER:  Objection, form.

20        A.   I mean, there are numb -- innumerable reasons.

21   You just wanna start throwing random ones out or --

22        Q.   The ones that occur to you as being the most

23   significant.

24             MR. MARDER:  Objection, form.

25        A.   They want access to the cash immediately for

1   any number of uses.

2       Q.   So we agree that immediate use is a factor that

3   would -- that would be considered by the customer?

4               MR. MARDER:  Objection, form.  Objection,

5   form.

6       A.   Agree.

7       Q.   A customer who needs immediate access to

8   their -- their funds would include potentially someone

9   who has a need to access the funds for things such as

10  grocery bills, for example?

11              MR. MARDER:  Objection, form.

12      A.   If that's a question yes, correct.

13      Q.   Yes, that was a question, I apologize.  That

14  could also include items that could create a crisis for

15  the customer should they not be able to access those

16  funds immediately, isn't that true?

17              MR. MARDER:  Objection, form.

18      A.   Potentially, yes.

19      Q.   And, of course, you have some experience with

20  this, but especially I assume with your background in

21  credit analysis, that customers come from all different

22  financial backgrounds, different means, and many

23  customers, for example, may live paycheck to paycheck,

24  is that true?

25              MR. MARDER:  Objection, form.

1  A. That is true.

2  Q. All right.  We will talk about -- we'll give

3 Scott a rest here and talk about a different topic.  I

4 want to talk about your preparation as a 30(b)(6)

5 designee today.  In preparation for your testimony

6 today -- and I don't wanna hear anything about the

7 actual content of the discussion in terms of meetings

8 with counsel on this -- on these next few questions.

9 But did you meet with counsel prior to your deposition

10 today?

11  A. Yes.

12  Q. How many times did you meet?

13  A. I believe just one time.

14  Q. When was that?

15  A. It was in December at some point prior to when

16 we had initially been scheduled for this.

17  Q. And so that would have been December of 2022,

18 is that right?

19  A. Correct.

20  Q. You met for how long?

21  A. A few hours in the afternoon.  I don't recall

22 how long it lasted, it was a few hours.

23  Q. And who was present in that meeting?

24  A. Mr. Marder and myself.

25  Q. Which documents, if any, were reviewed in that

1   meeting?

2       A.   I don't -- I don't recall specific documents

3   being reviewed, you know, maybe my memory's failing me.

4   We talked a lot of hypotheticals but I don't remember

5   looking at specific documents.

6       Q.   To just clarify, you can help me with the

7   answer, is it your recollection -- are you -- is it your

8   best recollection you did not review documents, is that

9   what you're --

10      A.   I don't recall reviewing specific documents.

11  We certainly talked at length about the --

12              MR. MARDER:  Mr. -- hold on, hold on,

13  Mr. Allen.  Don't reveal anything that we talked about.

14  Everything that we talked about is covered by

15  attorney-client privilege.  So just answer the question

16  narrowly that he's asking you about what documents you

17  reviewed, if you remember.

18              THE WITNESS:  Understood.

19      A.   I don't remember.

20      Q.   In your role as president of Harford Bank I

21  assume you're an officer of Harford Bank?

22      A.   Correct.

23      Q.   And you have the power to exercise judgment and

24  discretion on behalf of Harford Bank, is that right?

25      A.   Correct.

1    Q.   No one would argue that you do not have the

2    authority to bind Harford Bank in the decisions that you

3    make on behalf of Harford Bank, is that accurate?

4              MR. MARDER:  Objection, form.

5    A.   That's accurate.

6    Q.   We'll mark Exhibit 1 as the first exhibit --

7    I'm sorry, we will mark the notice of taking deposition

8    for Mr. Allen as Exhibit 1.  And, Mr. Allen, did you

9    have an opportunity to see the actual notice of taking

10   deposition in this matter for your deposition?

11   A.   I did, yes.

12   Q.   You're familiar with the three areas of inquiry

13   that were identified on that deposition notice?

14   A.   I don't recall it.  I don't have it in front of

15   me but I did read it.

16   Q.   Would it be helpful to take a look at that

17   right now?

18   A.   Yes.

19   Q.   I'll pull that up for you.  One moment.

20              (Exhibit 1 on screen)

21              Okay, Mr. Allen, I have what's been marked

22   as Exhibit 1 on the screen.  And you see here these

23   three topics.  Does this refresh your recollection of

24   the three topics you were asked to testify to?

25   A.   Yes.

1    Q.   How did Harford Bank prepare you for these

2  three matters of examination?

3    A.   I don't -- I'm not sure I under -- understand

4  the question.

5    Q.   In advance of today's deposition you were asked

6  to prepare for these three items of inquiry, is that

7  right?

8    A.   Correct.

9    Q.   And how did the bank prepare you for these

10  items?

11           MR. MARDER:   Objection, form.

12    A.   I don't know that I'd phrase it that way.  I

13  prepared myself for these items.  I'm not sure -- I'm

14  not sure -- just the way you're posing the question I'm

15  not sure how to answer.

16    Q.   How did you prepare for these three items of

17  inquiry?

18    A.   Just spent time looking at all of our -- all of

19  our -- everything I could find on policies, procedures

20  and -- and training.  And we -- we went through an

21  investigation.

22    Q.   How much time did you spend preparing for this

23  deposition?

24    A.   I -- I did not -- I can't answer that.

25    Q.   Did your preparation take place over the course

1   of more than one day?

2       A.    I'd say it was the equivalent of -- of a day.

3       Q.    When you say the equivalent of a day is -- is

4   that roughly 24 hours?

5       A.    That's as good an approximation as any.

6       Q.    Do you -- Are you fully prepared to provide all

7   information known or reasonably available to Harford

8   Bank with respect to these three items of inquiry?

9       A.    As far as I know, yes.

10      Q.    And are you fully prepared to provide the

11  position of Harford Bank with respect to these three

12  items of inquiry?

13                  MR. MARDER:  Objection, form.

14      A.    I am.

15      Q.    When preparing for this deposition was it your

16  role to gather all of the knowledge that you needed to

17  prepare?

18      A.    Yes.

19      Q.    In other words, did you seek the assistance of

20  anyone within Harford Bank to help you get ready for

21  this deposition?

22      A.    Asking for copies of certain things from

23  certain resources within the organization.

24      Q.    Who would you have asked for those copies?

25      A.    Specifically our head of retail operations.

Page 21

1     Q.    Who is the head of retail operations for

2    Harford Bank?

3     A.    Tiffany Hanks.

4     Q.    Who else did you ask for -- who else did you

5    consult with with Harford Bank to prepare for your

6    deposition?

7     A.    Our head of HR.

8     Q.    And what's the name of the head of HR?

9     A.    Calvin Tull.

10    Q.    Did you receive documents from Tiffany Hanks?

11    A.    I think she directed me where to find the

12   documents more than received them from her.

13    Q.    Which documents did she direct you to?

14    A.    Some training materials.

15    Q.    What did those training materials consist of?

16    A.    The teller training materials.

17    Q.    How many documents were included in the teller

18   training materials?

19    A.    Multi page.  It's a -- it's an outline of the

20   entire -- entire teller training process.  So I don't --

21   about 30 -- 30 pages maybe.  I don't know, I didn't

22   count them.

23    Q.    Were those materials provided to plaintiff in

24   the discovery in this matter?

25    A.    They were.

1    Q.    Excellent.  In the course of this deposition I

2    may ask you for training materials.  And I'll do my best

3    to identify the training materials that you've just

4    described here.  Let me know, please, if I am missing

5    any that -- and there will be subsequent questions about

6    this but just let me know if I'm missing something.  Did

7    the head of HR Calvin Tull provide you with any

8    documents in preparation for your deposition?

9    A.    Yes.  Yes.

10   Q.    Which documents were those?

11   A.    The -- A copy of the employee manual as it --

12   in its form from 2019 with the -- the version that would

13   have been in place at the time of the incident.

14   Q.    Anything else?

15   A.    Some weighted materials on -- just basically

16   copies of the -- of the employee manual.

17   Q.    How many pages is the employee manual?

18   A.    It's significant.  Forty -- 40, 50 pages.  It's

19   significant.

20   Q.    Does the employee manual discuss items like --

21   well, does the employee manual discuss how to identify a

22   fraudulent check?

23   A.    It does not.

24   Q.    Does it identify how to identify a counterfeit

25   check?

1      A.    It does not.

2      Q.    You were in the deposition, I believe, of

3  Mr. Claffee earlier this morning, is that right?

4      A.    Correct.

5      Q.    In the deposition of Mr. Claffee did we review

6  any pages of the employee manual?

7      A.    Not that I saw.

8      Q.    When you -- Topic one here is the incident --

9  topic one on your notice -- your 30(b)(6) notice of

10  deposition is the incident in question as well as the

11  investigation of said incident.  Did I read that right?

12      A.    Correct.

13      Q.    The second portion here, investigation of said

14  incident is what I have a few questions.  Who within

15  Harford Bank performed an investigation of the incident

16  on March 19th of 2020?

17      A.    Well, we had -- I asked, as you know, Brian

18  Claffee to gather as many facts as he could.  And Brian

19  was our head of -- of retail operations at that time.  I

20  also asked Dean Jager, J-a-g-e-r, who was the head of

21  our compliance at the time to do a separate -- an

22  independent review of all the facts.  I also asked

23  Calvin Tull, our head of HR, to do sort of an informal

24  probe just to make sure that we cover every base, and

25  then I made my own inquiries.

1   Q.   As to Mr. Claffee you heard his deposition this

2   morning.   Having heard his deposition and reviewed the

3   materials he prepared in the form of a report to you,

4   are you satisfied with Mr. Claffee's investigation of

5   this incident?

6   A.   In -- in general terms it is accurate as I

7   understand the incident, yes.

8   Q.   Are there areas wherein you have identified

9   material facts that were not included in Mr. Claffee's

10  report?

11  A.   I think there are, yes.

12  Q.   Can you -- What is one of them?

13  A.   In your discussion about the check itself this

14  morning there were some -- there were some areas there

15  that were not mentioned in the report that were

16  substantive and were part of the decision made by the

17  branch staff to elevate the inquiry on that check.

18  Q.   How did you make that determination?

19  A.   Well, from the facts from literally the next

20  day when -- when I made my own -- began making my own

21  inquiries, and then the subsequent inquiries made by

22  everyone else.

23  Q.   And you were present in Mr. Claffee's

24  deposition when we identified seven different factors

25  that led Gail O'Keefe and Jasmine Brown to believe that

1   the check that Sheira Brown presented was fraudulent.

2   You were present for the identification of those seven

3   factors?

4       A.   I was.

5       Q.   Are there additional factors that were not

6   included in -- in that testimony that you believe should

7   be included?

8       A.   I believe there are.

9       Q.   We had seven factors.  What is the eighth

10  factor you'd like to identify?

11      A.   The color of the check.

12      Q.   Is that -- Is the color of the check included

13  as a factor in any of the Harford Bank policies?

14      A.   No.

15      Q.   And we'll come back to that topic.  Before we

16  do, though, is there a ninth factor that Gail O'Keefe

17  and Jasmine Brown considered when believing that Ms.

18  Brown -- that Sheira Brown's check may have been

19  fraudulent?

20      A.   I think so, yes.

21      Q.   What's the ninth factor?

22      A.   The -- the drawee or the maker of the check

23  is -- is incorrectly identified on the check.  The

24  account name for that account is different than what is

25  printed on that check.

1     Q.   What is the account name printed on the check?

2     A.   I believe it says Olive -- Olive Italian Grill

3  or something.  It's Olive -- Olive -- I don't have it in

4  front of me.  It refers to Italian Grill, as I recall.

5     Q.   And you believe that Gail O'Keefe and Jasmine

6  Brown identified that fact in determining that Ms.

7  Brown's check was fraudulent?

8     A.   I can't say that.  They should have but I can't

9  say that.

10    Q.   So my question to you wasn't whether there were

11  additional things they could have considered when I

12  asked for a -- these additional factors.  Number nine --

13  well, so we'll go back to number eight.  You identified

14  the color of the check?

15    A.   Yes.

16    Q.   Is that a factor that Jasmine -- that Gail

17  O'Keefe identified when she believed -- or per your

18  investigation is that a -- is that a factor that Gail

19  O'Keefe identified as a reason to suspect the check was

20  fraudulent?

21    A.   Yes.

22    Q.   Where did she include that in her -- in the

23  report of Brian Claffee?

24    A.   She didn't --

25          MR. MARDER:  Objection, form.

Page 27

1          THE WITNESS:  I'm sorry.

2          MR. MARDER:  Yes, sir, Mike, just -- yeah,

3  just pause a second before you answer.

4      A.   She didn't include anything in Brian's report.

5  Brian wrote the report and that was a significant piece

6  that he left out of that report.

7      Q.   Is that information contained in any other

8  report that Harford Bank or you received?

9      A.   I would have to go back and -- and review.  I

10  don't recall but that I received yes, firsthand.  It was

11  -- is was described detail to me firsthand through my

12  own inquiries.

13      Q.   Who told you that information?

14      A.   Gail O'Keefe.

15      Q.   That the color of the check is a reason she

16  felt that the check was fraudulent?

17      A.   Correct.

18      Q.   Now, the second clarification that I wanna make

19  is you said that the ninth factor is that the account

20  name is different than what is printed on the check.

21  That is -- that is a factor you believe Gail O'Keefe

22  included in believing the check was fraudulent?

23      A.   I can't -- I can't say.  I can't say.  It would

24  surprise me if she didn't notice that but I cannot say.

25  She did not talk about it to me.

1      Q.    Right.   She did not provide you with that

2   information when you did your own inquiry?

3      A.    Correct.

4      Q.    It's also not included in Harford Exhibit 11 as

5   a reason why the check would be considered fraudulent,

6   correct?

7      A.    I don't remember what exact --

8             MR. MARDER:  Can you repeat that -- I'm

9   sorry, could you repeat that question.

10     Q.    Yeah, and maybe it's easier if we just look at

11  the exhibit.

12             MR. MC MULLEN:  Leslie, if you wouldn't

13  mind to pull that exhibit up, Exhibit 11.

14             MS. TYROCH:  No problem, Matt.  Can you

15  stop share screen and it'll allow me to.  Thank you.

16             (Document on screen)

17             MR. MARDER:  And, Matt, can you show the

18  witness this entire document, not just one page out of

19  the document so at least he knows what he's looking at.

20             MR. MC MULLEN:  Yes, sir.  I think this is

21  the only page.

22             MS. TYROCH:  That's the entirety.

23     Q.    This is Harford Exhibit 11.

24             MR. MARDER:   Not 11.  It's Bates numbered

25  Harford 11.

1          MR. MC MULLEN:  I apologize.  Bates number

2    11.  This I think will be Exhibit 2 to this deposition.

3      A.   And I don't -- what was the question about

4    this?

5      Q.   Sure.  The -- well -- well, this is something

6    that was received by plaintiff from Harford Bank in

7    discovery.  Can you explain what we're looking at here?

8      A.   The top check you're looking at a check that is

9    -- was presented at the Joppatowne branch on March 19th,

10   2020 to be cashed.  And what you're looking at below

11   that are the checks that -- and this is for comparison

12   sake, this is not something that came from Gail to be --

13   to be clear.  But these are the -- below are the

14   checks -- the standard checks issued by Olive Branch.

15   The check above is not -- as you can see does not look

16   like the checks below.  The checks below were printed by

17   the bank's service provider.  So Olive Branch bought

18   their checks through Harford Bank.  The check above was

19   issued by ADP, a completely different looking check and

20   different color clearly, and something that obviously

21   had -- had our branch staff scratching their heads.

22     Q.   And to be clear, the check above is a valid --

23   is a copy of a valid check, correct?

24     A.   Correct.

25     Q.   A valid payroll check that ADP printed and

1   provided to Sheira Brown as far as you understand, is

2   that right?

3       A.   Correct.

4       Q.   And we would agree that ADP is a very

5   well-known payroll provider, is that right?

6       A.   Correct.

7       Q.   When you say -- and we'll come back to the

8   factors we were identifying.  You identified that the

9   color of the check that was presented to Gail O'Keefe

10  was a factor in generating her suspicions.  Did I

11  understand that correctly?

12      A.   Correct.

13      Q.   In what way was the color of the check a

14  factor?

15      A.   The fact that it's multi colors.  She described

16  it as it looked faded or like maybe something that had

17  sat in a car for a while.

18      Q.   Do you see those indicia on this check?

19      A.   It certainly doesn't look like a check I would

20  have expected to see from our provider.

21      Q.   In what way?

22      A.   The colors to begin with, multiple fonts,

23  the -- just I'll draw your attention to where Harford

24  Bank is right there.  It's sort of a classic tipoff on a

25  fraudulent item.  You see what our checks look like with

1   our logo and address, but on this one all we have is

2   a -- is a straight printing of Harford Bank and a -- and

3   a font that's different from much of the rest of the

4   check.

5       Q.   Okay.  These aren't checks, of course, that

6   were issued by your organization, right?

7       A.   Correct.

8       Q.   These were issued by a payroll company?

9       A.   The top check, correct.

10      Q.   Right.  You said that a classic tipoff is that

11  the logo is not found in the -- in the far left -- in

12  the bottom left corner?

13                  MR. MARDER:  Objection, form.

14      A.   A classic tipoff being the way the bank name is

15  printed right there --

16      Q.   Okay.

17      A.   -- without the -- without -- without the logo,

18  without the address.  That's sort of a classic area that

19  would draw your attention.

20      Q.   Where in Harford's policies is that classic

21  tipoff identified?

22      A.   I don't know that that would be included in any

23  policy.

24      Q.   Why not?

25      A.   Well, policies typically don't go into that

1  kind of -- that kind of procedural description, number

2  one.  Number two, it would be difficult to write a

3  procedural manual that would include every possible

4  indicia of fraud.

5      Q.   Well, I'm not asking for every possible indicia

6  of fraud.  You identified this as a classic tipoff.

7  When you train your tellers at Harford Bank you don't

8  include classic tipoffs?

9      A.   When we train our tellers at Harford Bank --

10  and I believe you have a copy of this -- we use what

11  they call the DDAMPER method.  So it's an acronym

12  that -- that basically runs you around the check.  Every

13  bank uses something similar.  The DDAMPER is to start

14  with the date.  And we talked about the date.  The

15  drawee, which we just talked about, the amount of the

16  check.  And that includes talking about the discrepancy

17  between the written amount and the numerical amount, the

18  maker of the check, the payee.  In this case we -- the

19  endorsement was fine on this check.  And the R in

20  DDAMPER is the -- is the routing number.  And that was

21  fine on this check but I think for most of the rest of

22  the D-D-A-M-P-E -- or D-D-A-M-P we had -- we had

23  reasonable questions on all of that.  And that's how

24  they are trained.  They are trained on that.

25      Q.   Which document specifies the DDAMPER's method?

1      A.    You've got -- well, I believe it was -- I

2  believe it was mentioned in the document you -- you

3  listed as a policy earlier today.  And I'm not familiar

4  with what you were showing there but it's in our -- it

5  is in our teller training packet.  It's day two in our

6  teller training packet.

7      Q.    So you appear to have identified that

8  Mr. Claffee was asked to comment on this DDAMPER's

9  policy, is that right, in his deposition?

10              MR. MARDER:  Objection, form.

11     A.    Yeah, I'm sorry, I -- Can you restate that.

12     Q.    You watched the deposition testimony this

13  morning of Brian --

14     A.    Correct.

15     Q.    -- Claffee, right?  You were there the entire

16  deposition, right?

17     A.    Correct.

18     Q.    Was Mr. Claffee asked about the portion of

19  Harford Bank's policies that deal with the DAMPER's

20  method?

21     A.    I did not hear that specific question asked,

22  no.

23     Q.    Was -- Was he asked questions regarding the

24  same policy that you are identified -- that you are

25  identifying now when you say that the employees were --

1    are trained in the DAMPER's method?

2        A.   Yes --

3                MR. MARDER:  Objection, form.  Mike, just

4    pause for a second.

5                THE WITNESS:  Sure.

6        A.   Without -- without reference to the actual

7    DDAMPER acronym, yes.

8        Q.   Right.  So we -- at least with Mr. Claffee we

9    have reviewed this exact policy that you're referring

10   to, is that right?

11               MR. MARDER:  Objection, form.

12       A.   Yeah, I don't think he did.  I don't think he

13   went into the detail on that, no.

14       Q.   We identified the policy, is that right?

15               MR. MARDER:  Objection, form.

16       A.   You identified a document that showed -- that

17   included DDAMPER in it in that multiple charts that you

18   have there.  I don't -- I don't know what -- I wouldn't

19   call that a policy.  I don't know what that is.

20       Q.   What would you call it?

21       A.   I don't know what that was, honestly.  It

22   looked -- it looked like it was probably a page out of

23   a -- out of the teller training manual maybe.  I wasn't

24   familiar with that.

25       Q.   And I'll represent to you that was a document

1   that was provided to us by Harford Bank.  We can take a

2   look at it later in your deposition.  I wanna take a

3   look at this check at the top here.  And we will app --

4   Are you familiar with the DAMPER's -- the DDAMPER's

5   method?

6         A.   To the extent that I just shared with you, yes.

7         Q.   Okay.  What is the first D in DAMPERs?

8         A.   The date.

9         Q.   What is the second D?

10        A.   The drawee.

11        Q.   Okay.  And please identify for me where the

12   date is suspicious in this top check.

13        A.   You know, I think as was discussed earlier it

14   is unusual -- it is unusual to see a payroll check wait

15   30 days to be -- to be negotiated.

16        Q.   You agree that it's not stale, this check is

17   not stale, correct?

18        A.   Correct.

19        Q.   And there's no indication on the check that

20   checks of this nature from this issuer should be looked

21   at with suspicion if they're not cashed within 30 days,

22   is that right?

23        A.   Correct.

24             MR. MARDER:  Objection, form.

25        Q.   What info -- What information are you basing

1   this determination on that -- that payroll checks should

2   be looked at with suspicion if they're not cashed within

3   30 days?

4           MR. MARDER:  Objection, form.

5      A.   Experience.  That's what we do.

6      Q.   Was it the --

7      A.   Go ahead.

8      Q.   I apologize, go ahead.

9      A.   No, go ahead. I'm done.

10     Q.   Well I want to hear the complete answer.  You

11  said experience.  What other ways?

12     A.   This is what our retail folks do for a living.

13  And they are -- any one of these things may not -- any

14  one of the things we've identified on this check may not

15  in and of itself be confirmation of fraud, but there are

16  warning signals, and that would be one of them.

17     Q.   So it's the Harford Bank position that payroll

18  checks that are not immediately deposited or cashed can

19  be looked at with suspicion?

20          MR. MARDER:  Objection, form.

21     A.   It would -- it would -- it would definitely

22  trigger additional review.

23     Q.   Is that a yes?

24          MR. MARDER:  Objection, form.

25     A.   It's a qualified yes.

1      Q.    Okay.  How far -- how long -- well, let's say

2  this check purports to have been issued on February 20th

3  of 2020, correct?

4      A.    Correct.

5      Q.    How long did Ms. Brown have until Harford Bank

6  would see that as an indicia of a fraudulent check?

7      A.    There would be no set time frame.

8      Q.    If she had come in a week earlier would that

9  have indicated that this check may be fraudulent?

10      A.    In addition to other indicia on here, perhaps.

11      Q.    That wasn't my question.  My question is all

12  the factors considered if she had come in a week prior

13  would that date have been cause for suspicion that the

14  check was fraudulent?

15              MR. MARDER:  Objection, form.

16      A.    So I just wanna make sure I understood what you

17  said.  You said all of these factors considered?

18      Q.    Well, sure, and answer it both ways, please.

19      A.    All these factors considered, absolutely.

20      Q.    A week prior would have contributed to

21  suspicion that the check was fraudulent?

22      A.    That's part of it, absolutely.

23      Q.    What about two weeks prior?

24      A.    In conjunction with everything else.  I'm still

25  answering that way, yes.

1    Q.    What about three weeks prior?

2    A.    You're looking for an absolute that you're not

3   gonna be able to get.  In conjunction with everything

4   else it may not be as much of an issue at that point.

5    Q.    I'm trying to identify when the cutoff is.  And

6   we can use that to look at your policies, but three

7   weeks prior would this have been something that you

8   train your tellers to look at with suspicion?

9    A.    I'm telling you you're not going to get a hard

10   cutoff and it would never be shown in a policy.  We

11   wouldn't -- we wouldn't disqualify checks based on

12   something that simplistic.  It would have to be the

13   indicia taken as a whole.

14    Q.    Yeah, and I'm talking about one indicia, right.

15   This is one of the indicia that you indicate is an

16   indicator for fraud?

17    A.    Correct.

18    Q.    And my question is if Ms. Brown had come to the

19   bank three weeks prior than she did could she be --

20   could she rest assured that Harford Bank would not

21   consider that factor in believing her check was

22   fraudulent?

23           MR. MARDER:  Objection, form.

24    A.    Yeah, you're -- you're asking me a hypothetical

25   I'm not gonna be able to answer.  If you are, again,

1  asking me everything else on this check being the same

2  as it is right now would we exclude that particular item

3  from -- from consideration.  I don't know why we would

4  do that.  There's a preponderance of concerns here.

5       Q.   I'm asking you whether in these circumstances

6  had Ms. Brown arrived at this Harford Bank branch would

7  you expect your tellers to look at this check with

8  suspicion based on the date if she had arrived -- all

9  other factors being the same if she had arrived three

10 weeks prior?

11            MR. MARDER:  Matt, you've asked him this

12 question probably at least four or five times.  He's

13 answered your question at least four or five times.

14 You're now getting to the point where you are harassing

15 the witness.  You may not like the answer he's given but

16 he's given you his answer.

17            MR. MC MULLEN:  I think he's actually

18 refused to answer the question.  So asked and answered

19 requires an answer and I'd like an answer.

20            MR. MARDER:  I think he's given you the

21 answer and if you want to give it one more time,

22 Mr. Allen, please go ahead.

23       Q.   Yes, please, sir, the answer.

24       A.   So what I'm hearing is a question that is

25 saying given the fact that you have multiple potential

1    issues with this check would the date alone have changed

2    anything here.  And the answer is no.  No.  It could be

3    three weeks earlier, it could be -- if -- that in and of

4    itself is not the sole issue.

5        Q.    Right.  The date itself is not a determinative

6    factor here.

7                   MR. MARDER:  Objection, form.

8        Q.    Well, let me ask it this way, sir, all other --

9    do you -- do factors compound one another?  In other

10   words, if a font is off does that make the date more

11   suspicious?

12       A.    That's a fair question.  And yes, yes, you have

13   to get a general sense of what's going on with this

14   check.

15       Q.    Right.

16       A.    Any -- As I said before, any single one of

17   these things wouldn't necessarily be determinative, to

18   use your term, but in -- in the aggregate it causes

19   suspicion, sure.

20       Q.    And so if one factor in your analysis is

21   suspicious it can take another factor from being

22   unsuspicious to becoming suspicious, is that -- is that

23   my under -- is that a correct understanding of your

24   testimony?

25                   MR. MARDER:  Objection, form.

1      A.   I -- I think that's fair to say, yes.

2      Q.   Right.  For example, if a teller identifies

3   that a person's visual appearance is suspicious all the

4   other factors that the teller may identify can go from

5   being not suspicious to suspicious?

6      A.   So --

7              MR. MARDER:  Objection, form.  Go ahead.

8      A.   -- a suspicious visual appearance.  I'm not

9   sure I understand what that means.

10      Q.   We can cover that.  Also --

11      A.   Oh, I'm sorry.

12      Q.   -- an example you heard in Mr. Claffee's

13   testimony that Gail O'Keefe believed that the picture ID

14   of Sheira Brown did not match her personal physical

15   appearance.  Was that your understanding of his

16   testimony?

17              MR. MARDER:  Objection, form.

18      A.   Yes.

19      Q.   Do you agree with Gail O'Keefe's assessment on

20   that point?

21              MR. MARDER:  Objection, form.

22      A.   I felt from the beginning there was definitely

23   noticeable difference between the two photographs and

24   certainly enough to raise questions.

25      Q.   I'm excited to hear that from you.  But being

1  that's the case Mrs. Brown's appearance as she presented

2  to Harford Bank that -- that factor as identified by the

3  tellers could have made otherwise unsuspicious factors

4  become suspicious to you.  Is that your testimony?

5          MR. MARDER:  Objection, form.

6     A.   If our teller had reason to suspect that the

7  person attempting to cash the check was not the pay --

8  the payee then absolutely.

9     Q.   Okay.  Another factor, for example, identified

10  by Ms. O'Keefe is Sheira Brown's neighborhood.  You

11  heard that testimony, is that right?

12          MR. MARDER:  Objection, form.

13     A.   No, I don't agree with that -- that entire line

14  of conversation I did not agree with.

15     Q.   What about it didn't you agree with?

16     A.   Well, first of all, the -- the question was not

17  whether or not she lived in Owings Mills.  The question

18  was was she somebody who lives in our market area or our

19  trade area as you were referring to.  And that's what

20  they were talking about, number one.  Number two, Owings

21  Mills -- I don't know what your -- your data were there

22  but Owings Mills has some of the most -- some of the

23  most affluent residential areas in the state.  I don't

24  know where Ms. Brown lives and no one did.  So to -- to

25  characterize it like that no, I do not agree with that.

1    Q.   And so let's say you're Ms. Brown, Ms. Sheira

2  Brown.  You want to avoid suspicion from Harford Bank,

3  for example, right?  In that hypothetical knowing that

4  Harford Bank may consider your physical location of your

5  home address, is it your testimony -- how would Ms.

6  Brown avoid suspicion from Harford Bank being that

7  Harford Bank knows she's from Owings Mills?

8                MR. MARDER:  Objection, form.

9    A.   It sounds to me that the question presupposes

10 that the reason we didn't cash the check is because

11 she's from Owings Mills, and that's not the case.  It

12 was one of many factors.

13   Q.   Right.  And if she wants to avoid that factor,

14 consideration that she's out of your trade area, how

15 would she do that?  Is it your testimony she should just

16 avoid banks that aren't within her neighborhood?

17   A.   I don't -- she could have deposited the check

18 into her own bank.  That would have been a -- would've

19 been a logical way to handle that.

20   Q.   Right, to avoid suspicion from the Harford Bank

21 branch location she should have stayed within her own

22 bank and her own neighborhood, is that your testimony?

23   A.   No.

24                MR. MARDER:  Objection, form.  Mike,

25 you've just gotta pause.

1    A.   Yeah, no, that's not how I -- that's not what I

2    said, no.

3    Q.   What is it that your testimony is on this

4    point, how would Ms. Brown avoid suspicion of -- on

5    being outside the trade area?

6    A.   She could deposit the check into her own bank.

7    Q.   But not within your branch -- not within your

8    bank at that location, right?

9    A.   Again, presupposing that that was the reason

10   the check probably created suspicion.  And that alone

11   was not the reason for it.

12   Q.   But it was a factor, right?  Ms. Brown choosing

13   to bank at that location was a factor in suspecting her

14   of fraud?

15   A.   Along with all of the other factors, correct.

16   Q.   She should have stayed away from that bank if

17   she didn't want to avoid -- if she wanted to avoid

18   another indicia of fraud?

19            MR. MARDER:  Objection, form.

20   A.   Nobody's telling her she should have stayed

21   away from the bank.

22   Q.   Unless she wants to avoid one of your indicias

23   of fraud, is that true?

24            MR. MARDER:  Objection, form.

25   A.   If you're asking if that would avoid that

1  specific indicia of fraud if she deposited that check

2  into her own bank that would have avoided it, correct.

3      Q.   How would she have -- Well, isn't it true --

4  Well, the plain -- the way this has been

5  characterized -- and correct me if I'm wrong -- is that

6  Ms. Brown being outside of that branch's trade area is a

7  factor in considering her to be more suspicious, isn't

8  that true?

9      A.   That's correct.

10     Q.   My question to you then looking at that policy

11  is how would Ms. Brown avoid that indicia of suspicion?

12              MR. MARDER:  Objection, form.

13     Q.   Let's say she needs to cash the check and she

14  doesn't have a bank within her neighborhood.  Is it your

15  testimony that she must avoid Harford banks outside of

16  her immediate neighborhood?

17              MR. MARDER:  I'm sorry, may I have that

18  question read back.

19              THE REPORTER:  Okay, the question was:

20  Let's say she needs to cash the check and she doesn't

21  have a bank within her neighborhood.  Is it your

22  testimony that she must avoid Harford -- Harford banks

23  outside of her immediate neighborhood?

24              MR. MARDER:  Thank you.

25     A.   In -- In conjunction with all of the other

1   indicia she should -- that would -- that was yet another

2   factor that was causing suspicion.  So yes, that needed

3   to be avoided.

4       Q.   Right.  She needed to stay in her neighborhood,

5   is that right?

6                MR. MARDER:  Objection, form.

7       A.   That's not what I said.

8       Q.   What did you say -- I'm confused.  If Ms. Brown

9   -- Is there any world where Ms. Brown under these

10  circumstances could have presented to this branch

11  without raising this branch's suspicion?

12               MR. MARDER:  Objection, form.

13      A.   Given the combination of all of the elements

14  here it would've been difficult.

15      Q.   Right.  Ms. Brown needed -- on that particular

16  day with that particular check Ms. Brown needed to stay

17  away from that branch if she wanted to make a deposit,

18  right?

19               MR. MARDER:  Objection, form.

20      A.   That assumes that somebody else would have

21  negotiated that check then.  And somebody else would

22  have seen the same indicia that we saw.

23      Q.   Right.  Someone else should've considered that

24  check but she shouldn't have brought it to you, is that

25  right?

1          MR. MARDER:  Objection, form.

2     A.   No, I -- No, I'm not saying that.

3     Q.   Right.  And we agree she had a valid payroll

4  check.

5     A.   Correct.

6     Q.   So I'm gonna try to get an answer one final

7  time on this point.  If Ms. Brown wanted to avoid that

8  indicia of suspicion, the indicia of being outside that

9  branch location's trade area, how could she have done

10  that that day?

11     A.   Again, by utilizing her own bank.  It has

12  nothing to do with staying out of our trade area.  It

13  has everything to do with utilizing the avenues of -- of

14  banking that she had -- that she normally utilizes.

15     Q.   But not your bank that day?

16          MR. MARDER:  Objection, form.

17     A.   With everything that -- considering everything

18  that was going to be a challenge with all of the red

19  flags, yes.

20     Q.   Presenting to your bank in that trade area that

21  day raised her level of suspicion, is that true?

22          MR. MARDER:  Objection, form.

23     A.   It is true.  And I would qualify it by saying

24  not just our bank.  These are not unique to Harford

25  Bank.  These are standard --

1      Q.   Well --

2      A.   -- standard components of review.

3      Q.   And I'm asking you as an officer of Harford

4  Bank.  So it's your testimony the answer you just

5  provided is the position of Harford Bank, isn't that

6  right?

7               MR. MARDER:  Hey, Matt, I'm gonna object

8  at this point.  You're getting argumentative.  He's a

9  corporate representative.  The legal implications of his

10  answer are to be determined by the court, not by this

11  witness.  You have asked him this question over and over

12  and over.  And you seem to have a practice of wanting to

13  repeat your questions over and over when you don't like

14  the answers you're getting from Mr. Allen.  It is

15  getting to be harassing and you know you're not

16  permitted to harass the witness in a deposition.  You're

17  permitted to ask questions but not harass him.

18               MR. MC MULLEN:  Right.  I can ask the

19  question until I get an answer so I intend to do that.

20  If at any point we need to meet and confer as to whether

21  you're going to end the deposition let me know.  Your

22  objection is noted but I intend to get an answer to my

23  last question.

24               MR. MARDER:  You already got the answer

25  over and over.  And I'm getting to the point where we're

1    gonna have to have that meet and confer.

2                    MR. MC MULLEN:  Okay.

3                    MR. MARDER:  So what's your question?

4                    MR. MC MULLEN:  Let's read the question

5    back, please.

6                    THE REPORTER:  Your -- okay -- Your last

7    question was:  Right.  She needed to stay in her

8    neighborhood, is that right?

9                    MR. MC MULLEN:  And, I'm sorry, ma'am,

10   court reporter, I think my last question was to clarify

11   whether the witness's testimony was given as an officer

12   of Harford Bank.

13                   THE REPORTER:  Okay, hold on.  Sorry.

14                   MR. MARDER:  Yeah, that's -- I believe

15   that's right, that's the last question.

16                   THE REPORTER:  Okay, hold on please.

17   Okay, correct.  I'm asking you as an officer of Harford

18   Bank.  So it's your testimony the answer you just

19   provided is the position of Harford Bank, isn't that

20   right?

21                   MR. MARDER:  Objection, form.

22        A.   Yes.

23        Q.   Thank you, sir.

24                   MR. MC MULLEN:  I think this is probably a

25   good point to take a break, if you agree.  It's 3

1  o'clock your time, right around the hour.  Say five, ten

2  minutes?

3                      THE WITNESS:  Good, thank you.

4                      MR. MARDER:  Works for me.

5                      VIDEOGRAPHER:  We're off the record.  The

6  time is 3:07 p.m. eastern standard time.

7                      (Recess from 3:07 to 3:17)

8                      VIDEOGRAPHER:  We are back on the record,

9  the time is 3:17 p.m. eastern time.

10                      MR. MC MULLEN:  Thank you.

11      Q.   I want to take a -- to back up a moment and

12  talk about your experience a little more before we

13  return to the topic of the investigation.  I imagine

14  that you have some experience in crafting Harford Bank

15  policies or at least reviewing them, is that right?

16      A.   Correct.

17      Q.   For example, the adoption of the DDAP -- the

18  DDAMPERs guidelines for their incorporation in Harford

19  Bank policies, is that a decision you made, is that

20  something that predated you or can you tell me a little

21  bit about how a policy like that would be -- would have

22  been adopted and your involvement in that process.

23                      MR. MARDER:  Objection, form.

24      A.   DDAMPER is -- it's not a policy, it's a

25  procedure.  And it predated me.  It was in place when I

1    got here.

2         Q.    Right.   Your involvement in crafting the bank's

3    policies, are you involved in either creating, modifying

4    or adding to Harford Bank's policies?

5         A.    I am involved in it, yes.

6         Q.    Right.   Would you agree that in doing -- in

7    crafting bank policies it's important to understand the

8    social impact to the community of the -- of the policies

9    that a bank adopts?

10                  MR. MARDER:   Objection, form.

11        A.    Absolutely.

12        Q.    It's important also to understand the social

13   impact of policies when enforcing them, isn't that true?

14                  MR. MARDER:   Objection, form.

15        A.    In general terms, yes.

16        Q.    And so, for example, if new info -- if a policy

17   is created and new information comes out that would tend

18   to suggest that a particular policy is harmful to the

19   community, would you agree that that policy should be --

20   or at least the bank should consider modifying that

21   policy?

22        A.    Yes.

23        Q.    And would you agree that if an employee of

24   Harford Bank, for example, acts in a way that has a

25   particularly negative social impact and they do that

Page 52

1   within the course and scope of their employment, the
2   bank should be accountable for that?
3                MR. MARDER:  Objection, form.
4      A.   Yeah, I mean, that's an awfully broad question.
5   I -- I don't -- I don't know how to answer that.
6      Q.   Is that a yes or a no?
7                MR. MARDER:  Objection, form.
8      A.   Is there any way to rephrase that question?
9      Q.   You can help me rephrase the question.  Let's
10  -- let's try that.  What part of it is too broad for
11  you?
12               MR. MARDER:  Objection, form.
13     A.   So if -- if the bank was aware of an employee
14  behaving in such a way that was detrimental to the
15  general social good and did nothing about that, is that
16  a fair way to propose it or --
17     Q.   Well, I think so.  If -- if a -- so I'll try it
18  again.  If a bank employee acts in a way that has a
19  negative social impact and does so in the course and
20  scope of employment at the bank, should the bank take
21  accountability for those actions?
22               MR. MARDER:  Objection, form.
23     A.   Yes.
24     Q.   And are you familiar with the -- you would --
25  you saw the testimony with Mr. Claffee, I asked him the

1   same question.  Are you familiar with the disparities

2   and treatment between White Americans and Black

3   Americans when they encounter police?

4            MR. MARDER:  Objection, form.

5       A.   Yes.

6       Q.   You probably saw -- well, you were there for

7   it, the testimony and the exhibit shown to Mr. Claffee

8   regarding the statistic that Black people in the United

9   States are 3.23 times more likely to be killed when

10  compared to their White counterparts when they interact

11  with the police.  You saw that testimony?

12      A.   I did.

13      Q.   I won't show you the study unless you need to

14  consolidate, you've already seen it obviously.  And

15  is -- is that your recollection that that's what the

16  study purported?

17            MR. MARDER:  Objection, form.

18      A.   Yes.

19      Q.   Were you aware of statistics tending to show

20  that fact?

21            MR. MARDER:  Objection, form.

22      A.   Aware of specific statistics?  I can't say that

23  I'm -- I'm well-versed in it but certainly the concept,

24  absolutely.

25      Q.   Right.  And I think that's the important part,

1    the concept.   Which Harford Bank policies -- being that

2    you're aware of that -- address when to call the police

3    on a customer?

4                    MR. MARDER:   Objection, form.

5        A.   As far as a policy is concerned I don't believe

6    it's specifically addressed in a policy.

7        Q.   And which Harford Bank training deals with --

8    employee training deals with when and why to call the

9    police?

10       A.   All retail staff understand that if they feel

11   they are under threat in any way they are to call the --

12   the police immediately.

13       Q.   And is there a training that imparts that

14   wisdom on them?

15       A.   I'd have to get details on that.   We have a

16   security officer that -- that trains in the branches on

17   a routine basis.   And I'd have to get the whole

18   curriculum of what he's administering, yeah.

19       Q.   I understand.   The security officer, remind me

20   of his name, if you don't mind.

21       A.   Mitchell Lindsey.

22       Q.   And you've heard the testimony of Mr. Claffee

23   earlier.   He referred to a practice at Harford Bank

24   wherein if a teller suspects a check of being fraudulent

25   that it would be expected that Mr. Claffee and

1    Mr. Lindsey are contacted in some way.  Is -- Is that

2    consistent with your understanding of the practice?

3         A.    Absolutely.

4         Q.    Is that policy identified in any of the

5    documents that you reviewed in preparing for your

6    testimony today?

7         A.    Yes.

8         Q.    And if you can, what's the name of that -- of

9    that document?

10        A.    It may not be one that you have.  It's a doc --

11   I don't remember the name of it, honestly.  It's a

12   document that we put together in the past year as we

13   revamped our processes here.

14        Q.    And when you say it's not one that we have, it

15   wasn't produced in discovery?

16        A.    I think we produced a lot of the information

17   back from when -- at the time of the event itself so

18   this was not in existence at that time.

19        Q.    Fair enough.  And the policy you're referring

20   to that -- that went into place after the fact -- after

21   the fact of this incident, that is, would it be fair to

22   say that this is a now written policy that at the time

23   of this incident was an unwritten policy?

24        A.    I would agree except I'd use the word procedure

25   rather than policy, yes.

1    Q.   Fair enough.  And so the -- the writing that

2    you're referring to being now in existence codifies a

3    pre-existing procedure, is that right?

4    A.   Correct.

5    Q.   Okay.  How many pages is that document?

6    A.   It's short, two pages.  Just a list of

7    procedures.

8    Q.   Do you have that document with you today?

9    A.   I have it in my materials.  I don't have it in

10   front of me.

11   Q.   If it's in your materials is it in the room

12   with you now?

13   A.   Yes.

14   Q.   Would you be willing to show us that document,

15   just hold it up for the camera please.

16   A.   (Witness complies).

17   Q.   Right.  And actually that document may have

18   been produced in discovery so -- and I'll show that to

19   you so you can confirm.  I'll summarize a little bit of

20   Mr. Claffee's testimony, I just wanna confirm that all

21   of it is accurate as to Harford Bank.  Harford Bank is a

22   Maryland bank, is that right?

23   A.   Right.  It's a member of the FDIC state

24   chartered bank, correct.

25   Q.   Okay, it's -- it's got bran -- ten branches, is

Page 57

1    that right?

2         A.    Correct.

3         Q.    And 80 employees?

4         A.    Probably 90 but in that range.

5         Q.    Eighty to -- let's say 80 to 95-ish employees?

6         A.    Correct.

7         Q.    And of those employees about how many of them

8    are in the retail banking operations?

9         A.    About half, 40 to 45.

10        Q.    Is there any data on -- well, we'll back up a

11   little bit.  We understand that there are policies in

12   place for -- or at least procedures or policies in place

13   at Harford Bank for what to do when a check is suspected

14   of fraud, is that right?

15        A.    Correct.

16        Q.    Is there -- Does Harford Bank collect data on

17   how often checks are refused under suspicion of fraud?

18        A.    We do not.

19        Q.    Is there data on how often Harford Bank

20   confiscates the check under suspicion of fraud?

21        A.    Not to my knowledge.

22        Q.    We talked during Mr. Claffee's deposition about

23   this branch location.  Can you identify the branch

24   location as you would identify it by name?

25        A.    Yeah, it's the Joppa branch in Joppatowne,

1    Maryland.

2        Q.   So if I refer to it as the Joppa branch that's

3    a familiar term for you, is that right?

4        A.   Correct.

5        Q.   You heard testimony about a trade area and you

6    heard Mr. Claffee testify about that as well.  Do you

7    have your own definition of trade area?

8        A.   Similar to what he said, a five to ten mile

9    radius around -- around the branch.

10       Q.   And can you define for us, at least your

11   definition, of a trade area when you use the term?

12       A.   It's the -- the area upon which that branch

13   team would focus when it comes to business development

14   efforts.  And the area where you'd see most account

15   opening activity adjacent to the branch.

16       Q.   Thank you.  And you just put -- the phrase I

17   had been looking for this morning.  Trade area is a --

18   is a term of art.  And tell me if I'm wrong, a trade

19   area is a term of art that is used in your industry to

20   describe a target area for business development, is that

21   about right?

22       A.   It's about right, yeah.  It's a footprint.

23       Q.   In this particular bank -- branch -- in the

24   case of this particular branch, the Joppa branch, do you

25   have an opinion as to what the trade area would be for

1    that branch?

2              MR. MARDER:  Objection, form.

3      A.   Specifically which towns or -- I'm not sure I'm

4    following.

5      Q.   Well, do you have an opinion about what the

6    trade area would be for Joppa branch?

7              MR. MARDER:  Objection, form.

8      A.   Yeah, I do.

9      Q.   And what is that opinion?

10             MR. MARDER:  Same objection.

11     A.   Yeah, I -- so, I mean, literally describing

12   what I view the trade area as being is -- is Joppatowne

13   proper, although the residential development and the

14   retail development that -- that is surrounding that

15   coming out into route 40 going up into -- into really

16   the -- sort of the southern part of Edgewood as well.

17     Q.   Okay.  Turning back to the March 19th incident.

18   We discussed who you interviewed in preparation for your

19   deposition, correct me if I'm wrong.  We have Mr. Brian

20   Claffee is one of the individuals you interviewed, is

21   that right?

22     A.   Correct.

23     Q.   We also have Dean Jager who you identified, is

24   that right?

25     A.   Correct.

1    Q.    And Mr. Claffee prepared a report, is that

2  right?

3    A.    Correct.

4    Q.    Mr. Jager provided a report, is that right?

5    A.    Correct.

6    Q.    You identified an individual with the last name

7  Tull, is -- is that -- is that familiar to you?

8    A.    Yeah.  Our head of HR, yeah.

9    Q.    Right.  Did the head of HR prepare a report as

10  well?

11    A.    I'd have to go back and look.  It wasn't

12  anything formal.  What I wanted him to do was to not be

13  part of the -- I -- I wanted him to have a little softer

14  approach to it and not be part of the inquisition that I

15  knew we were kind of throwing on these folks when --

16  when Dean and Brian went out.  So I wanted Calvin to go

17  out and just have some softer conversations.  I -- He

18  didn't do a formal report.  He may have provided me with

19  some notes.

20    Q.    Are the notes with you here today?

21    A.    No, I'd have to look for those.  I don't know

22  where they would be right now.

23    Q.    And Mr. Tull interviewed the same individuals

24  that Mr. Claffee and Mr. Jager interviewed, is that

25  right?

1       A.   As I recall, yes.

2       Q.   Do you recall Mr. Tull interviewing anyone who

3  Mr. Claffee and Mr. Jager did not interview?

4       A.   No.

5       Q.   You also believe -- Well, you did your own

6  investigation, right?  Is that right?

7       A.   Correct.

8       Q.   Did you prepare your own report?

9       A.   I did not.

10       Q.   Okay.  We'll go to Mr. Claffee's report which

11  is Harford Bates 18.

12            MR. MARDER:  Matt, are you gonna mark this

13  separately for -- as an exhibit to this deposition?

14  What's your plan on that?

15            MR. MC MULLEN:  I would suggest having it

16  separately identified.  If you have a preference then --

17            MR. MARDER:  I'm fine with that, too.

18            MR. MC MULLEN:  Yeah, we can just identify

19  it as an exhibit.  I think it's -- we're on Exhibit 3.

20            MR. MARDER:  Yep, that looks right.

21       Q.   (BY MR. MC MULLEN)  And, Mr. Allen, you can let

22  us know what you need in terms of being able to identify

23  this report.  We can scroll up or zoom in, whatever you

24  need.

25       A.   I'm fine.

1    Q.   Do you recognize this document?

2    A.   I do.

3    Q.   And who prepared this document?

4    A.   Brian Claffee.

5    Q.   We touched on this a minute ago.  It's your

6 opinion that this report is missing material pertinent

7 to the incident, is that right?

8    A.   Correct.

9    Q.   Is the missing material information that you're

10 identifying now in a different report?

11    A.   I -- I'd have to go back and look at Dean

12 Jager's report.  I simply don't recall.  It's been a

13 while since I've read that one.

14    Q.   Sure.  Other than Mr. Jager's report is there

15 another report that may have this material, pertinent

16 information?

17    A.   There -- There shouldn't be any other report.

18    Q.   Okay.  And so there are no reports -- well, let

19 me put -- let's ask it this way.  If Mr. Jager's report

20 does not contain this material information that you're

21 referring to as having been missing from Mr. Claffee's

22 report, that information is not contained in any report

23 that Harford Bank generated out of this incident, is

24 that -- is that accurate?

25    A.   To my knowledge that's correct.

1    Q.   Okay.  And like I said, we'll review

2   Mr. Jager's report to -- to see if we can identify if

3   that missing material information is in that.  You --

4   Mr. Claffee testified that -- that you had asked him to

5   prepare this report.  Is that your recollection?

6    A.   Correct.

7    Q.   We had a general timeline from Mr. Claffee that

8   he had prepared this report over the course of likely

9   not more than 30 days.  Does that sound accurate to you?

10    A.   Oh, yeah, it was no where near that long.  Yes.

11    Q.   Do you have an estimate on the time it took to

12   prepare this report?

13    A.   I don't recall but I can tell you we started in

14   on all of this the next morning, the morning of the

15   20th.

16    Q.   And would it be fair to say the report was sent

17   your direction within a week?

18    A.   I don't remember but it wouldn't have been much

19   longer than that.  We -- We needed to get this all put

20   together.  So I just don't remember if it was shorter or

21   longer but if it was longer it wasn't much longer.

22    Q.   Fair to say not longer than two weeks after

23   March 19th of 2020?

24    A.   Yes, I think that's fair to say.

25             MR. MC MULLEN:  And if we can scroll down

1   the document.

2       Q.   (BY MR. MC MULLEN)  I don't see a date as to

3   when it was transmitted to you.  Do you see anything --

4   any indication as to when you would have received this

5   document?

6       A.   No, he handed me a hard copy.

7       Q.   Understood.  We're gonna look at the

8   description that Mr. Claffee prepares -- prepared of the

9   incident here.  It begins incident -- incident began

10  around 5 p.m.  We'll walk through some of the same

11  things that we walked through with Mr. Claffee.  And if

12  you need to you can clarify anything that you feel is

13  material based on your investigation.  The first

14  sentence is Sheira presented -- Sheira, the plaintiff in

15  this case, presented a check to be cashed by Jasmine.

16  Did I read that correctly?

17      A.   Correct.

18      Q.   It notes Sheira is not a known person to the

19  bank.  Is that right?

20      A.   Correct.

21      Q.   I understand your testimony to be that that

22  circumstance, whether or not Sheira is a -- is a known

23  person to the bank is one of the indicia of Ms. Brown's

24  check being fraudulent.  Do you share that opinion?

25                  MR. MARDER:  Objection, form.

1    A.    Yes.

2    Q.    And can you explain why being a known person to

3    the bank is important to Harford Bank.

4    A.    Harford Bank is a community bank.  And the vast

5    majority of our customers are in the immediate vicinity

6    of our larger footprint.  The Olive Branch is a

7    significant employer in the area and obviously a

8    significant customer of the bank.  So we have -- we know

9    a lot of the folks that would be coming to cash payroll

10   checks.  So the reference to not a known person is to

11   that they had not seen Sheira Brown before to come in

12   and -- and cash one of the Olive Branch payroll checks.

13   Q.    Okay.  We'll return to the exhibit that we

14   showed Mr. Claffee on this point.  I'm looking for the

15   number here.  One moment.  This would be Harford Bates

16   number 2, Harford Bank Check Cashing Guidelines and

17   Check Fraud.

18              (Document on screen)

19              Mr. Allen, are you familiar with this

20   document I'm showing you?

21   A.    From our earlier conversation, yes.

22   Q.    Right.  And I know -- this is -- up at the top

23   here the process that we reviewed with Mr. Claffee and

24   I'm reviewing now is that -- I think it's your testimony

25   that that's a -- it's called a DDAMPER process, is that

1    right?

2         A.    Right.

3         Q.    And does this document put in writing Harford

4    Bank's application of the DDAMPER process?

5         A.    It's a summary of it, yes.

6         Q.    Is there another document that needs to be

7    consulted other than this document for the DDAMPER

8    process as would have been in place by Harford Bank on

9    March 19th of 2020?

10        A.    I -- I think so but I need to under -- I --

11   this just doesn't look familiar to me.  So I'm not sure

12   why we produced this one.  And I've -- I've got

13   something that looks different so we may have two

14   different things here.

15        Q.    Do you have the thing that looks different in

16   front of you now?

17        A.    Well, I have it in a folder here, yeah.  So

18   I've got -- it's got a cover sheet of -- of an outline

19   of training days.  And then it goes basically day by

20   day.  And the DDAMPER is included in this learning

21   objectives day two.

22        Q.    Do those documents have Bates numbers on 'em?

23        A.    I'm sorry, do they have?

24        Q.    Bates numbers on the bottom.

25        A.    Yeah, these are from 2019.

1      Q.    I'm sorry, do they have --

2            MR. MC MULLEN:  If we can pull the --

3      sorry, the exhibit back up to show Mr. Allen what I'm

4      referring to when I say Bates numbers.

5            (Document on screen)

6            Down at the bottom.

7      Q.    You see, Mr. Allen, down here at the bottom

8      right corner it says Harford underscore 2?

9      A.    Yes, I see that.

10     Q.    And the documents you are looking at in terms

11     of the DDAMPER policy, do those documents have a Bates

12     number?

13     A.    No.

14     Q.    Is it your understanding those -- have those

15     documents been produced in discovery?

16     A.    I -- I don't know.  I thought they had but this

17     isn't what I had.

18     Q.    Understood.  So in preparation for your

19     deposition today you have not reviewed Harford 2, this

20     document that I'm showing you now?

21     A.    This one no, but I think the contents are

22     similar.

23     Q.    And this was produced by Harford Bank in

24     discovery.  Do you have any reason to believe this

25     document is not a Harford Bank guide for employees?

1     A.   I do not.  I have no reason to believe that

2  it's not.

3     Q.   Okay.  I'm gonna continue to reference it.  And

4  we'll take a look at whether we have that other

5  document.

6          MR. MARDER:  Hey, Matt -- Matt, look at --

7  I think Harford 66 is where that starts.

8          MR. MC MULLEN:  Excellent.

9          MR. MARDER:  And then you'll see another

10  reference -- if you look at Harford 69 you'll see the

11  DDAMPER section.

12          MR. MC MULLEN:  Excellent.  We can take a

13  turn at that in a little bit here.

14     Q.  (BY MR. MC MULLEN)  Okay, Mr. Allen, to zoom up

15  here -- I'm sorry.  Well, scroll up.  I'll let you take

16  as much time as you need to review this document.

17     A.   It looks -- it looks consistent with what we

18  have in other areas, yes.

19     Q.   You would agree that in the document there is

20  no reference to whether a customer is known to the bank

21  as being an indicia of fraud?

22     A.   In this document, that is correct.

23     Q.   You would agree that in this document there is

24  no indicia -- there is no indication that -- whether a

25  person who presents a check to Harford Bank and is not a

1   customer is an indicia of fraud?

2       A.   That is correct.

3               MR. MC MULLEN:   If we can return to

4   Mr. Claffee's report.

5               (Document on screen)

6       Q.   Mr. Allen, I'll go on in this description here.

7   It says the picture ID did not match -- didn't match in

8   her opinion.   That's referring to Jasmine Brown's

9   opinion, is that right?

10      A.   I believe that is correct, yes.

11      Q.   It's also ultimately going to be, as it turns

12  out, Ms. Gail O'Keefe's opinion, is that right?

13      A.   I believe so, yes.

14      Q.   In your investigation --

15              MR. MC MULLEN:   If we can zoom -- or

16  scroll up to the photographs, the comparison of the --

17  Ms. Brown's ID.

18      Q.   The photograph on the left is a -- is a copy of

19  Ms. Sheira Brown's drivers license.   Is -- Is that your

20  understanding?

21      A.   Yes.

22      Q.   And the photo -- photograph on the right is a

23  still image from video that was taken of Ms. Sheira

24  Brown at the Joppa location on March 19th of 2020, is

25  that your understanding?

Page 70

1      A.    Yes.

2      Q.    In your investigation -- Well, in what ways did

3  Gail O'Keefe believe that Ms. Brown's presentation on

4  March 19th differs from her drivers license?

5      A.    The hair was the obvious difference, obviously.

6      Q.    Right.  Any others?

7      A.    I -- I don't remember what Gail was -- was

8  thinking at that time.  I can't answer.

9      Q.    Did Gail relay to you any other reasons aside

10  from Ms. Brown's hair?

11      A.    I don't -- I don't -- My recollection was it

12  was obviously the hair.  And she just did not think that

13  it was the same person.  I mean, it was the extent of

14  the conversation.

15      Q.    Just to be clear, she didn't relay any other

16  facial differences to you as to the difference between

17  these two -- these two images?

18      A.    I don't recall her going into that level of

19  detail, no.

20      Q.    Did you ask her for any detail as to the

21  differences that she noticed?

22      A.    No, because when I was talking to her I had

23  these in front of me.  So I could -- I immediately

24  understood why she had some question about whether or

25  not these were the same people.

1    Q.    Why did you immediately understand that?

2    A.    The -- The difference in hair is pretty

3    compelling.

4    Q.    But do you identify a difference in her facial

5    features at all?

6    A.    I do potentially.  I mean, it's hard -- you get

7    an odd angle on -- on Ms. Brown on the right side but I

8    think the facial shape is different between the two.

9    Q.    Describe that facial shape difference for me.

10   A.    Well, I think you've got a narrower face on the

11   left and a broader face on the right.  Now, you know, is

12   that perspective?  I don't know.  But just looking at

13   what I have I think there's a question about it.

14   Q.    That wouldn't have anything to do with the way

15   this was put into the report?  You understood obviously

16   that you can change the dimi -- the height and width of

17   an image when you put it in the report, right?

18   A.    I just saw it.

19   Q.    Right.

20   A.    I do not believe that to have been done or done

21   intentionally in any way, no.

22   Q.    Okay.  And so you think Ms. Brown's head was a

23   little wider that day, is that -- is that accurate?

24   A.    I think this photograph compared to that

25   license has enough question between the two features

1    that I think it's legitimate to ask is that actually

2    that person.

3        Q.    What else is indicia that the way Ms. Brown

4    presented that day is different than her drivers license

5    photo?

6        A.    Well, I think it's pretty much everything you

7    see right there.  I'm -- I'm not sure -- you mean what

8    else in the photograph?

9        Q.    You said that it was immediately obvious to

10   you.  I'm just looking for all the reasons that it was

11   immediately obvious.

12       A.    Yeah.  Well, I said it was immediately obvious

13   to me based on the hair difference.  That is gonna grab

14   your attention for sure.  Upon -- upon closer inspection

15   you see differences between the two facial structures

16   there.

17       Q.    What are the differences in the two facial

18   structures?

19       A.    As I just said, the face on the left side on

20   the license seems to be narrower.  On the right side it

21   seems to be more full.

22       Q.    Are there any other facial structure

23   differences that you identify?

24       A.    No.

25       Q.    Are there any -- other than the hair difference

1  and the -- what you say is the facial structure

2  difference, are there any other differences between

3  those two images?

4      A.   Not -- Not upon first glance, no.

5      Q.   And Gail O'Keefe did not identify for you any

6  other differences, right?

7      A.   I did not ask her to and she did not identify,

8  correct.

9      Q.   Right.  Because you felt it was immediately

10  obvious in your opinion?

11      A.   I thought it was immediately obvious that there

12  was a question in my opinion, yes.

13      Q.   Did Gail O'Keefe ask Ms. Brown for a second

14  form of photo identification?

15      A.   Not to my knowledge.

16      Q.   Did Ms. O'Keefe tell -- tell you whether she

17  saw Ms. Brown in person?

18      A.   At this point?

19      Q.   When she made the decision that -- or the --

20  when she created her opinion that Ms. Brown looked

21  different than her photo ID, was that based on her --

22  well, let me back that up.  We are -- You and I are

23  looking at a -- an image that was generated by video of

24  Ms. Brown on that date, correct?

25      A.   Correct.

1    Q.   But Ms. O'Keefe would not have been basing her

2  decision on that video, I assume, is that accurate?

3    A.   Correct.

4    Q.   What -- So my question is do you have an

5  understanding whether Ms. O'Keefe visually saw Ms. Brown

6  that day?

7    A.   Yes, she was standing right next to Jasmine

8  Brown and they were both looking out at -- at Sheira

9  Brown.

10   Q.   Right.  And so now that we know that the person

11 pictured in the drivers license photo here on the left

12 is, in fact, Sheira Brown, it's fair to say that Ms.

13 O'Keefe would not have accurately noticed a facial shape

14 difference, right?

15           MR. MARDER:  Objection, form.

16   A.   I don't -- I wouldn't draw a conclusion like

17 that.  I have no idea.  I don't know if -- I don't know.

18 You've got -- you've clearly got a difference here.  And

19 you -- you mentioned a wig today.  I never -- that never

20 even occurred to me.  So I -- I don't know what changes

21 Sheira Brown may have gone through.  I -- I don't have

22 an answer.

23   Q.   Right.  My question then is for Gail O'Keefe to

24 have noticed a difference in the facial structure of Ms.

25 Brown, Ms. Brown would have to have a different facial

1   structure on March 19th of 2020 than she did when she

2   took her drivers license photo, isn't that right?

3               MR. MARDER:  Objection, form.

4     A.   Perhaps or perhaps there's an angle problem

5   with the drivers license photo.  I don't know how to

6   answer.

7     Q.   Understood.  Gail O'Keefe didn't ask Ms. Brown

8   for a second form of photo identification, isn't that

9   right?

10     A.   Not to my knowledge.

11     Q.   She could have, isn't that right?

12     A.   She could have, yes.

13     Q.   Did she attempt to inquire with Ms. Brown about

14   any of the other identifying information on the drivers

15   license?

16     A.   I don't know the answer.

17     Q.   For example, Ms. O'Keefe could have -- having a

18   copy of Ms. Brown's drivers license photo she could've

19   asked her what her date of birth was, isn't that right?

20     A.   She could have, yes.

21     Q.   But she did not, is that your understanding?

22     A.   I don't know the answer.  I don't -- I was not

23   there.

24     Q.   You don't -- Ms. O'Keefe did not indicate to

25   you that she did that, right?

1   A.   She did not indicate to me that she did that,

2   that's correct.

3   Q.   She also didn't identify to you that she asked

4   Ms. Brown to confirm her address as listed on the

5   drivers license while in possession of her drivers

6   license, is that right?

7   A.   That's correct.

8   Q.   She also didn't ask Ms. Brown to explain why

9   her hair may look different than on her drivers license,

10  is that right?

11  A.   Not to my knowledge, correct.

12  Q.   And we actually have no report that we can

13  refer to wherein Gail O'Keefe shares with us that she

14  asked Ms. Brown any clarifying questions that day on

15  March 19th of 2020, is that true?

16            MR. MARDER:   Objection, form.

17  A.   To my knowledge, no.

18  Q.   Right.   Ms. -- Ms. O'Keefe didn't ask Ms. Brown

19  any clarifying questions before the police were

20  contacted, is that right?

21  A.   Well, we've skipped some steps -- steps there

22  but to my knowledge I -- really I don't know.   I don't

23  know what the exchange was during that period of time so

24  I can't answer that with certainty.

25  Q.   If she did ask any clarifying questions of

1    Ms. Brown those were not included in any of the reports

2    from Harford Bank, correct?

3         A.   Correct.

4         Q.   And you did not reveal that in your

5    investigation, correct?

6         A.   Correct.

7         Q.   Does the DDAMPER procedure identify how to note

8    the differences in a person's visual appearance versus

9    their identification?

10        A.   No, I'm not sure how you could do that.

11        Q.   For example, if there are -- well, skeletal

12   differences in the face could -- does the DDAMPER

13   process -- procedure identify what those would be?

14        A.   No.

15        Q.   Is it fair to say that the DDAMPER procedure as

16   outlined by Harford Bank leaves it up to a bank teller

17   to determine that a person does not appear as they do in

18   their -- in their ID?

19        A.   The teller is the first line of defense.  And

20   as you saw here, if the teller has questions the teller

21   is instructed to then turn that over to an assistant

22   branch manager or a branch manager who then is

23   responsible for making those determinations.

24        Q.   Can we agree that a person's -- as you

25   testified earlier I believe -- and correct me if I'm

1   wrong -- one of these factors raising suspicion for a

2   teller can have the effect of making other indicia more

3   suspicious to that teller under the Harford Bank

4   procedure, is that accurate?

5              MR. MARDER:  Objection, form.

6      A.   I think that's fair to say.

7      Q.   So, for example, if Ms. Brown changed her hair

8   between the time that she took her drivers license photo

9   and when she presented to Harford Bank on March 19th of

10  2020, that difference in her visual presentation would

11  have raised -- would have made other indicia more

12  suspicious to the Harford Bank teller?

13     A.   Potentially.

14     Q.   We agree that individuals of all -- of all

15  types will change their hair from time to time, right?

16     A.   Correct.

17     Q.   You and I have quite short hair, but I think

18  folks who have longer hair do that more frequently,

19  isn't that right?

20     A.   Correct.

21     Q.   Weight changes from day to day and -- is that

22  right?

23     A.   Correct.

24     Q.   And, fortunately, we don't have to update our

25  drivers license photo every year, is that right?

Page 79

1    A.   Correct.

2    Q.   And so we agree that a teller who is looking at

3  a drivers license photo is necessarily going to be

4  seeing a change in hair or a change in weight, isn't

5  that right?

6            MR. MARDER:  Objection, form.

7    A.   Correct.

8    Q.   Where does Harford Bank draw the line where a

9  person's hair is more suspicious -- has become

10 suspicious versus just a routine change in hair?

11   A.   Again, that assumes that that change alone

12 would result in whatever, not cashing the check.  And

13 that would not -- that would not necessarily be the

14 case.

15   Q.   But to raise suspicion under that indicia under

16 whether a person, in this case Sheira Brown, looks

17 different than her ID how different can the hair be, at

18 what point should the teller decide this is routine?

19   A.    And I think if we're looking to codify that

20 we're fighting a losing battle.  We won't have -- at

21 some point our staff needs to make a determination as to

22 whether or not they're confident that they are giving

23 our depositors' money to the right person.  And that's

24 part of their job.  That's part of what they're trained

25 to do.

1  Q.   Okay.  And so this is another factor, Sheira

2  Brown's presentation on March 19th of 2020, and the

3  difference in -- Gail O'Keefe's perceived difference in

4  that between her drivers license where that factor alone

5  does not raise suspicion, it must be combined with other

6  indicia, is that accurate?

7  A.   I think it's fair -- I think it's fair to say

8  it raises suspicion.  But when it comes to being the --

9  a direct -- a direct reason for not cashing the check it

10 almost always is in conjunction with other -- other

11 issues.

12 Q.   Before we leave this point we agree, though,

13 that there are no Harford Bank policies which describe,

14 for example, how to visually recognize a face and

15 compare it to a drivers license, is that right?

16 A.   That is correct.

17 Q.   So on that point it is ultimately up to Gail

18 O'Keefe to make that determination, is that right?

19 A.   As an indicia of fraud, yes.

20        MR. MC MULLEN:  If we can look at -- I

21 think we're actually already looking at it.  If we can

22 scroll down -- I'm sorry -- to --

23 Q.   (BY MR. MC MULLEN)  I just wanna touch on -- we

24 touched on it briefly earlier.  This -- this check

25 presented by Sheira Brown, according to Gail O'Keefe and

1   according to Jasmine Brown, has different fonts, is --

2   is that your understanding of what they perceived that

3   day?

4        A.   The exact words Gail used when she -- when I

5   first spoke to her the next day is that it had different

6   sizes and fonts all over the check.

7        Q.   Okay.  Different sizes and different fonts, is

8   that right?

9        A.   (Witness nods head).

10       Q.   The entries by ADP where -- well, can you

11  identify for me where the font changes -- and I'm not

12  talking about font sizes, we'll talk about that second.

13  Where are the different fonts on this -- on this check?

14       A.   I'm -- I'm no font expert so I don't know that

15  I could -- should point out anything more to you than

16  what Brian Claffee pointed out to you earlier today.

17       Q.   Would it be --

18       A.   I'm sorry, go ahead.

19       Q.   Do you have more to add?

20       A.   Well, I would also -- I would also point out

21  that the issue here was the different print all over

22  this check.  People may be using a term font that may or

23  may not have been intentional, I don't know.  That's

24  what Gail told me, but the gist of it was this is a

25  classic case of -- of a suspicious item because of all

1    the different size print all over this.

2         Q.    Right.   But I think you said that the exact

3    words of Ms. O'Keefe were different sizes and fonts, is

4    that right?

5         A.    Correct.

6         Q.    And so my question is where is Ms. O'Keefe

7    seeing different fonts on this check?

8         A.    I don't know the answer to that.

9         Q.    Ms. O'Keefe does not receive from Harford Bank

10   any training on identifying font differences, does she?

11        A.    I don't know the -- I -- I don't know.   I don't

12   know the answer.

13        Q.    Did Ms. -- well, you don't know whether Harford

14   Bank provides Ms. -- or provided either Jasmine Brown or

15   Gail O'Keefe with training to identify what -- whether

16   the fonts are different here?

17               MR. MARDER:   Objection, form.

18        A.    Yeah, I -- I don't know specifically that font

19   is studied or if -- if it's a little broader differences

20   in the printing on a check is what's focused on.   I

21   don't know.

22        Q.    You reviewed Harford Bank policies in

23   preparation for today, didn't you?

24        A.    Correct.

25        Q.    Do any of those policies describe how -- how to

1    distinguish between different fonts on a check?

2        A.   Not that I --

3                  MR. MARDER:  Objection, form.

4        Q.   I'm sorry, I didn't catch the answer.

5        A.   Not that I saw, no.

6        Q.   And as far as you're aware Ms. -- Ms. O'Keefe

7    is not trained in identifying the differences in fonts,

8    right?

9                  MR. MARDER:  Objection, form.

10       A.   Ms. O'Keefe was in her job for 44 years.  I

11   have no idea what her training had been in the past.

12       Q.   Well, my question was just whether you're aware

13   that -- are you aware of any training she received on

14   that point?

15                 MR. MARDER:  Objection, form.

16       A.   I am not aware of any training.

17       Q.   And, in fact, it's entirely possible that where

18   it says Sheira Brown under paid to the order of and the

19   address below here, as well as the numbers, are all the

20   same font with maybe different sizing and -- and perhaps

21   some of it is bold, isn't that fair to say?

22                 MR. MARDER:  Objection, form.

23       A.   It's -- It's fair to say it.  I wouldn't say it

24   that way 'cause you're skimming right over the -- the

25   suspicious parts of this check.

1     Q.   What are the suspicious parts of the check

2   exactly?

3     A.   So you've got -- you've got the Olive Branch

4   Italian Grill in one size up there.  You've got Sheira

5   Brown in a completely different size.  It's a sure fire

6   tipoff right there to keep looking at this thing.  Then

7   you go down and you see Sheira Brown again in yet

8   another size here.  And Harford Bank I guess is the same

9   size as Olive Branch, I suppose, but there's all kinds

10   of differences here that are classic triggers to -- to

11   be attentive.

12     Q.   That's interesting.  So ADP which is the

13   organization that printed this check -- does Harford

14   Bank print its own check -- its own employment checks

15   through ADP?

16     A.   We do not.  We do not.

17     Q.   You're familiar with ADP?

18     A.   Oh, of course.

19     Q.   It's a well-known payroll company, isn't that

20   right?

21     A.   Absolutely.

22     Q.   And in this case it is your opinion as the

23   president of Harford Bank that ADP has printed a

24   classically looking fraudulent check, is that right?

25               MR. MARDER:  Objection, form.

1      A.    That is correct.

2      Q.    We'll come back to that.  The font sizes I

3  think we can see.  You cannot identify font types --

4  differences in font types here, can you?

5      A.    Not confidently, no.

6      Q.    Okay.

7            MR. MC MULLEN:  Let's see, I think we are

8  at another hour mark.  Can we take five, ten minutes

9  again?

10            MR. MARDER:  Sounds good.  Hey, Matt, for

11  planning purposes how much more do you think you have?

12  Again, not holding you to it.

13            MR. MC MULLEN:  Sure.  Let's see how

14  long -- it's been about two hours.  Ninety minutes.

15            MR. MARDER:  All right, see you in about

16  ten.

17            VIDEOGRAPHER:  Okay, we're off the record,

18  the time is 4:11 p.m. eastern time.

19            (Recess from 4:11 to 4:23)

20            VIDEOGRAPHER:  We are back on the record,

21  the time is 4:23 p.m. eastern time.

22            MR. MC MULLEN:  Thank you.

23      Q.    Mr. Allen, just to return to the exhibits,

24  Mr. Claffee's report.  I wanna see if I can understand

25  the font differences item before we go on to a different

Page 86

1    topic.

2                    MS. TYROCH:  One second, Matt, sorry.

3                    MR. MC MULLEN:  Not a problem.

4                    (Document on screen)

5        Q.    Okay, Mr. Allen, this -- and I understand from

6    this report this is the copy of Ms. Brown's -- the check

7    that's at issue in this case, is that your

8    understanding?

9        A.    It is.

10       Q.    And I wanna try to understand what you're

11   identifying as classic indi -- indications from the font

12   that this check is suspicious.  Is that -- And did I

13   just characterize that correctly, the font differences

14   are classic indicators of possible check fraud?

15       A.    Depending on how we're defining font.  The

16   print differences are the indicators.

17       Q.    How do you distinguish font and print?

18       A.    Well, I think my -- listen, for me, again,

19   font -- I'm not a font expert.  So I don't know if that

20   Harford Bank print, for example, is different -- a

21   different font than the cash amount there written out.

22   I don't -- I don't know the answer to that.  What I do

23   know is that you've got different print sizes and

24   different -- you've got bold in some places, no bold in

25   some places and multiple different print sizes.  And

1    that is a classic indicator of a red flag.

2        Q.   Is there an important distinction between

3    saying this is a font difference and saying this is a

4    print difference?

5        A.   I would -- again, I don't know what Gail meant

6    by difference in print size and fonts, but my guess is

7    there's very little difference between the two except

8    for the fact that you've got things in bold and you've

9    got things not in bold, and you definitely have multiple

10   sizes of print here.  And that was the point she was

11   making.

12       Q.   And so I'll get your understanding of those

13   differences.  We can look at the top left corner.  Let's

14   just use the way these two addresses are printed.  We

15   can see Olive Branch Italian Grill at the Aberdeen,

16   Maryland address up at the top there.  Compare that to

17   Sheira Brown at the Owings Mills, Maryland address.  In

18   your opinion or at least your understanding of these

19   classic indicia of fraud, is that a significant enough

20   difference to -- to become what you would categorize as

21   classic -- a classic indicia of fraud?

22       A.   Definitely a red flag.  Absolutely, yes.

23   Absolutely.

24       Q.   And can you explain for the jury how you see --

25   what are we looking for when we look -- when we compare

1  these two things and determine that it's a classic

2  indicia of fraud?

3      A.   We're looking for things that -- that may not

4  have appeared on a check that was not altered.  And

5  oftentimes if somebody is altering a check they're not

6  matching up print exactly the same way.  So we look --

7  that's -- that's one of the main things we're looking

8  for, how does the print on the check look, is it

9  consistent with the rest of the print on the check.

10     Q.   Fair to say if the -- and -- and I don't wanna

11 mischaracterize your testimony.  Is it your testimony

12 that if the print is not exactly the same between the

13 Olive Branch address here and the -- and the Sheira

14 Brown address down below how do I -- how do I know when

15 this rises to the level of suspicion just based on those

16 two addresses?

17     A.   Yeah, you don't just based on those two

18 addresses, but now what you have are two different print

19 sizes.  So now you've gotta be -- you've gotta be alert,

20 could something be wrong with this item.

21     Q.   And you would -- you would consider that a

22 classic red flag?

23     A.   Absolutely.

24     Q.   Okay.  Is there anything else I can look to to

25 determine whether this is a classic red flag other than

1   what you've just described?

2      A.   Yes.   The continued difference in print sizes

3   throughout the instrument.

4      Q.   Right.   If you have different print sizes,

5   different fonts in the check, it's classically, in your

6   opinion, fraudulent?

7      A.   Potentially.   Potentially fraudulent, correct.

8      Q.   Would these two addresses alone in your opinion

9   be sufficient to raise a red flag?

10      A.   Just the two addresses?  Not nec -- not -- just

11   alone I would say no.   Just that in and of itself --

12   again, this is a combination of red flags.

13      Q.   Do you have -- how many changes would you be

14   looking for when you -- before this becomes suspicious

15   under that red flag category?

16      A.   It depends on what the changes are.   There's no

17   way to codify that.   In this case, as I said before,

18   that Harford Bank right there would have drawn my

19   attention immediately.   So even regardless of what that

20   print size is on that -- and it is a lot smaller than

21   anything else -- that's got -- that's got my interest

22   because that's another kind of classic example there.

23   They -- they would have a hard time replicating our

24   logo.   So that might be the first place you'd see

25   somebody try to cut a corner if they were trying to

1   replicate a check.

2       Q.   Understood.   The font sizes being different is

3   an important consideration under -- under your analysis,

4   is that right?

5       A.   Correct.

6       Q.   And so you wanna see as few font size

7   differences as possible if you're trying to avoid

8   classic indicia of fraud?

9       A.   Ideally.

10      Q.   Okay.   Let's take a look at exhibit -- the

11  Harford 11.

12                  (Document on screen)

13      Q.   And I wanna take a look at the Olive Branch

14  Cafe, LLC check.   Are you familiar with these printed

15  checks?

16      A.   I am, yes.

17      Q.   And this is from Harford Bank's own vendor,

18  isn't that right?

19      A.   Correct.

20      Q.   Now, taking a look at the top address here we

21  have one font compared to the Aberdeen address down

22  below.   That's a significant font difference, can we

23  agree?

24      A.   Correct.

25      Q.   Is that a classic indicia of fraud?

1    A.   It's less so for me primarily because you've

2  got the appropriate Harford Bank insignia and address

3  there, so I'm less concerned than I am -- than I would

4  be with up at the top.

5    Q.   Okay.  If we didn't have the logo in the left

6  corner would this font difference raise a red flag?

7    A.   I think it would certainly -- it certainly

8  makes you look at it more carefully.

9    Q.   Right.  And it's different, for example, than

10  the section that says paid to the order of.  That is

11  a -- is a third different font on this check, isn't that

12  right?

13    A.   I -- I -- I guess so.  I can't tell if that's

14  the same -- I guess -- I don't know.  Could it -- I

15  don't know if that's the same as the address up above or

16  not.

17    Q.   Is -- You think that the Olive Branch Cafe, LLC

18  print is -- is the same as the pay to the order print?

19    A.   Well, that definitely is not the same, the

20  address -- I guess the address is a little bit bigger

21  than that paid to the order of.  So yes, that would be

22  different.

23    Q.   And all three of those print types are

24  different than the Aberdeen office print type there,

25  isn't that right?

Page 92

1      A.    Correct.

2      Q.    It's also different than the PO Box 640 print

3   there, isn't that right?

4      A.    Uh-huh.

5      Q.    So we've got five different print types on this

6   check, isn't that right?

7      A.    We do.

8      Q.    And that's a -- is that also five classic

9   indicia of fraud on this check?

10      A.    Potentially except that I'm not as concerned

11   about these checks, which is why you can't codify these

12   things.  When I look number one, you've got the dollars

13   written in here which was yet another indication on the

14   check above that it was missing.  So we've got that,

15   we've got the date the account was opened next to the

16   account holder.  And again, we've got the logo on here.

17   So to my eyes that check is much less suspicious than

18   the one above it.

19      Q.    You say much less suspicious but it retains

20   some suspicion, right?

21      A.    Well, it would have to be filled in.  I -- you

22   know, just -- just looking at this based on its own you

23   -- it's hard -- it's hard to say.  Are there differences

24   in font size?  There are.  So you can kind of keep that

25   fact tucked in the back of your mind but you'd have to

Page 93

1    see how this is filled in and so on.

2        Q.   Understood.

3             MR. MC MULLEN:  We can pull that exhibit

4    down and we'll move along to -- let's see.  I wanna look

5    at Harford Bank's interrogatory responses in this

6    matter.  Leslie, could you pull that up.

7             MS. TYROCH:  Matt, do you have the Bates

8    on that one?

9             MR. MC MULLEN:  I can -- You know what, I

10   can pull that up, I think.  I'll pull it up here, one

11   moment.

12            MS. TYROCH:  Got it.  Apologizes.

13            MR. MC MULLEN:  No problem, if you have it

14   we can -- we can share it.

15               (Document on screen)

16       Q.   I want to -- Mr. Allen, are you familiar with

17   this document here?

18       A.   I am.  It's been a while since I looked at it

19   but I am.

20       Q.   You contributed to the information that's

21   contained in this document, isn't that right?

22       A.   Correct.

23       Q.   In the response to interrogatory number one I

24   think you're identified as having assisted in answering

25   these interrogatories.  Did I get that right?  And it's

1   gonna be on the bot -- the bottom of page 2 and the top

2   of page 3.

3       A.   Okay.

4       Q.   I'll just read it and you can confirm if the

5   contents are accurate.  It says:  The following persons

6   assisted in answering these interrogatories, Michael F.

7   Allen, president of Harford Bank is listed.  And that's

8   -- that's you, is that -- is that accurate?

9       A.   Correct.

10      Q.   I wanna look at number -- interrogatory number

11  9, which I just wanna touch on this and confirm that

12  I've got an understanding of -- of this answer.  And the

13  answer here is the color of the check.  And you can read

14  it along, let me know if you need to see anything else.

15  It says:  Subject to and without waiving these

16  objections, the color of the check presented by

17  plaintiff appeared inconsistent with the color of checks

18  from this account holder.  Is that -- Did I read that

19  accurately?

20      A.   Correct.

21      Q.   The -- When it says that you assisted in

22  preparing this answer is this an answer you assisted in

23  preparing?

24      A.   Yes.

25      Q.   So when you say the color of the check

1   presented by plaintiff appeared inconsistent, can you

2   tell me in what way it appeared inconsistent?

3       A.   The multiple colors of the check made it look

4   like it was faded.  And it was a -- it was a color that

5   Gail O'Keefe did not recognize as a check drawn on the

6   Olive Branch company's.

7       Q.   What other ways was the check inconsistent in

8   color?

9       A.   The color.  The blue to red to blue it looked

10  to her like it must have been faded or something.  It

11  was not a check that she was used to seeing coming from

12  Olive Branch.

13      Q.   Are there any other ways in which the check

14  appeared inconsistent as far as Gail O'Keefe reported to

15  you?

16      A.   You mean besides what we've already discussed?

17      Q.   Correct.  I just want an exhaustive list.

18      A.   I think that's the extent.

19      Q.   And to clarify, it says from this account

20  holder.  Is that -- Was Gail O'Keefe comparing this

21  check to other checks from the account holder?

22      A.   I -- I don't know exactly what she did there so

23  I can't answer that question.

24      Q.   And correct me if I'm wrong, I -- I think it's

25  your testimony, and again this is not a trick question,

1   that your understanding of the color discrepancy issue

2   is actually contained within the check itself.  It's

3   what you said was the perceived fading of this check,

4   not necessarily comparing it to another check but just

5   within this check there looks to be, as Gail O'Keefe

6   might say, fading?

7      A.   She has access to images of the checks from

8   this customer.  So whether -- if she was doing it from

9   memory or she actually went back in and compared it,

10  again, I don't know but she said it was inconsistent

11  with what Olive Branch checks looked like.

12     Q.   And if she did it from anything other than her

13  memory she did not share that information with you, is

14  that right?

15     A.   We didn't -- she didn't offer it and I didn't

16  ask, correct.

17     Q.   Your investigation did not reveal that she had,

18  in fact, gone in to check whether this check matched up

19  with any other checks from this account holder?

20     A.   I did not look specifically for that.  We know

21  we don't print checks of that color so it -- it wouldn't

22  have occurred to me to ask that question.

23     Q.   Right.  And so your investigation did not

24  reveal that Ms. O'Keefe had actually compared this check

25  to another check when she did determine that the color

1   of this check was off, is that my under -- correct

2   understanding?

3       A.   Correct.

4       Q.   There are no other explanations that you

5   revealed in your explanation as to why Ms. O'Keefe

6   believes this color of the check was off?

7       A.   Not to my knowledge, no.

8       Q.   Let's -- So -- And we, of course, understand

9   and I believe you've testified already, correct me if

10  I'm wrong, that this check turned out to be a valid

11  payroll check for Sheira Brown as printed by ADP?

12      A.   Correct.

13      Q.   So why did Harford Bank fail to identify that

14  this, in fact, is a valid check that Ms. Brown was

15  presenting on March 19th of 2020?

16              MR. MARDER:  Objection, form.

17      A.   Because we talked to the account holder who

18  told us it was not a valid check.

19      Q.   All right.  And the factors that led to calling

20  the account holder turned out to -- turned up incorrect

21  information, right?

22              MR. MARDER:  Objection, form.

23      A.   Eventually.

24      Q.   Gail O'Keefe was, in fact, the reason that the

25  account holder or the -- what Harford Bank believed was

1    the account holder was called, right?

2         A.    Gail O'Keefe was following standard practice,

3    yes.

4         Q.    Had Gail O'Keefe not made a mistake in her --

5    what she identified as indicia of fraud, the account

6    holder would not have been contacted, right?

7                   MR. MARDER:   Objection, form.

8         A.    That is correct.

9                   MR. MC MULLEN:   Let's take a look at --

10   back at -- it's actually Harford 118.   It's in the

11   exhibit.

12                  (Document on screen)

13        A.    And, Mr. Allen, you can ask us to move down so

14   we can see all of the pages of this document.

15                  MR. MARDER:   Are you marking this as an

16   exhibit, Matt?

17                  MR. MC MULLEN:   I will be.

18        A.    I'm fine with it.

19        Q.    Thank you.

20                  MR. MC MULLEN:   If we can go to the page

21   of the -- it's -- it's Harford Bates 122 --

22        Q.    Well, to back up, this document that we

23   scrolled through can you explain for me what is this

24   document.

25        A.    Yeah, that's what I've shown you earlier.   This

1    is the -- this is the procedure for if you believe you

2    have a fraudulent item, yeah.

3         Q.    Okay.  And Gail O'Keefe would've had access to

4    this document on March -- in March of 2020?

5         A.    No, this was done after that.

6         Q.    Okay.  The document we reviewed earlier

7    containing the DDAMPER procedure I think you identified

8    it as, that's the document that Gail O'Keefe would've

9    had --

10        A.    Correct.

11        Q.    -- is that right?  But this document I think we

12   agreed was an attempt to sort of get in writing what

13   the -- what the understood practice was all along at

14   Harford Bank, is that fair to say?

15        A.    It is, yes.

16        Q.    We would note on here number 2B asks that

17   employees be sure to exhaust all avenues of check

18   verification, is that right?

19        A.    Correct.

20        Q.    Why is that factor or why is that bullet point

21   in the procedure important?

22        A.    That's our policy.  That's our procedure and it

23   always has been.

24        Q.    And why is it important?

25        A.    We want to make sure that we are giving our

1   depositors' money to the right person first and

2   foremost.

3       Q.   Is there any other reason?

4       A.   I'm not sure what you're looking for.

5       Q.   Well, are there any other reasons for

6   exhausting all avenues of check verification?

7       A.   To make sure we're doing it properly, make sure

8   we're handling the instrument properly.

9       Q.   Right.  To avoid falsely identifying something

10  as fraudulent when it is, in fact, not fraudulent, for

11  example?

12      A.   That might --

13           MR. MARDER:  Objection, form.

14      A.   That would be one reason.

15      Q.   Correct.

16      A.   To make sure that we're safeguarding our

17  depositors' money.

18      Q.   Sure.  And I want to point to number 4 as well.

19  It says, if the customer becomes upset and demands the

20  check be cashed or returned to them by the bank -- I'm

21  sorry, I misread that.  Number 4 says, if the customer

22  becomes upset and demands the check be cashed or

23  returned to them, the check may be returned to the

24  customer but not cashed.  Did I read that accurately?

25      A.   Correct.

1    Q.   And so was this policy in place at the time,

2  whether or not it was written, was this policy in place

3  at the time of March of 2020?

4    A.   It was but we wanted to stress this after that

5  particular incident, because what we do not wanna be

6  doing is putting our employees or anybody -- or other

7  customers at risk in the event of -- of another event

8  like this.

9    Q.   It's important to make sure and it had been

10 important that the check needed to go back -- if the

11 customer asked for the check back that the check be

12 returned, right?

13   A.   That was not the top priority.  The top

14 priority has always been to hold onto that item if you

15 can because if we know or confidently believe that it's

16 fraudulent we don't want to aid in somebody's ability to

17 go to either of our other branches or another bank and

18 negotiate it.  So if we can hang onto it we try to.  And

19 we do not wanna do that at the risk of anybody's safety.

20   Q.   You were very confident that Ms. Brown's check

21 was fraudulent that day, weren't you?

22   A.   Absolutely.

23   Q.   But that confidence was misplaced, wasn't it?

24   A.   I don't believe --

25          MR. MARDER:  Objection, form.

1    A.   I don't believe anywhere in here it says that

2    we will be 100 percent correct, but when our customer

3    tells us to please not give that check back that's our

4    obligation.

5    Q.   Right.  And so it's clear, Gail O'Keefe and

6    Jasmine Brown could have returned to Sheira Brown her

7    check when she asked for it back, couldn't they?

8                    MR. MARDER:  Objection, form.

9    A.   They could have but it would not have been the

10   preference.

11   Q.   Whose preference?

12   A.   The bank's preference.  As I just said, if we

13   believe -- particularly when we were just told by the

14   maker -- the owner of the account that it's not a valid

15   check we don't wanna be aiding somebody in negotiating

16   that instrument.

17                   MR. MC MULLEN:  Let's go to Harford -- if

18   we can take that exhibit down.  It's gonna be 112.

19                   MS. TYROCH:  You said 012?

20                   MR. MC MULLEN:  I think it's 000112.  And

21   I can find it if --

22                   MS. TYROCH:  I don't have that one here.

23                   MR. MC MULLEN:  It's right here.  I'm

24   incorrect, it's 00012.  Apologies.

25                   (Document on screen)

1          Yes, that's the one.

2     Q.   (BY MR. MC MULLEN)  Mr. Allen, this was the

3  other report I believe we referenced, one that was

4  generated by Mr. Jager, is that -- and I'll let you look

5  through it as much as you need to.  Let us know whether

6  you need to --

7     A.   Yeah, if you could just scroll down 'cause I

8  may have misspoken earlier.  If you can scroll down to

9  pages -- or the next couple of pages.

10    Q.   Yes, sir.

11    A.   Is there any more on this, is that it?  Oh.

12    Q.   I have that this runs from 4 -- 000012 to

13 000017.

14    A.   Okay, okay.  I had mentioned that I'd asked

15 Calvin Tull to do so -- you know, an informal review.

16 And I was thinking maybe I confused it with this but I

17 don't think I did so we're good.

18    Q.   Sure.  And that's because Calvin Tull was

19 copied on this report, is that correct?

20    A.   Yes, exactly.

21    Q.   Is it -- And is it your understanding that

22 Calvin Tull may have contributed to this report or just

23 that he was copied on it?

24    A.   Yeah, again if the -- I don't know if he

25 contributed to this and I don't think he did but

1    Calvin's inquiry was much more -- much softer.  He

2    wasn't trying to run down specific facts.  He was doing

3    -- he was trying to do what I was trying to do which is

4    basically find out what -- was there anything more

5    behind this than just a series of misunderstandings

6    here.  And that was what he was trying to do.

7        Q.    Understood.  I just have a few questions on

8    this report.  Is this the report -- and we'll return to

9    the -- our discussion about Mr. Claffee's report.  You

10   had identified that Mr. Claffee's report may have been

11   missing some material details.  Is this the report that

12   would contain those material details?

13       A.    It's been a while since I looked at it.  I -- I

14   don't recall.

15       Q.    If you need to we can have you read it again

16   and perhaps it refreshes your memory as to those

17   material details.

18       A.    Yeah, so I, mean, again we were looking -- I

19   don't think the expectation of -- with either of these

20   reports is that Dean or Brian were expected to list

21   every anomaly of the check.  So the items that I pointed

22   out that I -- I didn't agree with or I thought were

23   missing -- not necessarily missing from Brian's report

24   but weren't -- weren't mentioned are the same -- they're

25   not mentioned here either.  There's no real specifics in

1   this one about what was wrong with the check.

2        Q.   Right, this -- neither report generated by

3   Harford Bank contains the material details you believe

4   were missing from Gail O'Keefe's analysis?

5        A.   I think that's correct.

6        Q.   The -- I have -- I just have some clarifying

7   questions about this report.  There's a third paragraph

8   here, it starts with Ms. Brown requested her check back.

9   It says, Ms. Brown requested her check back, however,

10  the branch manager refused.  Isn't that refusal in

11  contradiction to the policy we just described wherein if

12  Ms. Brown wanted her check back she should be provided

13  it?

14            MR. MARDER:  Objection, form.

15       A.   Yeah, don't -- so again, the intent is not to

16  give the check back because they want it.  The intent is

17  if they're going to cause -- if they cause a threat to

18  anybody then we should give that check back and we'll

19  deal with it another way.

20       Q.   Right.  Harford Bank's concern there has

21  nothing to do with whether Ms. Brown can access her

22  payroll funds, it's entirely different than that, is

23  that right?

24            MR. MARDER:  Objection, form.

25       A.   Harford Bank's duty was to make sure that it

1    was giving its money or its depositors' money to the

2    proper person.

3         Q.    This report goes on to say, Ms. Brown then

4    contacted her boss to clear up the misunderstanding.  Is

5    that right?

6         A.    Correct.

7         Q.    And that didn't help Ms. Brown's circumstances

8    at least with Harford Bank, right?

9         A.    Nobody knew there were two bosses here.

10        Q.    Right.  And Ms. O'Keefe did not inquire of Ms.

11   Brown whether she could assist with that in order to

12   resolve the issue, right?

13        A.    Well, understand, Ms. O'Keefe, I believe, did

14   not even know there was an Owings Mills location of

15   Olive Branch at that point.  So as far as she knew she

16   had already talked to the boss.

17        Q.    And she didn't go -- she didn't take the step

18   of asking Ms. Brown for any clarification on that point,

19   right?

20        A.    Not to my knowledge, no.

21        Q.    She could've done that but she did not, is that

22   right?

23              MR. MARDER:  Objection, form.

24        A.    Correct.

25        Q.    It says, unfortunately the branch manager went

1   about closing the branch and the teller secured her

2   teller drawer in the main cash vaults with Ms. Brown's

3   check in her cash drawer.  Is that your understanding of

4   what transpired based on your investigation?

5        A.   Yes.

6        Q.   Why is that series of events unfortunate?

7        A.   I couldn't tell you other than it -- it

8   exacerbated the situation but the procedure was followed

9   to the T.

10       Q.   Is it your opinion it was not unfortunate?

11       A.   Well, if -- if by unfortunately he meant that

12  just fanned the flames yeah, no, I agree, that's

13  unfortunate that that happened but did everybody follow

14  procedures here correctly?  They did.

15       Q.   And Ms. Brown having brought to Harford Bank

16  her payroll check could have been left -- well, in fact,

17  was left unable to pay for her groceries, right?

18            MR. MARDER:  Objection, form.

19       A.   I don't have that knowledge.

20       Q.   If that's the case this is unfortunate because

21  Ms. Brown was put in a position where she was desperate

22  as a result of Gail O'Keefe and Harford Bank's actions,

23  isn't that right?

24            MR. MARDER:  Objection, form.

25       A.   I don't know how desperate she was.  What I do

1  know is that our account holder said it was not a valid

2  check.

3      Q.   But that doesn't -- the effect on Ms. Brown

4  does not factor into your concerns here.

5              MR. MARDER:   Objection form.

6      A.   I wouldn't characterize anything like that.

7  If -- if Ms. Brown was desperate because of that I feel

8  for her, absolutely.

9      Q.   Correct.

10     A.   Our duty was to our -- was to our account

11  holder not to give a check to somebody that we couldn't

12  verify.

13     Q.   And -- and ultimately choose not to return it

14  to Ms. Brown, right?

15     A.   Well, I -- why would we do that?  If we -- if

16  we now are virtually one hundred percent certain that

17  this is a fraudulent item why in the world would we give

18  it to somebody to go commit a crime somewhere else.

19     Q.   At the point -- and we agree that the check was

20  placed into this vault on March 19th of 2020, right?

21     A.   Correct.

22     Q.   Also on March 19th of 2020 the police did their

23  own investigation and they determined that the check

24  was, in fact, valid, isn't that right?

25     A.   Correct.

Page 109

1    Q.   All right.  And Gail O'Keefe did not do her own

2  investigation to determine that the check was valid,

3  isn't that right?

4              MR. MARDER:  Objection, form.

5    A.   She absolutely did.  She called the account

6  holder.

7    Q.   Well -- And based on that she determined that

8  the check was invalid, right?

9    A.   Correct.

10   Q.   And that determination was false?

11             MR. MARDER:  Objection, form.

12   A.   The account holder, our customer, told us to

13  hold the check.  That's -- I don't know what else we

14  were supposed to do.

15   Q.   Well, and the clarification I'm seeking on this

16  is that Mr. Claffee testified that perhaps Ms. Gail

17  O'Keefe independent of what the police officers

18  responding to the incident did, maybe she did her own

19  investigation and ultimately turned up that the check

20  was valid.  Is -- Do you have any information to believe

21  that Gail O'Keefe did that at all?

22   A.   I'm not --

23             MR. MARDER:  I'm gonna object to the form

24  of the question.  Go ahead.

25   A.   I'm not sure -- I'm not sure I understand

1   how -- the reference to Mr. Claffee.  Could you say that

2   again.

3       Q.   Sure.

4            MR. MC MULLEN:  Let's scroll to -- it says

5   at approximately 5:18 Deputy Corteel, that paragraph.

6            (Document on screen)

7       Q.   And so without making a comment on

8   Mr. Claffee's testimony on this, because I think it was

9   clear, it says that at approximately 5:18 p.m. Deputy

10  Corteel of the Harford Sheriff's Office.  It goes on to

11  say Deputy Corteel called Mr. Claffee and informed him

12  that he was able to verify that Ms. Brown was, in fact,

13  an employee of the restaurant and worked at another

14  location.  And that goes on to the next page.  And it

15  says on to another location they own in Reistertown,

16  Maryland.  Mr. Claffee informed the deputy that the

17  check was locked in the vault and could not be retrieved

18  until the following morning.  Mr. Claffee provided his

19  cell phone number to the deputy and asked him to share

20  it with Ms. Brown and asked for her to call him in the

21  morning so that he could return the check to her.  Did I

22  read that correctly?

23      A.   Correct.

24      Q.   And that is -- based on your investigation is

25  that your understanding of what unfolded?

1     A.    Correct.

2     Q.    So my question is -- I just -- ultimately the

3    check was returned to Ms. Brown, right?

4     A.    Correct.

5     Q.    Other than the verification provided by this

6    police officer that he had done an investigation and

7    determined that the check was, in fact, valid, is there

8    any other basis for which or by which Harford Bank

9    relied upon in determining that it was safe to release

10    the check to Ms. Brown?

11     A.    I don't know the answer to that.  You asked

12    that question earlier.  I don't know aside from the

13    police talking to the other manager in Reistertown, I

14    don't know what transpired between that night and the

15    next morning when Ms. Brown arrived.  I don't know

16    what -- if Gail -- I just didn't inquire of it.

17     Q.    Right.

18     A.    I was told the next morning that the check was

19    good so that's what I went on.

20     Q.    And all I wanna clarify is in terms of your

21    investigation is that we, based on this investigation,

22    have no other source for confirming that -- or at least

23    for how it was confirmed that this check was, in fact,

24    valid, right?

25     A.    To my knowledge, correct.

1    Q.   And did this responding officer have more

2    information than Gail O'Keefe had when he performed his

3    investigation?

4              MR. MARDER:   Objection, form.

5    A.   We had different information.

6    Q.   What was that information?

7    A.   It was --

8              MR. MARDER:   Objection, form.

9    A.   Sorry.  That there was a second location of

10   this restaurant with a manager to whom -- who she was

11   referring to as her boss.  My understanding is Gail did

12   not even know there was a second location.

13   Q.   Right.  At the beginning of Gail's

14   investigation and at the beginning of this officer's

15   investigation isn't it true that Gail had more access to

16   information than the officer did?

17             MR. MARDER:   Objection, form.

18   A.   As far as Gail knew she had access to the only

19   information by talking to the sole signer on the

20   account.

21   Q.   The difference I think we can probably agree is

22   that the off -- the responding officer's investigation

23   began with an interview with Ms. Sheira Brown, right?

24             MR. MARDER:   Objection, form.

25   Q.   Is that right?

1     A.    Correct.

2     Q.    And that Ms. O'Keefe did not do an interview of

3  Ms. Brown, is that right?

4     A.    Correct.

5     Q.    In fact, your investigation did not reveal that

6  at any point Ms. O'Keefe asked Ms. Brown any questions

7  about the circumstances, is that right?

8     A.    My investigation, correct.

9     Q.    Correct.  There's one additional page on this

10  report, I think it's Bates 13.  I think it's page 3 of

11  this report.  It's the -- it's up at the top here.  It

12  says, it was not until the next day that Ms. Brown was

13  able to get the check back.  It says, although this

14  result -- was resolved the following day the teller

15  should not have locked the check in the main cash vault

16  and should have turned it over to the police for

17  investigation.  Do you agree with that statement?

18     A.    I absolutely disagree with that statement.

19     Q.    Why do you disagree with that statement?

20     A.    A couple of reasons.  Number one, the -- the

21  teller should have locked the check.  Our policy --

22  every bank's policy is to take the teller work at the

23  end of the day and put that in the vault and lock it up.

24  And this was part of the teller work.  Number two, the

25  police -- it would have been turned over to the police

1   for investigation had we still believed it was a

2   fraudulent item.  That would have been the next day.

3       Q.   Why does this report indicate that the teller

4   should not have locked the check in the main cash vault?

5       A.   Because he's misinformed.

6       Q.   Did you ever communicate to Mr. Jager that --

7   as to this point, he's misinformed?

8       A.   I had no reason to argue with him.  I didn't

9   agree with it then, I don't agree with it --

10              MR. MARDER:  Mike, I think you hit your

11  mute button.

12              THE WITNESS:  Sorry, I had somebody

13  revving an engine up here.

14      A.   I did not.  I had no reason to argue with him.

15  I had no -- I had no reason to argue with him, I didn't

16  agree with him and I don't agree with him now.  I just

17  -- I wasn't gonna -- I wasn't going to tell him to

18  change his report, let's put it that way.

19      Q.   Why not?

20      A.   I didn't want there -- I wanted these to be

21  clean reports.  These stand on their own.  I don't agree

22  with that statement but I can tell you with one hundred

23  percent certainty these gentlemen did independent

24  reviews on what happened here.  I never wanted there to

25  be any question about that.

1    Q.   And Mr. Jager, remind me of his position with

2  Harford Bank.

3    A.   At the time he was head of compliance.  He's

4  since -- he's since left the bank.

5    Q.   Okay.  And so fair to say that in March of 2020

6  Harford Bank's head of compliance and Harford Bank's

7  president did not agree whether the check should have

8  been locked in the -- in the main cash vault that day?

9    A.   That is correct.

10         MR. MC MULLEN:  Let's see, we're at about

11  another hour mark.  I don't have much left.  Can we take

12  a ten minute break, reconvene and I'll finish up?

13         MR. MARDER:  All right, see you in ten

14  minutes.

15         VIDEOGRAPHER:  Okay, we are off the

16  record.  The time is 5:06 p.m. pm eastern time.

17         (Recess from 5:06 to 5:17)

18         VIDEOGRAPHER:  We were back on the record,

19  the time is 5:17 p.m. eastern time.

20    Q.   A few final questions for you, Mr. Allen.  Is

21  it Harford Bank's position that Gail O'Keefe and Jasmine

22  Brown did everything correctly on March 19th of 2020 and

23  March 20th of 2020?

24         MR. MARDER:  Objection, form.

25    A.   They followed proper procedures, yes.

1    Q.    Did they do that 100 percent correctly?

2    A.    I think when it comes to following procedures I

3    would say that they followed the procedures so, yes.

4    Q.    And Harford Bank created new procedures -- new

5    written procedures following that day, correct?

6    A.    Correct.

7    Q.    If that's the case why did -- if it is the case

8    that Gail O'Keefe and Jasmine Brown followed all

9    procedures correctly, why was it necessary to add new

10   procedures to deal with circumstances like this one?

11   A.    I thought it was prudent to add new procedures

12   here.  And mainly in large part because of the potential

13   threat that -- that resulted from this.  And I thought

14   it was important that we be very careful and do

15   everything we can to avoid the aftermath that we had

16   with this.

17   Q.    Let's cover all the ways this was a potential

18   threat to Harford Bank.  In what way was this situation

19   a potential threat to Harford Bank?

20   A.    Well, the immediate threat was to our employees

21   at the branch who were -- who felt very threatened that

22   night.

23   Q.    Is that revealed in either of your reports?

24   A.    No, not on my reports, no.

25   Q.    What other ways was this a potential threat to

1    Harford Bank?

2        A.    The continued concern about the safety of the

3    people in that branch in particular after the aftermath

4    of the -- of the fallout the next actually several

5    months, frankly.

6        Q.    And what other ways was this a potential threat

7    to Harford -- Harford Bank?

8        A.    I think that's quite enough.

9        Q.    Were there any other ways that this was a

10   threat to Harford Bank?

11       A.    I'm not thinking of anything else right now.

12       Q.    Right.  No one at Harford Bank was actually

13   harmed as a result of this incident, right?

14       A.    Correct.

15       Q.    I'm glad for that.  And isn't it true, though,

16   that the instigation for this event started with Gail

17   O'Keefe?

18               MR. MARDER:  Objection, form.

19       A.    I would not agree with that, no.

20       Q.    Who did it begin with?

21       A.    I wasn't there.  My understanding is that --

22   that the -- the ugly aspect of this whole event was

23   started by -- by Sheira Brown.

24       Q.    How did -- Well, we can talk about that then.

25   What could Ms. Brown have done differently on March 19th

1      of 2020 to avoid Ms. O'Keefe's suspicion?

2          A.   Um, I don't know.  It certainly was a -- it was

3      a confluence of events that were very unusual.  It was

4      the first night we had shut -- it was the eve -- it was

5      the first day we had shut down the branches to branch

6      traffic.  We had the day before and that afternoon both

7      times had -- had spent time talking to our branch teams

8      alerting them to the fact that, among other things, it's

9      likely that we'll see heightened attempts at fraud

10     because people are gonna be transacting remotely now

11     through the drive-thrus.  So we literally then had a

12     meeting about an hour-and-a-half before this event took

13     place where they -- they had been told be extra vigilant

14     right now because we expect heightened fraud attempts

15     here.  So, you know, between that and all the -- all the

16     items we've discussed here with the check ID and

17     everything else we may have not been able to avoid that

18     time.

19         Q.   (BY MR. MC MULLEN)  Ms. Brown if she had wanted

20     to avoid -- and I'm gonna object to the nonresponsive

21     portion of that answer.  But if Ms. Brown wanted to

22     avoid Gail O'Keefe's suspicion there was, in fact,

23     nothing she could have done that day?

24              MR. MARDER:  Objection, form.

25         A.   Well, I would begin with by -- by saying

1    Jasmine Brown was the first one to be suspicious and

2    then handed it to Gail O'Keefe.  So both of our staff

3    were suspicious at that point.  It was enough there that

4    it had two people on alert.  So again, given -- given

5    everything under consideration here could it have been

6    avoided?  Maybe not.

7         Q.   Should Ms. -- should Sheira Brown have not

8    changed her appearance prior to going to Harford Bank?

9         A.   That's not for me to say.

10        Q.   Should she have -- Well, I think you've

11   identified there's nothing that she could have done to

12   avoid Ms. O'Keefe's suspicion, correct?

13             MR. MARDER:  Objection, form.

14        A.   Given -- again, given everything that we have

15   there it would have been difficult.

16        Q.   Right.  And because Ms. Brown's check was valid

17   this should have been a simple transaction at Harford

18   Bank, right?

19             MR. MARDER:  Objection, form.

20        A.   I -- No, it wouldn't have been regardless --

21   again because of everything we've discussed this

22   afternoon.

23        Q.   We can agree that Ms. Brown in her experience

24   with Harford Bank would have been -- being that she had

25   a valid check it would have been humiliating for her?

1             MR. MARDER:  Objection, form.

2      A.   Yeah, I don't know if humiliating but certainly

3  upsetting.

4      Q.   Right.  It would have been embarrassing to have

5  her payroll check which was valid denied, isn't that --

6  isn't that fair to say?

7             MR. MARDER:  Objection, form.

8      A.   It certainly would have been confusing.

9      Q.   Would it have been embarrassing?

10            MR. MARDER:  Objection, form.

11     A.   I don't know Sheira Brown.

12     Q.   Would you be shocked to learn that it was

13  embarrassing for her?

14            MR. MARDER:  Objection, form.

15     A.   I would not be shocked, no.

16     Q.   Would you be shocked to learn that it would've

17  -- it was humiliating for her?

18            MR. MARDER:  Objection, form.

19     A.   No, I wouldn't be shocked.

20     Q.   We covered, and I think you agreed, that there

21  is a difference in the way that Black folks and White

22  folks interact with police.  Is that fair to say?

23            MR. MARDER:  Objection, form.

24     A.   That is correct, we have discussed that.

25     Q.   And that is a reality that you are aware of, is

1    that right?

2                    MR. MARDER:  Objection, form.

3        A.    I am aware of that, yes.

4        Q.    So we agree that when Gail O'Keefe called the

5    police to report Sheira Brown, that the potential risk

6    to Sheira Brown would be different to Sheira Brown than

7    it would have been a White customer, is that right?

8                    MR. MARDER:  Objection, form.

9        A.    The immediate risk was perceived by our

10   employees when physical threats were made to them.  So

11   the proper protocol was to call the police at that

12   point.

13       Q.    (BY MR. MC MULLEN)  And I'm gonna object to the

14   -- that as nonresponsive.  If I have to I'll restate the

15   question.  My question was knowing that outcomes are

16   different when police are called for Black folks as

17   opposed to White folks, when Gail O'Keefe called the

18   police on Sheira Brown the potential risk to Sheira

19   Brown is different than had she called the police on a

20   White customer.

21                   MR. MARDER:  Objection, form.

22       A.    She threatened our employees.  You call the

23   police when that happens.

24       Q.    (BY MR. MC MULLEN)  That's -- again, that's

25   nonresponsive.  I'm gonna pose the same exact question.

1    Please answer.

2                    MR. MARDER:  Objection, form.

3        A.   Given these circumstances I -- I don't know the

4    answer to that.

5        Q.   You don't know whether -- and I think we

6    agree -- you don't know whether the risk to Sheira Brown

7    as a -- as a Black person when the police arrive and are

8    called -- you don't know that the outcome is different

9    for her as a Black person than it would have been for a

10   White customer?

11                   MR. MARDER:  Objection, form.

12       A.   We agreed to the overall assumption.  We -- We

13   are not in agreement on the specific call here.

14       Q.   You don't agree that the data supports that Ms.

15   Brown was at greater risk than a White customer?

16                   MR. MARDER:  Objection, form.

17       A.   Our staff was at risk.  I won't apologize for

18   that.

19       Q.   (BY MR. MC MULLEN)  Again, that's

20   nonresponsive.  I'm gonna object to that answer.  Please

21   answer the question.

22                   MR. MARDER:  Objection, form.

23       A.   I'll answer it again by saying I don't have any

24   specific knowledge given the specific circumstances in

25   this situation.

1    Q.   So my question was you don't agree whether the

2    data supports that Ms. Brown as a Black person would

3    have been at greater risk from a police encounter than a

4    White customer when Gail O'Keefe called the police?

5                MR. MARDER:  Objection, form.

6    A.   And I will say I am not qualified to answer

7    that question.  I don't know.  Those are statistics

8    you're quoting and this is a specific instance.  Trying

9    to apply those statistics to this instance requires a

10   depth of knowledge that I do not have.

11   Q.   You're familiar with the data that we -- or at

12   least the concept of the data that we discussed, right?

13   A.   The concept, yes.

14   Q.   And it's your position that you cannot possibly

15   apply that concept to Ms. Brown?

16                MR. MARDER:  Objection, form.

17   A.   That is my position, yes.

18   Q.   And can you explain why you refuse to apply

19   that knowledge to Ms. Brown.

20                MR. MARDER:  Objection, form.

21   A.   You are asking me to make a leap in logic here

22   that I -- I cannot connect those two.

23   Q.   Why is that?

24   A.   'Cause you're talking conceptual versus actual.

25   We have an actual situation here.  I don't know how the

1    data at the high level conception will apply to this

2    specific instance.

3         Q.    Okay.  And so it's your position you can't

4    possibly apply that data to Ms. Brown's circumstances,

5    she is different than a different Black person when the

6    police are called?

7              MR. MARDER:  Objection, form.

8         A.    Every situation is different.

9         Q.    Right.  Somehow Ms. Brown is different in most

10   circumstances than another Black customer would be,

11   right?

12             MR. MARDER:  Matt, I'm gonna object at

13   this point.  You are now harassing the witness.  You've

14   asked him over and over again.  This is becoming

15   argumentative, you don't like his answer, he's given you

16   the answer.

17             MR. MC MULLEN:  Yeah --

18             MR. MARDER:  We're getting to the point --

19   hey, hold on for a second, let me finish.  I've been

20   polite to you the whole day.

21             MR. MC MULLEN:  We can talk about --

22             MR. MARDER:  He's given you -- he has

23   given you the answer over and over, okay?  If you

24   continue this we're gonna have to have a little caucus

25   and I may terminate the deposition.

1            MR. MC MULLEN:  I'm actually -- I'm gonna

2   pass the witness but I would like to discuss some

3   matters with you immediately after this.

4            MR. MARDER:  So are you finished with the

5   witness?  I didn't hear you, Matt.

6            MR. MC MULLEN:  I'm sorry, yes, sir, I am

7   finished with the witness.

8            MR. MARDER:  Okay, no questions.  He'll

9   read.

10            VIDEOGRAPHER:  Okay, we are off the

11   record.  The time is 5:31 p.m. eastern time ending the

12   deposition.

13            (Proceedings concluded at 5:31 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          CHANGES AND SIGNATURE

2     PAGE LINE   CHANGE                         REASON

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

1      I, MICHAEL ALLEN, have read the foregoing deposition

2   and hereby affix my signature that same is true and

3   correct, except as noted above.

4

5                                    _____

6                                    MICHAEL ALLEN

7

8   THE STATE OF _____)

9   COUNTY OF _____)

10

11      Before me, _____, on this day

12   personally appeared MICHAEL ALLEN, known to me or proved

13   to me on the oath of _____ or through

14   _____ (description of identity card

15   or other document) to be the person whose name is

16   subscribed to the foregoing instrument and acknowledged

17   to me that he/she executed the same for the purpose and

18   consideration therein expressed.

19      Given under my hand and seal of office on this _____

20   day of _____, _____.

21

22                                    _____

23                                    NOTARY PUBLIC IN AND FOR

24                                    THE STATE OF _____

25   My Commission Expires: _____

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF MARYLAND
 2                    BALTIMORE DIVISION

 3   SHEIRA BROWN,                §
     Plaintiff,                   §
 4                                §
     v.                           § Case No. 1:21-cv-00096-JRR
 5                                §
     HARFORD BANK,                §
 6   Defendants.                  §

 7

 8                    REPORTER'S CERTIFICATE

 9       ORAL VIDEOTAPED DEPOSITION OF MICHAEL ALLEN

10                    JANUARY 18, 2023

11

12      I, Vanessa P. Pompa, Certified Shorthand Reporter in

13   and for the State of Texas, hereby certify to the

14   following:

15      That the witness, MICHAEL ALLEN, was duly sworn and

16   that the transcript of the deposition is a true record

17   of the testimony given by the witness;

18      That the deposition transcript was duly submitted on

19   _____ to the witness or to the attorney for

20   the witness for examination, signature, and returned to

21   me by _____, 2023.

22      That pursuant to information given to the deposition

23   officer at the time said testimony was taken, the

24   following includes counsel for all parties of record:

25
```

```
 1      Mr. Matthew McMullen,
            Attorney for Plaintiff;
 2
        Mr. Scott H. Marder
 3          Attorney for Defendant;
```

 4      I further certify that I am neither counsel for,

 5   related to, nor employed by any of the parties or

 6   attorneys to the action in which this proceeding was

 7   taken, and further that I am not financially or

 8   otherwise interested in the outcome of the action.

 9      Further certification requirements pursuant to Rule

10   30 of FRCP will be certified to after they have

11   occurred.

12      Certified to by me on this _____ day of

13   _____, _____.

14

15                        /S/ Vanessa P. Pompa
                          Vanessa P. Pompa, CSR
16                        Texas CSR 2670
                          Expiration:  01/31/24

17

18

19

20

21

22

23

24

25

1        FURTHER CERTIFICATION UNDER FRCP RULE 30

2        The original deposition was/was not returned to the

3    deposition officer on _____.

4        If returned, the attached Changes and Signature

5    page(s) contain(s) any changes and the reasons therefor.

6        If returned, the original deposition was delivered

7    to Mr. Matthew McMullen, Custodial Attorney.

8        $_____ is the deposition officer's charges to the

9    Plaintiff for preparing the original deposition and any

10   copies of exhibits;

11       The deposition was delivered in accordance with Rule

12   30, and a copy of this certificate, served on all

13   parties shown herein, was filed with the Clerk.

14       Certified to by me on this _____ day of

15   _____, _____.

16

17

18                        /S/ Vanessa P. Pompa
                         Vanessa P. Pompa, CSR
19                       Texas CSR 2670
                         Expiration:  01/31/24
20

21

22

23

24

25