IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| SHEIRA BROWN, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-00096-JRR |
| | § | |
| HARFORD BANK, | § | |
| Defendants. | § | |

ORAL AND VIDEO DEPOSITION

OF BRIAN CLAFFEE

JANUARY 18, 2023

        ORAL DEPOSITION OF BRIAN CLAFFEE, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on JANUARY 18, 2023, from 9:02 a.m. to 1:10 p.m., before
VANESSA P. POMPA, CSR in and for the State of Texas,
reported by stenographic method, Via Zoom video
conference, San Antonio, Bexar County, Texas pursuant to
the Federal Rules of Civil Procedure, and the provisions
stated on the record or attached hereto, and pursuant to
Texas Governor's Orders regarding the COVID-19 State of
Disaster, Section 22.0035(b) of the Texas Government
Code.

```
 1                     APPEARANCES
 2   FOR PLAINTIFF:
 3        Mr. Matthew McMullen          (Via Zoom)
          Ms. Leslie Tyroch
 4        Hilliard Martinez Gonzales LLP
          719 S. Shoreline Blvd.
 5        Corpus Christi, Texas  78401
 6   FOR DEFENDANT:
 7        Mr. Scott H. Marder           (Via Zoom)
          Thomas & Libowitz, P.A.
 8        25 S. Charles Street, Suite 2015
          Baltimore, Maryland  21201
 9
     ALSO PRESENT:
10
          Michael Allen,               (Via Zoom)
11
          Ryan Ligon,                  (Via Zoom)
12        Video Technician;
13        Brian Claffee,               (Via Zoom)
          the Witness; and
14
          Vanessa P. Pompa, CSR        (Via Zoom)
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                          INDEX

2                                              PAGE

4    Appearances                                  2

5    BRIAN CLAFFEE

6        Examination by Mr. McMullen              4

7        Examination by Mr. Marder              142

8        Re-Examination by Mr. McMullen         143

9    Signature and Changes                      145

10   Reporter's Certification                   147

11                      EXHIBIT INDEX

12   1  Notice of Deposition                     56

13   2  Mapping of fatal police violence         56

14   3  Brian Claffee Report                     77

15   4  Harford Bank Check Cashing Guidelines    84

16   5  Joppatowne Maryland Population           110

17   6  2020 Census                             112

18   7  Notes of seven factors                  134

19                   REQUESTED DOCUMENTS

20   NONE

21                   CERTIFIED QUESTIONS

22   NONE

23

24

25

Page 4

1          VIDEOGRAPHER:  We are on the record.  The

2     date is January 18th, 2023, the time is 9:02 a.m.

3     beginning the deposition of Brian Claffee.

4          Will the attorneys present please state

5     their appearances for this record.

6          MR. MC MULLEN:  This is Matthew McMullen.

7     I'm one of the attorneys for plaintiff Sheira Brown.

8     And with me today in the deposition is attorney Leslie

9     Tyroch.

10          MR. MARDER:  Scott Marder on behalf of

11     defendant Harford Bank.

12          VIDEOGRAPHER:  And then will the court

13     reporter please swear in the witness.

14               BRIAN CLAFFEE,

15     having been first duly sworn, testified as follows:

16               EXAMINATION

17     By Mr. McMullen:

18     Q.   So as I just indicated, Mr. Claffee, my name is

19     Matthew McMullen.  I represent plaintiff Sheira Brown in

20     the lawsuit in which you're testifying.  I -- Have you

21     had your deposition taken before?

22     A.   Many years ago yes, once.

23     Q.   Well, I'll refresh your recollection of the

24     rules, just give you the ground rules for today.  The

25     court reporter is here to transcribe what's being said,

1  we're also on video, but a lot of these rules pertain to

2  the court reporter because we need her to be able to

3  make a transcript of the proceedings.  In some ways this

4  is likely gonna be different than the last time you took

5  a -- you provided a deposition because we're doing this

6  remotely by Zoom, but in most material respects it won't

7  be too much different because the core of my

8  instructions here are gonna do -- are gonna have to do

9  with the transcript we're providing.

10             So the first rule I tell folks is we're

11  gonna try to avoid overtalk.  And what I mean by that is

12  it's normal in a conversation for you to anticipate

13  where I'm going with the question and wanna get me the

14  answer before I'm finished.  You want to avoid that so

15  that the court reporter can get everybody's full words

16  down and create a nice transcript for us.  And so we

17  have an agreement, I assume, that we're gonna do our

18  best to avoid overtalk.  Is that a yes?

19      A.   Yes.

20      Q.   And I may as we go on say things like is that a

21  yes if -- or -- or instruct you that the form of your

22  answer might offend the court reporter.  When I do that

23  my intention is not to be a bully, it's just to make

24  sure we keep a nice transcript.

25             With that said, answers need to be

1    verbalized not -- no head shaking or -- it will be

2    picked up on video but we still want that transcript.

3    So I may say things like is that a yes, is that a no,

4    and just try to confirm.

5                    In general, if you provide an answer I

6    have to assume that you understood the question.  So I

7    generally ask that folks only testify to answers they

8    know.  And so if you -- if you need a clarification on a

9    question, if you need me to restate something certainly

10   let me know, otherwise the -- we have an agreement, and

11   I think you'll agree, that you're only gonna provide

12   answers to things you know about.  Can we agree on that?

13       A.   Yes, sir.

14       Q.   You understand that you're under oath today?

15       A.   Yes, sir.

16       Q.   And what's your understanding of the meaning of

17   being under oath?

18       A.   Tell the truth.

19       Q.   And I agree with that.  I would only add tell

20   the whole truth.  Can we agree to that?

21       A.   Yes, sir.

22                    MR. MARDER:  Objection, form.

23       Q.   On that point as far as overtalk goes, I will

24   generally allow for some lag time with these Zoom

25   depositions.

1          MC MULLEN:  So, Scott, if there's a

2     situation where your objection comes out right after the

3     answer just -- just let's just get it all out on the

4     record and we can accommodate.

5          Q.   (BY MC MULLEN)  My last point for Mr. Claffee

6     -- and I'm sorry, it is Mr. Claffee, right?

7          A.   That's fine, yes.

8          Q.   Okay, thank you.  If you need a break just let

9     me know.  The only ground rule there being if you -- if

10    you have a question pending you need to answer the

11    question before we go take a break, but otherwise I'm

12    generally -- we generally try to do one break at the

13    hour mark.  So it's 9 -- I believe 9 o'clock eastern

14    time or five after.  So we'll shoot for a break around

15    10 -- 10 o'clock eastern, 9 o'clock my time if that

16    works for you. Okay?

17         A.   Okay.

18         Q.   Just let me know in -- in the interim if

19    there's another break time or what have you.

20    Mr. Claffee, how long have you worked for Harford Bank?

21         A.   Just over three years.

22         Q.   What is your current position with Harford

23    Bank?

24         A.   I am the manager of retail banking services.  I

25    oversee the branch network.

1    Q.   How long have you been in that position with

2  the bank?

3    A.   The same, just more than three years.

4    Q.   Okay.  You were hired on into that position?

5    A.   That's correct.

6    Q.   How long have you worked in the industry you're

7  currently working in?

8    A.   In financial services about 32 years.

9    Q.   What was the -- the employer -- the name of

10  your employer prior to Hartford Bank -- Harford Bank?

11    A.   PNC Bank.

12    Q.   Thank you.  And what was your title at PNC

13  Bank?

14    A.   My last position there was a senior client

15  adviser at PNC wealth management.

16    Q.   How long did you work at that -- in that

17  position?

18    A.   I was in that role just under two years.

19    Q.   The employer immediately prior to PNC Bank?

20    A.   It was still PNC Bank, just in a different

21  role.

22    Q.   What was that role?

23    A.   Several different roles.  The one previous to

24  wealth management I was in universal branch

25  transformation, a program job for about two years.

Page 9

1   Prior to that I was a regional manager overseeing 17
2   branches in the tri-county area in Harford and Cecil
3   county.
4       Q.   And we'll get into your current duties.  But I
5   understood your answer thus far to be I think it was 32
6   years working in the banking industry, is that right?
7       A.   That's correct.
8       Q.   And what is your education?
9       A.   I have a bachelors degree.
10      Q.   In what -- what is the bachelors --
11      A.   It -- Sorry.  Bachelors of science, a
12  concentration in consumer economics from the University
13  of Delaware.
14      Q.   Thank you.  Did you always know you wanted to
15  go into banking?
16      A.   No, I did not.
17      Q.   When did you learn that?
18      A.   When I left the University of Delaware I was
19  working for a credit card company, a credit card bank
20  part time.  And a full time job opened up and the rest
21  is history, as they say.
22      Q.   Thank you.  Other than your bachelors degree do
23  you have any other higher post secondary education in
24  the -- relative to the banking industry or any other
25  post secondary education?

1      A.    I do not.

2      Q.    Do you maintain any certificates along with

3   your college education?

4      A.    I have an NMLS registration which allows you to

5   speak to customers about home lending.

6      Q.    And what's an NMLS?

7      A.    National -- National Mortgage Licensing.

8      Q.    What's the significance of an NMLS certificate?

9      A.    In order to speak to consumers regarding loans

10  where their home is the collateral, so that could be a

11  mortgage or a home equity line of credit.  I need to

12  have an NMLS certification in order to take an

13  application.

14     Q.    Thank you.  The -- Your current role, does that

15  require you to have an NMLS certification?

16     A.    It's not required.  It's maintained from my

17  previous bank to this bank.

18     Q.    Okay.  Do -- Do you employ your training or --

19  or your certification in your current role?

20              MR. MARDER:  Objection, form.  Hey, Brian,

21  just pause for about a second just in case I need to

22  object, and that way our court reported can get down all

23  of the voices at one time.

24              THE WITNESS:  Okay.

25     Q.    And you can answer unless Mr. -- Mr. Marder

1   instructs you not to.

2      A.   Can you repeat the question.

3      Q.   Yes, sir.  Do you -- Do you use the training

4   that you received to get your NMLS certification in your

5   current role?

6      A.   Minimally.

7      Q.   Okay.  Of the 30 -- well, when did you obtain

8   your NMLS certification, just rough period of years?

9      A.   I really don't recall.  It's been a while.

10     Q.   More than ten years?

11     A.   I would say yes.

12     Q.   You have 32 years of experience in banking.  Do

13  you have a subject matter expertise in your opinion?

14             MR. MARDER:  Objection, form.

15     A.   No, my -- my range of experience in knowledge

16  in retail banking is pretty broad.

17     Q.   Can you explain what it is -- what your

18  experience is.  If I were to try to come up with a

19  category for your banking experience what would that

20  category be?

21     A.   I would say management of a team performance

22  wise, execution against strategy, overall retail banking

23  from a branch network and branch operations perspective.

24     Q.   What is retail banking?

25     A.   The branch network for any size bank or credit

Page 12

1    union.

2        Q.   When you say branch network you're referring to

3    banking -- bank branches that customers can access

4    banking services, is that right?

5        A.   Yes, sir.

6        Q.   And so how many years -- when you say

7    experience in retail banking, how many years of your 32

8    years in banking dealt -- have dealt with retail

9    banking?

10       A.   More than ten, probably closer to 15 total.

11       Q.   You have ten to 15 years in retail banking

12   experience, is that right?

13       A.   Yes, sir.

14       Q.   And I think we identified that retail banking

15   involves how customers engage with banks at physical

16   banking locations, s is that right?

17               MR. MARDER:  Objection, form.

18       A.   Yes.

19               MR. MC MULLEN:  I'm sorry, what's the --

20   what's the objection?

21               MR. MARDER:  Leading and misstating his

22   testimony.

23               MR. MC MULLEN:  Isn't he an opposing

24   witness?

25               MR. MARDER:  Huh?

1          MR. MC MULLEN:  I'm allowed to lead the

2    witnesses, isn't that true?

3          MR. MARDER:  Go ahead, you can ask your

4    question, I've made my objection.

5          MR. MC MULLEN:  Okay.

6    Q.   (BY MR. MC MULLEN)  So, Mr. Claffee, you have

7    ten to 15 years of retail banking experience is it safe

8    to say?

9    A.   Yes.

10   Q.   Do you -- Would you say you have more than 15

11   years of experience in how customers engage with banks?

12   A.   Yes.

13   Q.   How many years of experience do you have in

14   that area?

15   A.   The first 14 to 15 years of my career was

16   serving customers and managing teams in a call center

17   environment for a financial institution.

18   Q.   The first 15 years?

19   A.   Yes.

20   Q.   And so we add that to your -- I think -- I

21   think it was ten to 15 years of retail banking

22   experience.  Would you say you have at least 25 years of

23   experience in how cust -- banking customers engage

24   with -- with banks?

25   A.   Yes.

1      Q.    Thank you.  That would include how a customer

2   interacts with a physical banking location, right?

3      A.    Yes.

4      Q.    In other words, how they interact with branch

5   locations, correct?

6      A.    Yes.

7      Q.    That -- That would include in your 25 years in

8   -- of experience how customers interact with bank

9   tellers, is that true?

10     A.    Yes.

11     Q.    And how customers engage banking products, is

12   that true?

13     A.    Yes.

14     Q.    So I have some questions that deal with how a

15   customer may engage a bank or banking services.  And --

16   And you can tell me what your experience has been with

17   that.  So my first question is are you familiar with the

18   concept of cashing a check?

19     A.    Yes.

20     Q.    And what's the -- How do we distinguish what

21   cashing a check is versus depositing a check?

22     A.    If a customer is going to cash a check they're

23   expecting cash back from that check versus depositing

24   where they're going to put it into a bank account.

25     Q.    And why would a -- why might a customer choose

1   to cash a check versus making a deposit?

2        A.   For a number of reasons.  They -- they need the

3   cash, they are purchasing something using that cash,

4   they're paying bills with that cash.

5        Q.   I agree.  So we agree then that some of the

6   reasons -- some of the primary reasons that a customer

7   might cash a check include things that have to deal with

8   necessity, did I understand that to be the case?

9                  MR. MARDER:  Objection, form.

10       A.   I agree with that, yes.

11       Q.   And so items among those necessities would be,

12  for example, they need to cash a check to pay for

13  groceries?

14       A.   Sure.

15       Q.   Or pay a bill?

16       A.   Sure.

17       Q.   They may need to -- and I think your answer is

18  consistent with this, that a person cashing a check has

19  a need for their funds to be given to them immediately,

20  would you agree with that?

21       A.    In some cases, yes.

22       Q.   Okay.  What would be the significance to that

23  person if a -- if a person who needs the cash

24  immediately if that check cannot be cashed?

25                  MR. MARDER:  Objection, form.

1      A.    Could you restate the question, please.

2      Q.    So let's have a -- let's discuss it as a

3  hypothetical, and tell me if I'm wrong.  Your answer was

4  that in some cases, not all, a customer may require that

5  -- may be seeking that their check be cashed because

6  they have an immediate need for those funds, is that

7  right?

8      A.    Yes.

9      Q.    And that immediate need oftentimes has to do

10 with a personal necessity such as paying a bill, paying

11 for groceries or paying for rent, would you agree with

12 that?

13            MR. MARDER:  Objection, form.

14     A.    Yes, I can agree with that.

15     Q.    And so my question is if in that hypothetical

16 with those conditions what would be the significance to

17 a person who attempts to cash a check and the bank

18 refuses to cash the check?

19            MR. MARDER:  Objection, form.

20            MR. MC MULLEN:  What's the basis for the

21 form objection?

22            MR. MARDER:  Number one, you're asking the

23 witness to speculate.  Number two, you're asking him for

24 an opinion.  And this witness is a fact witness, not an

25 expert witness.

1          MR. MC MULLEN:  I think I've laid some

2   foundation in the -- is that the -- is that the entire

3   nature of the objection?

4          MR. MARDER:  That's my objection.

5          MR. MC MULLEN:  Thank you.

6      Q.  (BY MR. MC MULLEN)  Mr. Claffee, if you can

7   recall the question, otherwise I can have it read back

8   to you.

9      A.  Yeah, please read it back to me.

10          MR. MC MULLEN:  And I'm sorry, Madam Court

11   Reporter, I -- my memory is okay but not quite that

12   good, if you wouldn't mind to read that back, please.

13          THE REPORTER:  Sure.  Okay, the question

14   was:  And so my question is if in that hypothetical with

15   those conditions what would be the significance to a

16   person who attempts to cash a check and the bank refuses

17   to cash the check?

18          MR. MARDER:  Same objection.

19      A.  Well, the customer would leave the bank without

20   having their cash.

21      Q.  What would be the significance to that person

22   that they do not have the cash in that instance under

23   those --

24          MR. MARDER:  Objection -- Sorry, Matt, you

25   done?

Page 18

1        MR. MC MULLEN:  I am.

2        MR. MARDER:  Objection, form.

3    A.   They would need to use an alternate form of

4    payment if they don't have the cash.

5    Q.   Well, we've identified that this person needs

6    the cash, right, in this hypothetical?

7    A.   Okay.

8    Q.   Is -- We're working with the same hypothetical,

9    right?

10        MR. MARDER:  Objection, form.

11    A.   Okay.

12    Q.   I'm sorry, Mr. Claffee, we're working with the

13    same hypothetical, can we agree on that?

14    A.   Yes.

15    Q.   And so in this instance a person who cannot get

16    the cash cannot access their cash immediately, right?

17    We agree on that?

18        MR. MARDER:  Objection, form.

19    A.   Yes.

20    Q.   Okay.  Let's add to this hypothetical, maybe

21    that'll help with your answer.  This person needs to pay

22    for groceries, for example, for their child.  If a

23    person cannot cash the check what would be the

24    significance to that person, what -- what must they do

25    in that instance?

1          MR. MARDER:  Objection, form.

2     A.    Depending on where they shop most grocery

3  stores, places that have groceries might accept a check

4  and they could use that check to pay for their

5  groceries.  There are other alternatives to cashing the

6  check, check cashing agencies, some liquor stores, for

7  instance.

8     Q.    What if the bank had actually seized the check

9  and -- and taken the check from them, what would that

10 person do then?

11         MR. MARDER:  Objection, form.

12    A.    They would need to find an alternate form of

13 payment for their groceries.

14    Q.    They would need to find a different source of

15 funds entirely, wouldn't they?

16         MR. MARDER:  Objection, form.

17    A.    Yes, they would.

18         MR. MC MULLEN:  And just -- just for the

19 -- to make it easier on you, Scott, we can just lodge a

20 standing objection on -- I think you had previously

21 identified what these form objections were.

22         MR. MARDER:  Yeah, if you'll -- if you'll

23 accept a standing objection to the line of questions

24 that are hypotheticals where you're asking the witness

25 to speculate and/or render opinions on this line of

1   questions that's fine.

2            MR. MC MULLEN:  Yeah, of course.  And I'm

3   not stipulating that I'm doing those two things but

4   that's your objection.

5            MR. MARDER:  Yeah, no, I -- yeah, I get

6   that, that's fine.

7            MR. MC MULLEN:  Okay, thank you.

8       Q.   (BY MR. MC MULLEN)  So in -- in our

9   hypothetical, Mr. Claffee, we have an individual who --

10  where the bank has taken the check and they need to

11  identify different funds entirely, right, if they're

12  going to meet their immediate necessities, can we agree

13  on that?

14      A.   Yes, sir.

15      Q.   Because the funds because of the bank's action

16  are no longer available until the bank releases that

17  check?

18      A.   That's correct.

19      Q.   And we'll come back to that.  I think we can

20  agree before we move on to a different topic that if you

21  are dealing with a person whose resources have been

22  compromised in such a way that they can't get access to

23  a source of funding for an immediate need, we can agree

24  that that could create an actual crisis for that person

25  in that hypothetical, can we?

1      A.    It could be, yes.

2      Q.    Right.  You understand from your 25 years of

3  experience in retail banking that customers have all

4  types of financial backgrounds, right?

5      A.    Yes.

6      Q.    And you have some familiarity with the needs of

7  customers from these different income levels?

8      A.    Yes.

9      Q.    And would you imagine that any other retail

10  banking or -- or employee of Harford Bank with retail

11  banking experience such as yours would also be familiar

12  with those types of circumstances such as the

13  circumstances we described in our hypothetical earlier?

14            MR. MARDER:  Objection, form.

15      A.    Yes, I do.

16      Q.    Before we go on I just wanna touch on some of

17  the ways that you prepared for this deposition.  Did you

18  meet with your legal counsel for Harford Bank prior to

19  this deposition?  And before you answer I don't wanna

20  hear the actual substance of the conversation,

21  nothing -- no communications between you and the -- the

22  attorneys, just the real specifics of the question.  So

23  in this case the question would be did you meet with

24  legal counsel?

25      A.    Yes.

1      Q.    How long were your meetings?  And actually let

2    me -- let me back it up.  How many meetings were there?

3      A.    I had one.

4      Q.    How long was that meeting?

5      A.    Approximately an hour-and-a-half.

6      Q.    When was the meeting?

7      A.    I don't recall the exact date.  It was -- I

8    believe it was earlier this week.

9      Q.    We can say perhaps within the last two weeks?

10     A.    Yes.

11     Q.    And who was present in the meeting?

12     A.    It was Mr. Marder and myself.

13     Q.    Anyone else?

14     A.    No.

15     Q.    Did you review documents in that meeting?

16     A.    We did.

17     Q.    How many documents did you review?

18     A.    We reviewed the document that I prepared called

19   a memo.

20     Q.    Okay.  And I think we're gonna be discussing

21   that.  You prepared a memo in this matter which you

22   supplied to one of your supervisors or -- not supervisor

23   but your superior within Harford Bank, is that right?

24     A.    That's correct.

25     Q.    Have you reviewed that document with

1    Mr. Marder?

2        A.    I did, yes.

3        Q.    Which other documents did you review with

4    Mr. Marder?

5        A.    There were no other documents.

6        Q.    Did you review any of the documents that were

7    referenced in your report with Mr. Marder?

8        A.    Can you clarify that?

9        Q.    Yeah.  So, for example, I think your report has

10   photo -- photographs of checks within it or maybe

11   references another policy document or another procedure.

12   Did you review any documents that were referenced in the

13   report or just the report itself?

14       A.    We referenced everything that was in the memo.

15       Q.    Okay.  So --

16       A.    And reviewed the memo -- I'm sorry.  We

17   reviewed the memo.

18       Q.    Okay.  Did you pull up separate documents that

19   were referenced in the memo?  So for -- and I'll -- I'll

20   make it easier on you.  I think there's a section of

21   your report where you discuss that a bank teller

22   followed a procedure.  Do you -- Did you actually review

23   a document describing that procedure with Mr. Marder?

24       A.    I did not.

25       Q.    Okay.  So you only -- and we'll identify this

1   later -- but you only reviewed your report with

2   Mr. Marder?

3        A.   That's correct.

4        Q.   No other documents, right?

5        A.   That's correct.

6        Q.   Thank you.  I wanna get back to your role

7   within Harford Bank.  Tell me what your job title again

8   is, if you wouldn't mind to do that, and what your job

9   duties at the general level entail.

10       A.   My title is Manager of Retail Banking Services.

11   And generally my job is to oversee and manage the retail

12   branch network and branch operations.

13       Q.   Are you considered an officer of Harford Bank?

14       A.   Yes, I am.

15       Q.   And so you have the ability to exercise

16   judgment and discretion in -- within your job role at

17   Harford Bank?

18       A.   Yes, I do.

19       Q.   Can you describe some of the -- No, I'll strike

20   that question.  Do you have authority in your deposition

21   today to speak on behalf of Harford Bank, at least as to

22   matters that pertain to -- in this lawsuit?

23            MR. MARDER:  Objection, form.

24       A.   As I understand I'm here with respect to the

25   facts of this case and the memo that I prepared.

1    Q.    Okay.  And as a -- as a director of Harford

2  Bank are there instances in which you are -- you have

3  authority to bind Harford Bank?

4                MR. MARDER:  Objection, form.

5    A.    First of all, I am not a director of the bank.

6    Q.    I'm sorry.  Are -- we'll -- we'll -- you said

7  earlier that you were an officer of Harford Bank, is

8  that right?

9    A.    That's correct.

10    Q.    And that's -- my apologies, I'm conflating the

11  two things.  As an officer of Harford Bank in your job

12  role are there instances in which you can bind Harford

13  Bank?

14                MR. MARDER:  Objection, form.

15    A.    I don't know the answer to that question.

16    Q.    Are you able to -- Well, I'll just put it to

17  you directly.  Are you -- in your -- in your deposition

18  today when you -- when you testify are you testifying as

19  a -- an officer of Harford Bank?

20                MR. MARDER:  Objection, form.

21    A.    I'm testifying to the fact that I know of this

22  case and I'm an officer of the bank.

23    Q.    Are you testifying as an officer of the bank?

24                MR. MARDER:  Objection, form.

25    A.    Yes.

Page 26

1    Q.   Thank you.  Who -- Who designated you to

2    testify today?

3              MR. MARDER:  Matt, this is not a corporate

4    representative deposition.  You noticed him by name.

5              MR. MC MULLEN:  I understand.

6    Q.   (BY MR. MC MULLEN)  Same question.

7              MR. MARDER:  Objection, form.

8    A.   I don't know who asked me to testify today

9    other than one of the two gentlemen on the phone.  It

10   was either Scott or Mike.

11   Q.   Okay.  And -- And I'm not trying to lead you

12   down a trap here.  I just wanna confirm that we noticed

13   your deposition and no one else decided that you should

14   step forward on this matter other than by virtue of

15   having been noticed.  Is that -- is that your

16   understanding?

17   A.   That's my understanding.

18   Q.   Thank you.  Let's move ahead here to going back

19   to your experiences as a retail banking professional.

20   You would agree that ensuring that banking customers

21   have equal access to banking services regardless of

22   their race, gender, creed and nationality is of the

23   utmost importance to Harford Bank, is that true?

24   A.   Yes, sir.

25   Q.   And, in fact, it's a first priority, is that

1    true?

2        A.    Yes, sir.

3                MR. MARDER:   Objection, form.   Brian, you

4    just have to pause about a second before -- before you

5    answer, please.

6                MR. MC MULLEN:   And -- And, Scott, just

7    for -- you know, obviously that -- that instruction to

8    you, Mr. Claffee, doesn't change but if -- if your

9    objection comes in afterward it's fine.   I'm not gonna

10   object on the timing.

11               MR. MARDER:   Yeah, no, I appreciate that,

12   Matt.   I just want to try to make things as easy as

13   possible for Vanessa.

14               MR. MC MULLEN:   Understood.

15       Q.    (BY MR. MC MULLEN)   Mr. Claffee, what, if

16   anything, could be more important than ensuring that

17   banking customers have equal access to banking services

18   regardless of race, gender, creed or nationality?

19               MR. MARDER:   Objection, form.

20       A.    As a community bank our mission is to serve

21   people in our communities where we have our branches

22   and -- and our overall footprint.   That's our role.

23       Q.    And my question was is there anything that the

24   bank -- is there anything more important to the bank

25   than ensuring that customers have equal access to

Page 28

1   banking services regardless of race, gender, creed or

2   nationality?

3        A.   Our goal is to provide banking services in our

4   community, so that is our number one charge.

5        Q.   And so I -- I read your answer -- and you can

6   correct me if I'm wrong -- to mean there may be things

7   that are equally important to that charge but nothing

8   that surpasses that charge, is that right?

9             MR. MARDER:  Objection, form.

10       A.   I guess I would put it this way, if we don't

11  have customers we don't have a bank.  So we're here to

12  serve the needs of our customers in the community where

13  we live and work.

14       Q.   I understand.  But my question was is there

15  anything more important to the bank in your experience

16  at the bank and as a -- as an officer of the bank than

17  providing equal access to banking services regardless of

18  race, gender, creed or nationality?

19            MR. MARDER:  Objection, form.

20       A.   No, the customers' needs come first.

21       Q.   Right.  And that's because customers have a

22  right to equal access to banking services regardless of

23  race, gender, creed or nationality in the United States,

24  isn't that right?

25            MR. MARDER:  Objection, form.

Page 29

1      A.    Yes, they do.

2      Q.    Thank you.  Do you have experience at Harford

3   Bank in drafting or putting together bank policies?

4      A.    I do not write policy.

5      Q.    Okay.  And just to -- I think I understand your

6   answer to mean that you have never done that for Harford

7   Bank, you have never drafted bank policies for Harford

8   Bank, is that correct?

9      A.    I do not draft policy, no.

10      Q.    Okay.  And -- And just to be clear, you do not

11   but you have also never drafted bank policy?

12      A.    I have not written bank policy.  I've probably

13   been asked my opinion or what should go into a policy.

14      Q.    Okay.  And so you -- you would, for example,

15   tap into your retail banking experience perhaps to

16   provide the bank with your opinions about policies that

17   it seeks to adopt or enforce?

18              MR. MARDER:  Objection, form.

19      A.    That would be fair, yes.

20      Q.    Have you -- have you done that -- Well, have

21   you drafted policies at any other bank in your

22   professional experience?

23      A.    I do not -- I have not drafted policies, no.

24      Q.    Similar to how you -- you contributed to --

25   to -- your insight to Harford Bank on either drafting or

1  enforcing Harford Bank policies, have you ever done that

2  at a different bank in your professional experience?

3     A.   I have not.

4     Q.   So at Harford Bank you have new experience in

5  the sense that you've been asked from time to time to

6  contribute your years of experience to putting together

7  Harford Bank policies, is that fair to say

8     A.   Yes, that's fair.

9     Q.   To -- When a bank is putting together policies,

10  and we're gonna talk specifically about the policies

11  that have to do with diversity we'll call it, we would

12  agree and you would agree that failing to provide equal

13  access to Harford Bank customers based on race, gender,

14  creed or nationality can have impacts in the community.

15  Would you agree with that?

16     A.   Yes.

17          MR. MC MULLEN:  Objection, form.

18     Q.   There was a form objection but I don't -- I

19  didn't catch your answer, Mr. Claffee.

20     A.   Yes.

21     Q.   What would be -- Can you provide me with some

22  examples of how failing to provide equal access to

23  banking services might contribute to or might impact a

24  community?

25          MR. MARDER:  Objection, form.

1      A.    Some examples might be not providing certain

2   home loans to a certain segment of the population.  And

3   there are laws to protect consumers because of that.

4      Q.    That's an example?

5      A.    Uh-huh.

6      Q.    And so the result of that example would --

7   would be there may be economic segregation or -- that

8   would impact racial minorities, would that be fair to

9   say?

10            MR. MARDER:  Objection, form and

11   foundation.

12      A.    I can't answer that question.

13      Q.    Tell me why you can't answer that question.

14      A.    Well, could you rephrase it then, please.

15      Q.    Well, my question was -- and you've rightfully

16   cited that, for example, if a racial minority doesn't

17   have equal access to banking services it may deprive

18   them of economic opportunities such as mortgage loans.

19   Is that fair to say?

20            MR. MARDER:  Objection, form.

21      A.    I did not single out in my answer any one of

22   the categories you mentioned.  I just said broadly if

23   we're not providing home lending services to the people

24   in our community it could have negative effects, I agree

25   with that.

1     Q.    What would those negative effects be?

2           MR. MARDER:  Objection, form.

3     A.    People -- The American dream is to own a -- own

4     a home.  If they're unable to get a mortgage to be able

5     to purchase that home that's certainly something that

6     would hurt their -- their long term prospects perhaps of

7     finding that home --

8     Q.    So there would be -- I'm sorry --

9     A.    -- and realizing their dream.

10    Q.    Okay.  And that would be an example perhaps,

11    would you agree, of a banking policy or a banking

12    practice that could create an economic -- that could

13    create economic segregation for racial minorities, isn't

14    that true?

15          MR. MARDER:  Objection, form and

16    foundation.

17    A.    Well, there are laws protecting them.  It's not

18    just a bank policy.  There are laws protecting them.

19    Q.    Right.  And we've put in place laws because of

20    that, because there would be greater societal damage if

21    a bank doesn't provide equal access to banking services

22    to racial minorities, isn't that true?

23          MR. MARDER:  Objection, form and

24    foundation.

25    A.    Laws are put into place to avoid

Page 33

1   discrimination.

2       Q.    Why are they put into place to avoid

3   discrimination?

4              MR. MARDER:  Same objection.

5       A.    I can't speak to that specifically, I didn't

6   craft the laws.  But, you know, if you're a bank serving

7   the community you wanna be able to serve the -- all the

8   different types of people in the community from home

9   lending to banking services.

10      Q.    Sure.  But we can agree I -- I presume that

11  these policies -- and I'm asking you as a -- as a retail

12  banking professional with over 25 years of experience --

13  that if bank practices or bank policies don't provide

14  equal access, we can agree that could have a greater

15  societal impact on racial minorities, can we agree on

16  that?

17             MR. MARDER:  Objection, form and

18  foundation.

19      A.    It could.  And that's why there are laws

20  against that -- that activity.

21      Q.    We agree on that point.

22             MR. MARDER:  Is that a question, Matt?

23             MR. MC MULLEN:  It is not.  That is a

24  sidebar and your objection is noted.

25             MR. MARDER:  Then I don't need to object

1  to it if it's not a pending question.

2          MR. MC MULLEN:  It's not a pending

3  question.

4      Q.  (BY MR. MC MULLEN)  I think that as an

5  extension of what we discussed we agree that -- well

6  plainly, we agree that folks of all different racial

7  complexion should have equal access to banking services,

8  right?

9          MR. MARDER:  Objection, form.

10     A.  Everyone in the communities we serve should

11  have access to banking services.

12     Q.  And we'll talk about the communities that

13  Harford Bank serves.  My question coming from that is

14  in -- in any case regardless of a person's race, gender,

15  creed or nationality, if that customer prevents the --

16  presents the bank with a valid check, and there are no

17  other competing concerns, that check should be accepted

18  by the bank, isn't that right?

19          MR. MARDER:  Can I have the question read

20  back?  I'm not sure I heard it.

21          MR. MC MULLEN:  No problem.

22          THE REPORTER:  Okay, the question was:  My

23  question coming from that is in -- in any case

24  regardless of a person's race, gender, creed or

25  nationality, if that customer prevents the -- presents

1   the bank with a valid check, and there are no other

2   competing concerns, that check should be accepted by the

3   bank, isn't that right?

4              MR. MARDER:  Objection, form.

5       A.   If we know the check to be valid yes, we should

6   either cash it or deposit it, that's correct.

7       Q.   To touch on your point that you would have to

8   know the check is valid, would it be fair to say that

9   unless you have a -- a legitimate concern that the check

10  is invalid the check should be accepted?

11             MR. MARDER:  Objection, form.

12      A.   That's fair.

13      Q.   Thank you.  Touching on one point.  We talked

14  about banking policies.  And you have some experience in

15  at least lending your insight from your years of banking

16  services experience to at least sharing your opinions on

17  banking policies.  So I have some questions on that

18  point.  You would agree that it's important to

19  understand the social impact of policies when crafting

20  them?

21             MR. MARDER:  Objection, form.

22      A.   Yes.

23      Q.   You would also agree that it's important to

24  understand the social impact of policies when enforcing

25  them or, in other words, when carrying them out?

Page 36

1          MR. MARDER:  Objection, form.

2     A.   Yes.

3     Q.   Would you agree that if an employee of the bank

4     acts in a way that has a particularly negative social

5     impact, and that employee is doing so within the course

6     and scope of their employment, the bank should be

7     accountable for that behavior?

8          MR. MARDER:  Objection, form.

9     A.   Can you give me an example?  That seems very

10    broad.

11    Q.   Sure.  Let's get into an example but first I'd

12    like the answer to that question.

13    A.   It was a long question.  Could you please

14    repeat the question.

15    Q.   Not a problem.  If -- If a bank employee acts

16    in a way that has a negative social impact, and that

17    employee does so in the course and scope of their

18    employment, will you agree that the bank should at least

19    in part be held accountable?

20          MR. MARDER:  Objection, form.

21    A.   Yes, that could be true.

22    Q.   Thank you.  Let's just discuss Harford Bank in

23    particular.  Is Mar -- Harford Bank is a Maryland bank,

24    is that right?

25    A.   Yes, it is.

1    Q.    Is -- Is Maryland the only state that Harford

2  Bank operates in?

3    A.    Yes, it is.

4    Q.    And I understood -- this is not an exact figure

5  but that Harford Bank has in the range of $365 million

6  in assets, is that right?

7    A.    At least, yes.

8    Q.    Thank you.  Harford Bank has eight branches?

9    A.    We have ten.

10    Q.    Ten branches, thank you.  And about how many

11  employees does Harford Bank have at the moment?

12    A.    I don't know the exact number.  It's about 90.

13    Q.    Okay.  Maybe 80 to 100 employees, roughly?

14    A.    Absolutely, that's fair.

15    Q.    And so in -- of the bank's operations there are

16  ten branches.  Is your role -- do you interface with all

17  ten branches or do you have particular branches you

18  interface with?

19    A.    I oversee all ten.

20    Q.    Okay.  You have a role in overseeing all 80 to

21  100 employees of Harford Bank, is that fair to say?

22    A.    No.  There are roughly 40 employed in the

23  retail world of the ten branches.

24    Q.    Understood.  And so that's because you're

25  involved in the retail banking side so naturally you --

1  you only deal with the retail banking employees, is that

2  fair to say?

3      A.   That's correct, I oversee the employees in the

4  ten branches.

5      Q.   Okay.  And there are about 40 employees in

6  the -- in the ten retail branches, is that fair to say?

7      A.   Yes.  Between 40 and 45, that's correct.

8      Q.   Okay.  Is there anyone else at Harford Bank who

9  on the -- on the sort of corporate ladder is on par with

10 you or are you at an -- at an apex on the -- on that

11 chain of command?

12          MR. MARDER:  Objection, form.

13     A.   I'm the only one in the retail side.  There are

14 certainly other officers at my level in different

15 departments.

16     Q.   Understood.  In the retail side, though, there

17 are folks who perhaps have more authority than you do

18 and less authority than you do but no one with equal

19 amount of authority as you, is that right?

20          MR. MARDER:  Objection, form.

21     Q.   And I can phrase it another way, I don't wanna

22 get caught in the weeds in that phrase in there.  But

23 you are -- you manage or oversee about 40 to 45 retail

24 banking employees, right?

25     A.   Yes.

1     Q.   And there are folks above the -- above you in

2    the chain of command, correct?

3     A.   Yes.

4     Q.   But you don't -- all I wanna know is do you

5    have a co -- a compatriot or a co-manager who is resting

6    exactly at the same level as you in the retail banking

7    side?

8     A.   No, not in retail banking.

9     Q.   Okay, thank you.  It was a clumsy way to get

10   there but I think I understand your question -- or your

11   answer.  And so you are at -- at the helm, in a way, of

12   the retail banking book of business that Harford Bank

13   does, is that correct?

14              MR. MARDER:  Objection, form.

15    A.    I oversee the ten branches if that's what you

16   mean by helm, yes.

17    Q.   Sure.  And I put -- and I just -- I put the

18   same definition that -- that you may on helm.  So you

19   have some -- you have familiarity then with retail

20   operations at Harford Bank, is that fair to say?

21    A.   Yes, sir.

22    Q.   You have some exposure to how often Harford

23   Bank either refuses to deposit or refuses to cash checks

24   at the operational retail level, is that fair to say?

25              MR. MARDER:  Objection, form and

1  foundation.

2      A.   That's very broad.  There are so many checks

3  that are reviewed on a day-to-day basis.  I'm not aware

4  of all of them, no.

5      Q.   And do you know about how many checks at the

6  ten branches are reviewed every day at Harford Bank?

7      A.   I do not know that number.

8      Q.   Would it be -- How many checks perhaps are

9  reviewed by a single branch on a given day, rough

10  estimate?

11      A.   I couldn't even guess at that number.

12      Q.   Would a thousand checks per day be accurate or

13  in the range?

14      A.   I don't know.

15      Q.   Would it be less than a thousand checks per

16  day?

17      A.   More than likely, yes.

18      Q.   Okay.  Would it be less than 500 checks per

19  day?

20      A.   I would have no idea.

21      Q.   Fair to say that a -- one of your -- on any

22  given day one of your branches is not likely to review

23  more than a thousand checks per day, is that right?

24           MR. MARDER:  Objection, form -- excuse me,

25  objection, form.

1      A.    I think that's fair.

2      Q.    How often do you in your role get brought in --

3   Well, let me ask it this way.  In your role if a check

4   is refused do -- does -- does the branch employee need

5   to contact you in that -- in that situation or -- or --

6   or not?

7      A.    They do not need to contact me.  I would hope

8   they would.

9      Q.    Why would -- why would you hope that they

10  would?

11     A.    We're a community bank.  If we're refusing to

12  cash a check for whatever reason I'd like to be made

13  aware of it and have a conversation.

14     Q.    Your preference would be that in all instances

15  where a check is refused that you be contacted?

16     A.    That is not my preference, no.  All checks is

17  very broad.

18     Q.    Sure.  And -- And I'm just asking what your

19  preference is.  You would prefer that more often than

20  not you're contacted when a check is refused?

21          MR. MARDER:  Objection, form.

22     A.    If a check is presented at a branch and they

23  are unable to cash it -- so this is an in person

24  transaction -- I would certainly like to be made aware

25  of that because there could be implications that there

Page 42

1   is fraudulent activity on an account perhaps.

2       Q.   What would be another reason why you'd like to

3   be contacted?

4                MR. MARDER:  Objection, form.

5       A.   If a customer -- if we were not able to cash a

6   check for a customer and they requested the check back

7   and it resulted in maybe an escalation of the issue I

8   would certainly like to be made aware of that.

9       Q.   And so I read into that -- and you can correct

10  me if I'm wrong -- that you are generally, not always,

11  but generally available if branch locations have an

12  issue with a check they'd like to deposit -- that they

13  believe they need to refuse, is that fair to say?

14      A.   Yes, I'm available for them to consult with, of

15  course.

16      Q.   Sure.  And they're not compelled to contact

17  you, but if they -- if they -- you would -- you would

18  like to be contacted if it's possible, is that fair to

19  say?

20               MR. MARDER:  Objection, form.

21      A.   Yes, but they're empowered to make these

22  decisions every day.

23      Q.   Correct.  And I'm -- I'm not -- not trying to

24  muddy the waters there, but you certainly are available

25  to branch employees in cases where checks need to be

1   refused, is that your testimony?

2        A.   Yes, I'm available.

3        Q.   Thank you.  So you have no numbers, for

4   example, of the rates at which Harford Bank has let's

5   say in a year -- in a given year refused to deposit or

6   cash checks?

7        A.   I do not.

8        Q.   If you needed to know that, for example, if you

9   needed to prepare a report on it does Harford Bank

10  maintain data on those figures?

11       A.   Not that I'm aware of, no.

12       Q.   Are all incidents in which a bank -- or in

13  which Harford Bank refuses to cash or deposit a check,

14  are all of those instances documented at the bank?

15       A.   Not that I'm aware of.

16       Q.   There is not a policy in place where if a bank

17  teller or a bank employee refuses to cash or deposit a

18  check that the bank needs to document that?

19       A.   Could you be more specific?

20       Q.   Sure.  So if a -- in a hypothetical if a -- if

21  a customer comes to the bank and wants to have their

22  check cashed, and the bank either refuses or is unable

23  to do so, is there any documentation generated from that

24  refusal?

25       A.   It's possible.

1    Q.    It's not required by Harford Bank policy?

2    A.    It's not possible in all situations to get that

3  documentation.

4    Q.    I'm talking about -- I'm sorry, I didn't mean

5  to cut you off.

6    A.    I said if that makes sense is all I'm saying.

7    Q.    Sure.  So what you're saying is there may be

8  instances in which the bank is unable to document what

9  happened for any particular reason, is that right?

10    A.    That's possible, yes.

11    Q.    Is there -- My question is is there a policy

12  that says to Harford branch bank employees if you refuse

13  a check you must document that incident in any

14  particular way?

15    A.    I don't believe there's a policy that states

16  that specifically, no.

17    Q.    And so if -- Well, first, if a -- an employee

18  does do that and wishes to document the incident is

19  there a means or a manner in which the bank specifies

20  that that should be done?

21    A.    There are certain people that need to be

22  notified in some of those cases, yes.

23    Q.    How should they be notified?

24    A.    They can pick up the phone and call, they can

25  email the information.  I don't think it's specific to

1   any one particular way.

2       Q.   Okay.   The bank doesn't -- in other words, the

3   bank does not specify how that incident should be

4   recorded but it -- it -- let me rephrase that.   The bank

5   does not specify how individuals at the bank need to be

6   notified about that incident, is that fair to say?

7       A.   There are -- There are procedures in -- in how

8   to notify the bank security officer and myself in

9   certain instances, yes.

10      Q.   There are procedures for how to notify you and

11  the bank security officer?

12      A.   To notify.   It doesn't specify how.

13      Q.   Okay.   But they must notify you and the bank's

14  security officer?

15              MR. MARDER:   Objection, form.

16      A.   In certain instances, yes.

17      Q.   What are those instances?

18      A.   In our policy if a check is over a certain

19  dollar amount they're required to call and verify with

20  the maker of the check, for instance.   And if we're

21  unable to cash a check because they believe it to be

22  fraudulent they are supposed to let the security officer

23  and myself know that that happened.

24      Q.   What's the dollar amount that you specify?

25      A.   I don't have the policy in front of me

Page 46

1   obviously.  It's -- I believe it's $500.

2       Q.    What's the significance of $500?

3       A.    It's been our policy for years, before I got

4   here.

5       Q.    Is refusing to cash a check one of the

6   instances in which -- in which you and the -- and the

7   security officer are to be notified?

8       A.    If they believe it to be fraudulent, yes.

9       Q.    In -- In cases where the -- So the answer is

10  yes in cases where the refusal is based on a belief that

11  the check is fraudulent, is that accurate?

12      A.    Yes.

13      Q.    What other in -- situations would -- I'm sorry,

14  one moment.  When a -- When this occurs and a check is

15  suspected to be fraudulent the employee can either call

16  or email you and the branch security officer?

17      A.    Yes.

18      Q.    Are there any other ways that they can notify

19  you?

20      A.    We now have access to teams chat.  They could

21  certainly put the information in our teams chat as well.

22      Q.    Are there any other ways that you can be

23  notified?

24      A.    That pretty much covers it.

25      Q.    And so in the instance where a bank employee

1   believes a check that's been presented to be cashed to

2   the bank is suspected of fraud, the ways that an

3   employee can report that to you are to call you, email

4   you and -- or send you a message on teams, is that

5   correct?

6        A.   Those are all appropriate, yes.

7        Q.   And there are no other ways to do that?

8        A.   Those are probably the best ways.

9        Q.   I understand.  Are there other ways to notify

10   you of that information?

11        A.   I guess they could put it in interoffice mail

12   and mail it to our headquarters.

13        Q.   Are there any other ways they can notify you?

14        A.   Not that I can think of.

15        Q.   Is there anyone at Harford Bank who is familiar

16   with the policy of -- well, actually I think I'm about

17   to test -- depose that person so I'll save that question

18   for later.  Correct me if I'm wrong, in an instance

19   where a check is suspected of being fraudulent a branch

20   employee must contact you and the branch security

21   officer, is that correct?

22        A.   If they deem the item to be fraudulent, is that

23   what you said?  Then yes.

24        Q.   If they suspect it of being fraudulent.

25        A.   Yes.

Page 48

1      Q.   Which policy specifies that protocol?

2      A.   I don't know.

3      Q.   Is it a policy that you referenced in the

4   report that you wrote that -- that we referenced when

5   you were talking about your conversation with

6   Mr. Marder?

7      A.   Do you have -- can you share that with me?  I

8   can read that and confirm that.

9      Q.   I will.  And right now I'm just going on your

10  recollection.  We'll cover the -- the actual report.

11     A.   Okay.

12     Q.   As you sit here right now can you think of a

13  policy is my question.

14     A.   Our check cashing policy.

15     Q.   The check cashing policy.  Excellent.

16          MR. MARDER:  Hey, Matt, whenever it's a

17  good time for you to take a break just -- we're heading

18  to it.

19          MR. MC MULLEN:  Yeah, I agree we're at

20  the -- roughly the hour mark now, so say ten minutes?

21          MR. MARDER:  Yeah, works for me if it

22  works for Brian.  Brian, you wanna go for another ten?

23          THE WITNESS:  That's fine.  10:13 we're

24  back.

25          MR. MC MULLEN:  Excellent.  Works for me.

1                    MR. MARDER:  Sounds good.  See you ten.

2                    VIDEOGRAPHER:  We're off the record.  The

3     time is 10:04 a.m.

4                    (Recess from 10:04 to 10:17)

5                    VIDEOGRAPHER:  We are back on the record,

6     the time is 10:17 a.m.

7                    MR. MC MULLEN:  Thank you.

8         Q.   (BY MR. MC MULLEN)  We were discussing a policy

9     whereby branch employees must call you and the branch

10    security officer if a check is suspected of fraud and it

11    has been presented to the bank.  So I just have some

12    follow-up questions on -- on how that's documented.  In

13    the instance in which this occurs and the employee

14    places a call to you and the branch security officer how

15    is the call documented?

16        A.   There's nothing official that it's documented,

17    no.

18        Q.   There is no requirement that the call be

19    documented?

20        A.   Not that I'm aware of, no.

21        Q.   There's no requirement that -- or policy that

22    specifies what must be reported in terms of contents to

23    you and the branch security officer?

24        A.   Not that I can recall, no.

25        Q.   As to you said if -- this could be reported to

1    you and the branch security officer by email.  If that

2    is done are the emails ar -- archived by Harford Bank?

3         A.    As far as I know, yes.

4         Q.    How long are those archives maintained?

5         A.    I do not know.

6         Q.    Who would know that information?

7         A.    Someone in our IT department.

8         Q.    Does anyone at Harford Bank catalog those types

9    of emails?

10        A.    I don't know.

11        Q.    Who would know that?

12        A.    Same answer, someone in the IT department.

13        Q.    Does anyone in the human resources department

14   catalog if an employee has decided that -- or has

15   determined that a check may be fraudulent?

16        A.    I don't know that.

17        Q.    If an employee has an incident in which that

18   employee determines that a check may be fraudulent, HR

19   is not notified of that incident?

20        A.    Not in all cases I wouldn't think so, no.

21        Q.    And so Harford Bank does not keep records of

22   incidents in which an employee has suspected a check is

23   fraudulent?

24              MR. MARDER:  Objection, form.

25        A.    Could you rephrase that.

1     Q.   Sure.

2     A.   I'm sorry, what you're asking.

3     Q.   Not a problem.  I'll put it a different way.

4 There is no official policy that requires that an

5 employee who has reported a check or suspected a check

6 of being fraudulent be documented and can -- in such a

7 way that it can be tied to that employee for future

8 reference, is that accurate?

9     A.   I don't recall exactly what is in the check

10 cashing policy so I -- I don't think I can answer that

11 question completely.

12    Q.   Would it be in the -- in any kind -- any

13 personnel policy that you're aware of?

14    A.   Not that I'm aware of, no.

15    Q.   If the -- Well, when you identified that the

16 incident in this case if a -- if a check is suspected of

17 being fraudulent that could be placed into an

18 intraoffice memo, is that right?

19    A.   An interoffice envelope I believe is what I

20 said.

21    Q.   Okay.  Clarify that.  Are those envelopes

22 cataloged by Harford Bank?

23    A.   I'm not sure what you mean by cataloged.  They

24 are couriered to our headquarters where they are opened

25 and distributed to whoever gets the mail.

1    Q.   If you are the recipient of that mail what do

2  you do with the mail after you've read it?

3    A.   I don't know what they do upstairs when they

4  open the mail.

5    Q.   I'm asking about you.  If you receive an intra

6  office envelope what do you do with that communication

7  after you've disseminated the contents?

8            MR. MARDER:  Objection, form.

9    A.   Are you speaking if mail is coming to me

10  directly in my name?

11    Q.   Correct.

12    A.   And it has information regarding a fraudulent

13  or potentially fraudulent check?

14    Q.   Yes.

15    A.   I'm going to consult with our security officer

16  and start gathering the facts to see if it truly is a

17  fraudulent item.  And if it is we turn it over to our

18  security officer for handling.

19    Q.   And -- And what happens to the literal

20  communication after that point, is it preserved?

21    A.   I don't think I have an example of one to even

22  answer that question.  I would keep it.

23    Q.   How would you store it?

24    A.   If I had one I'd put it in -- in my locked

25  files in my drawer in my office.

1      Q.    It would go into a physical locked file

2  cabinet?

3      A.    Most likely I would scan it first so that it

4  was converted electronically so I could email it to the

5  security officer.  He doesn't sit here in this office.

6  And then I would keep the piece of paper in a file, yes.

7      Q.    Do you have a -- a physical document storage in

8  your office or at the bank regarding this incident?

9      A.    I do have that, yes.

10     Q.    And has that -- all of that documentation been

11  provided to Harford Bank's attorneys?

12     A.    As far as I know, yes.

13     Q.    About how many documents are in that physical

14  storage?

15     A.    In my storage it's the memo that I wrote.

16     Q.    Just the memo?

17     A.    Yes.

18     Q.    You have no other physical documentation about

19  this incident?

20     A.    I'm sorry, I'm pausing.  I -- I may have some

21  printed out emails but they would also be electronic.

22     Q.    And you provided those to your counsel?

23     A.    Everything we had as far as I know was -- was

24  sent to our counsel, yes.

25     Q.    About how many emails were printed out?

Page 54

1      A.    I don't know.

2      Q.    Was it more than ten emails?

3      A.    Doubtful.

4      Q.    Was it more than five emails?

5      A.    I couldn't tell you the exact number.  It

6    was -- it was a few, maybe one or two.  I don't know.

7      Q.    Did those emails -- were those emails written

8    in the year 2020?

9      A.    I don't recall but probably, yes.

10     Q.    Were any of the emails written in 2021 or 2022?

11     A.    I don't know.

12     Q.    So we have -- Go ahead.

13     A.    No, no, sir.

14     Q.    Okay.  To summarize, the materials that you

15    have -- have had access to and have provided to your

16    counsel is the report that you prepared, and the number

17    of emails, less than five emails that you printed and

18    provided -- either forwarded, printed, scanned and gave

19    to your counsel, is that right?

20              MR. MARDER:  Objection, form.

21     A.    I believe so, yes.

22     Q.    Thank you.  I wanna talk -- talk about one more

23    sort of background piece of information, and then we can

24    talk about your report.  We talked about some of the

25    possible social impacts of banking policy.  And I just

1    wanna touch on one important one because I think it's

2    important to this case.  And I want to know your level

3    of familiarity with some of the history on this.  Are

4    you familiar with disparities in treatment between White

5    Americans and Black Americans when they encounter

6    police?

7                    MR. MARDER:  Objection, form.

8         A.    Not personally, no.

9         Q.    You're not familiar with the concept that there

10   is a disparity in treatment between Black folks and

11   White folks when they deal with police --

12                   MR. MARDER:  Objection, form.

13        Q.    -- and the outcomes of those interactions?

14                   MR. MARDER:  Objection, form.

15        A.    In --

16        Q.    You can answer.

17        A.    In general yes, sure.

18        Q.    Okay.  So generally you understand that there

19   exists data on the disparities and outcomes between when

20   white folks interact with -- with police and when Black

21   folks interact with police, is that fair to say?

22                   MR. MARDER:  Objection, form and

23   foundation.

24        A.    Generally, yes.

25        Q.    And because there's a form objection can you

Page 56

1    tell me how you became aware of that issue?

2        A.   I'm sorry, which issue?

3        Q.   The issue of the disparity and outcomes between

4    when Black people -- when Black Americans and White

5    Americans deal with police and those encounters.  How

6    did you become aware that that was an issue?

7        A.   Media, social media, friends, stories.

8        Q.   Sure.  So this is an issue that you're

9    generally aware of, you've read about, you've heard

10   about and you have no reason to believe that it's false,

11   is that right?

12              MR. MARDER:  Objection, form.

13       A.   That's correct.

14       Q.   I wanna point to one particular study.

15              MR. MC MULLEN:  Leslie, if you have the

16   study I'm referring to we can -- we can actually show

17   Mr. Claffee the one I'm referring to.

18              MR. MARDER:  Are you gonna mark it as an

19   exhibit, Matt?

20              MR. MC MULLEN:  Yeah, and actually, if we

21   could, I'd like to mark the notice of taking deposition

22   as Exhibit 1.  So this would be Exhibit 2.

23              MS. TYROCH:  Matt, is this the mapping

24   fatal policies?

25              MR. MC MULLEN:  That's right.

1           MS. TYROCH:  Thank you, sir.

2           (Document on screen)

3     Q.   And, Mr. Claffee, I'm not gonna expect that

4  you're familiar with this study, but I just want to

5  gauge the level of familiarity you have with it.  In

6  this -- I'll represent to you that this is a study that

7  was performed.  In the study they refer to MSAs.  And on

8  page 1 here I'll represent to you as well that the study

9  refers to MSAs as being metropolitan statistical areas.

10 The study reviewed fatal encounters with police and

11 looked for any disparities in the treatment of White --

12 encounters with White folks and with -- with Black

13 folks.

14           I'll point to page 5 of this report.  And

15 I wanna go to the final paragraph of this page.  It

16 starts with on average.  And, Mr. Claffee, I -- as I

17 mentioned, I don't expect that you're familiar with the

18 study, perhaps you're familiar with the -- the actual

19 level of the disparity which has been objectively

20 measured in American society.  I'll read this portion to

21 you.  It says, On average there were large racial ethnic

22 inequities in the rates at which White and Black people

23 were killed during police contact.  Across all MSAs,

24 Black people were 3.23 times more likely to be killed

25 compared to White people.  Mr. Claffee, did I read that

1   portion correctly?

2       A.   Yes, sir.

3       Q.   And I ask you as -- as an officer of Harford

4   Bank and in your personal experience, do you have any

5   reason to dispute that rate of disparity?

6                MR. MARDER:  Objection, form and

7   foundation.

8       A.   No, I do not.

9       Q.   Right.  And so we all understand that when

10  Black folks encounter police and when White folks

11  encounter police it's a vastly different experience for

12  each category of person, is that accurate to you,

13  Mr. Claffee?

14               MR. MARDER:  Same objection.

15      A.   According to this report that you showed me,

16  yes.

17      Q.   In your personal experience do you have any

18  reason to disbelieve that fact?

19               MR. MARDER:  Same objection.

20      A.   I have no personal experience dealing with

21  that.

22      Q.   You -- Do you agree or -- well, let me ask it

23  this way.  Do you dispute this fact, do you believe

24  that, in fact, there is no disparity?

25               MR. MARDER:  Objection, form and

1    foundation.

2        A.   I do not dispute it, no.

3        Q.   So you don't believe there is -- you don't

4    believe -- let me ask it this way.  My question was do

5    you believe there is no disparity?  I understand your

6    answer to be no, I -- I believe there is a disparity, is

7    that accurate?

8              MR. MARDER:  Objection, form and

9    foundation.

10       A.   Are you asking if I believe there is a

11   disparity?

12       Q.   Personally do you believe there's a disparity?

13             MR. MARDER:  Objection, form and

14   foundation.

15       A.   Yes.

16       Q.   And so when you provide your insight as a

17   retail banking professional when you're asked to as you

18   -- you indicated you were from time to time add your

19   thoughts to banking policy, is this a factor that plays

20   into your consideration?

21             MR. MARDER:  Objection, form.

22       A.   No.

23       Q.   Why not?

24       A.   This article that I'm reading or that you're

25   citing here is talking about police interaction and --

1    and deaths.  I'm not quite sure what that has to do with

2    my job.

3         Q.   Understood.  So in reacting to a suspicion that

4    a check is fraudulent are the police ever contacted?

5         A.   Yes, sometimes.

6         Q.   And so that's why I ask it.  That doesn't --

7    this disparity doesn't factor in your considerations

8    when dealing with bank policies in which a bank employee

9    may call the police on a customer?

10             MR. MARDER:  Objection, form.

11        A.   No, it does not.

12        Q.   Why not?

13             MR. MARDER:  Same objection.

14        A.   We follow the law and you can't discriminate.

15        Q.   You don't consider the risk to the customer of

16   a police interaction?

17             MR. MARDER:  Objection, form.

18        A.   No, I do not.

19        Q.   Or that some customers may have a heightened

20   risk as a result of a police interaction than others?

21             MR. MARDER:  Object -- objection, form.

22        A.   I cannot speculate to that, what they think.

23        Q.   But it doesn't factor into your considerations

24   when you weigh in on bank policy, does it?

25             MR. MARDER:  Objection, form.

1    A.   No.

2    Q.   Are any Harford Bank policies created that

3  you're aware of, or in existence that you're aware of,

4  that deal with when an employee should contact the

5  police?

6    A.   I don't think there's anything written in a

7  policy that states that, no.

8    Q.   So it's up to the employee whether to contact

9  the police in any given situation?

10    A.   Yes.

11    Q.   And in terms of fraud -- fraudulent checks,

12  there's an actual policy on how to deal with a situation

13  in which an employee suspects a check is fraudulent,

14  isn't that right?

15    A.   I believe that's spelled out in the check

16  cashing policy, yes.

17    Q.   Right.  That policy also includes contacting

18  you and the branch security officer, is that correct?

19    A.   I don't remember exactly what -- how the policy

20  is worded.

21    Q.   Are you aware that the policy asks or

22  encourages or even -- well, are you aware that the

23  Harford Bank's policies instruct that -- and I believe

24  you testified about this earlier -- that you and the

25  branch security officer are notified in the event that a

Page 62

1  check is suspected of being fraudulent?

2       A.   Yes, I agree with that.  Yes.

3       Q.   Okay.

4       A.   If the -- If the check is suspected to be

5  fraudulent it's to be brought to the security officer's

6  attention for sure.

7       Q.   But the policy is silent as to involving the

8  police in these matters, is that correct?

9       A.   Again, I don't know the exact wording but I

10  don't believe that's in there, no, correct.

11       Q.   If a police -- If the police are involved does

12  that result in an -- does Harford Bank policy require

13  documentation be generated when an employee contacts the

14  police?

15       A.   Again, I don't know exactly what is in the

16  policy in regards to that.

17       Q.   You're not aware of a specific policy that has

18  to do with police interactions between branch employees

19  and the police?

20       A.   I don't recall if there's anything specific in

21  the policy, no.

22       Q.   Do you keep any records as to how often

23  employees summon the police to branch locations?

24       A.   We do not, no.

25       Q.   Does anyone at Harford Bank keep track of that

1    information?

2        A.    I don't know.

3        Q.    If you needed to find out who would you ask?

4        A.    Our bank security officer.

5        Q.    What's the name of the bank security officer?

6        A.    Mitch Lindsey.

7        Q.    How long has Mitch Lindsey been employed with

8    Harford Bank?

9        A.    I believe about as long as I have been here,

10   about three years.

11       Q.    He would have been the branch security officer

12   in the year 2020, is that right?

13       A.    Yes.

14             MR. MARDER:   Objection, form.

15       A.    Sorry, yes.

16       Q.    Okay, thank you.   The -- You have ten branch

17   locations.   I'll -- I'll focus on the branch location

18   now that is involved in your -- in the report that you

19   generated about the incident in this lawsuit.   Where is

20   -- That's the -- which -- which branch is that?

21       A.    Internally we call it Joppa.   It's in

22   Joppatowne, Maryland.

23       Q.    What's the nearest if you -- if you -- if you

24   know, what's the nearest branch location to Joppa?

25       A.    The nearest next Harford Bank branch?

Page 64

1    Q.   Correct, yes.

2    A.   By distance probably this one I'm sitting in,

3    Aberdeen.

4    Q.   I apologize, one moment here.  What's the

5    distance between Joppa and the Aberdeen location?

6    A.   Probably ten miles.

7    Q.   Thank you.  Are you familiar with the concept

8    of a trade area for each branch location?

9    A.   I don't think there's a formal definition but

10   sure.

11   Q.   How would you define trade area for each

12   branch?

13   A.   Personally I would define the trade area as

14   probably within a five to ten mile radius of a physical

15   branch location.

16   Q.   What's the significance of a trade area, in

17   other words, what is a trade area?

18   A.   Internally for the managers that I work with I

19   would like them to focus on that area around their

20   branch, so that there's perhaps an overlap where they're

21   stepping on each others toes looking for business.  So

22   they have a defined area where they can search and look

23   for, you know, new customers and do business in and

24   around the branch where they live and work.

25   Q.   Fair to say that the trade area has to do with

Page 65

1   cultivating and maintaining banking business, is that

2   right?

3       A.   Yes.

4       Q.   What other significance is there to a trade

5   area other than what you've described?

6       A.   To me that's -- that's pretty much it.

7       Q.   So that's -- that's a term of art perhaps that

8   you would use -- well, let's just ask you, do you use

9   the term trade area?

10      A.   From time to time.  Branch area, trade area,

11   area which we serve, our community.  It's all

12   interchangeable.

13      Q.   The use of -- and correct me if I'm wrong --

14   you use it, the term trade area, to mean this is an area

15   in which this bank needs to focus its business

16   operations, new client, new customer generation and the

17   maintenance of existing customers.  Is that fair to say

18   or would you have anything to add to that?

19      A.   That's fair to say.

20      Q.   Would you have anything to add to that

21   definition of trade area?

22      A.   No.

23      Q.   Certainly if a customer wishes to engage a

24   certain branch and does not happen to be within the

25   trade area you're not turning away business, correct?

Page 66

1    A.   No.

2    Q.   In terms of the Joppa location how many

3 employees work at that location?

4    A.   Today or back in 2020?

5    Q.   If you know as to both.

6    A.   Actually I believe it's the same number.  There

7 are four there today and I believe there were four back

8 then.

9    Q.   And who -- what are each of their roles?  If

10 you can tell me just the -- the makeup of what that

11 branch would employ.

12    A.   Back in 2020 it would have been a branch

13 manager, an assistant manager and two tellers.

14    Q.   In 2020 do you know who the branch manager of

15 the Joppa location was?

16    A.   In early 2020 yes, it was Gail O'Keefe.

17    Q.   Gail O'Keefe no longer works for Harford Bank,

18 is that correct?

19    A.   She retired, that's correct.

20    Q.   And approximately when did Gail O'Keefe retire?

21    A.   She notified us some time in March and she

22 retired at the end of March.

23    Q.   She was not terminated, correct?

24    A.   No.

25    Q.   Who was the assistant manager in early 2020 at

1   the Joppa location?

2       A.   Her name is Peggy Hoban.  I think her first

3   name is Margaret.  We call her Peggy.

4       Q.   And who were the two tellers at the Joppa

5   location in early 2020?

6       A.   Jasmine and Amber.

7       Q.   And that's Jasmine Brown?

8       A.   Yes.

9       Q.   And what is Amber's last name?

10      A.   I -- actually I don't recall.

11      Q.   That's fine.  Jasmine Brown also no longer

12  works for Harford Bank, is that right?

13      A.   Correct.

14      Q.   When did she part ways with Harford Bank?

15      A.   I don't recall.

16      Q.   Was it in 2020?

17      A.   Yes, it was some time in 2020.

18      Q.   So in early 2020 the Joppa location of Harford

19  Bank employed Gail O'Keefe, who retired during the month

20  of this incident, is that correct?

21      A.   Yes.

22      Q.   And Jasmine Brown who left -- parted ways with

23  Harford Bank the year of this incident, is that right?

24      A.   Yes.

25      Q.   When Gail O'Keefe retired did she cite her

1  reasons for choosing to retire in March of 2020?

2      A.   I don't recall her reasons for retiring.  She

3  had been here for 44 years, I do know that.

4      Q.   And so my question is of all the months why did

5  she choose that month, do you know?

6      A.   She notified us earlier in that month.  I don't

7  know why she chose that, no.

8      Q.   Okay.  And so you recall that she actually

9  notified you prior to the incident that she was planning

10  to retire in March of 2020?

11      A.   That's correct, she did plan to retire.

12      Q.   So she knew when this incident occurred that

13  she would be heading -- parting ways with Harford Bank

14  and her profession shortly after or during March of

15  2020?

16      A.   Yes.

17           MR. MC MULLEN:  Turning to -- well, let me

18  -- okay.  We're only about half an hour away from the

19  last break.  I've got another topic that will probably

20  put us after 11 o'clock your time.  I'll leave it up to

21  other folks.  We can continue on or we can take an early

22  break.

23           MR. MARDER:  Matt, a question for you --

24  and not to hold you to this, of course, but do you have

25  a sense as to how much longer you'll be with Brian?  I'm

1    just trying to think about when we'll finish him versus

2    going to the next deposition.

3            MR. MC MULLEN:  I'm about -- I think I

4    have about two hours left, if that helps.

5            MR. MARDER:  All right.  Brian, I'll leave

6    it to you if you want to take a break now or if you

7    wanna wait another 15, 20 minutes or half hour.

8            THE WITNESS:  That's fine, we can wait

9    until then.

10           MR. MARDER:  All right.  And obviously,

11   Brian, if during that period of time you need to take a

12   break, use the restroom just let us know.  Nobody wants

13   you to sit there with your legs crossed.

14           MR. MC MULLEN:  Certainly not.  Yeah, so

15   if you need a break just let me know.  I just thought

16   I'd call it out if we wanted to do it early.

17       Q.   (BY MR. MC MULLEN)  Mr. Claffee, are you

18   familiar with an individual named Sheira Brown?

19       A.   Familiar?  I know her name now, yes.

20       Q.   How did you become aware of Sheira Brown?

21       A.   From an incident that happened back in March of

22   2020.

23       Q.   Is that March 19th of 2020?

24       A.   Yes, that Thursday night.  Yes.

25       Q.   How did you first learn of the incident?

Page 70

1    A.    I got a phone call that evening from Gail

2    O'Keefe, the manager.

3    Q.    What did Gail tell you?

4    A.    Gail said that she had to call the police,

5    everyone was okay, I did nothing wrong but they want to

6    talk to you so I gave them your name and number and they

7    wanna call you.

8    Q.    She said I did nothing wrong.  Was she

9    referring to herself or to you?

10   A.    Herself.

11   Q.    Okay.  So she called you and said I did nothing

12   wrong, as in I Gail did nothing wrong?

13   A.    Correct.

14   Q.    Why would she signal whether she had done

15   something wrong?

16   A.    I can only guess because she had called the

17   police but she wanted me to know that everybody was

18   okay.

19   Q.    Okay.  And she told you that you may need to

20   speak with the police?

21   A.    She told me that she gave them my phone number

22   and name because they wanted to speak to her boss, me.

23   Q.    Understood.  Did she impart on you why she --

24   why the police wanted to speak to you?

25   A.    No, I don't recall that.  No.

1    Q.    What else did she report to you on that call?

2    A.    That was it.  It was a very quick phone call.

3    Q.    So Gail called you and advised number one that

4  no one was harmed in this incident -- well, she reported

5  an incident -- that incident to you first, is that

6  right?

7    A.    All she said --

8          MR. MARDER:  Objection, form.  Go ahead.

9    A.    All she said to me was we're all okay, I did

10  nothing wrong, the police are here, they need to speak

11  to you and I gave them your name and phone number.

12   Q.    Understood.  And -- well, why did she -- did

13  she identify why the police had been called?

14   A.    I don't recall that she told me that, no.  It

15  was a very quick phone call.

16   Q.    What happened then?

17   A.    Within a few minutes after hanging up the

18  Harford county deputy gave me a call.

19   Q.    What did the deputy tell you?

20   A.    I know it's in -- in my notes in the memo.

21  From what I recall he said that there was a customer

22  there who tried to cash a check and the check was now

23  locked in the vault.  And he wondered if there was a way

24  for us to get this check back out of the vault.

25   Q.    Did he tell you why the check needed to come

Page 72

1    out of the vault?

2         A.   He said that the person -- I didn't know her

3    name at the time -- but Ms. Brown requested to have that

4    check given back to her.

5         Q.   Did you have an understanding why she needed

6    the check back?

7         A.   No, I do not.  I did not.

8         Q.   But how did you respond to that information

9    from the officer?

10        A.   Knowing that the check is locked in the vault,

11   the vault's on a timer and there is no way for anyone to

12   get in that vault until the following morning when the

13   timer comes off and two people open the vault, I

14   asked -- I gave the sheriff my name and phone number and

15   asked that he give that to Ms. Brown so that she could

16   call me first thing in the morning.

17        Q.   And just to clarify that timing.  Is that a --

18   is that a number of hours?  And I'm not trying to rob

19   the bank or anything.  How long is -- What's the

20   timeline, is it just the next morning, is it a number of

21   hours?

22        A.   Without being too exact so that you can't rob

23   our bank, it's a number of hours so that the timer comes

24   off in enough time for us to open for the day.  And it

25   varies if it's a weekend versus a weekday, obviously,

1  the number of hours.

2      Q.   Okay.  And it requires two -- two bank

3  employees to be there?

4      A.   To open the vault.

5      Q.   I'm sorry, to open the vault they have some

6  sort of access card or key, does that sound right?

7      A.   Yes, it's either a key and a combo or two

8  combinations.  So it takes two people, yes.

9      Q.   Of the four branch employees who has the

10  ability to open the vault, all four?

11      A.   It's two people.  And generally most branches

12  you have an A and a B combination.  So two people would

13  have the A, two people would have the B.  And it would

14  require two of them to get into the vault.  It's called

15  dual control.

16      Q.   Understood.  On that day -- so March 19th of

17  2020 is when this incident happened.  I understood your

18  testimony to mean the check could not be accessed from

19  the vault until March 20 -- March 20th of 2020, does

20  that sound right to you?

21      A.   That's correct.

22      Q.   On March 20th of '22 which -- who would have

23  had -- well, who could -- I won't -- I won't make you go

24  through every permeatation of who could have done this,

25  but you would've had to have two different employees of

1  Harford Bank, is that right, of that branch location?

2      A.   Yes, two people from that branch location to

3  get into the vault.

4      Q.   And do you have a recollection who had the A

5  and who had the B designation in that -- at that time?

6      A.   I have -- no, I do not.

7      Q.   Would there have been a way to determine who

8  should be what or is it random?

9      A.   I can't speak to that branch specifically,

10  'cause different branches have different types of vaults

11  and combinations versus locks and combos so I can't

12  answer that.  I don't know.

13      Q.   Would it ever be the case that both tellers are

14  A or B?

15      A.   It should not be the case, no.

16      Q.   I would think that there's some -- some import

17  to having a manager and a teller at least, is that -- is

18  that your understanding?

19      A.   Correct.

20      Q.   And so in this case either Gail or -- a

21  combination of either Gail or Peggy on the one hand or

22  -- and Jasmine and Amber on the other hand would have

23  been required, is that right?

24      A.   That's correct.

25      Q.   On March 20th of 2020 do you know whether Gail

1   or Peggy was scheduled to be at the bank that day?

2       A.   I knew Gail was scheduled to be there.

3       Q.   Okay.  So Gail would've been one of the -- of

4   the two folks that needed to be there to access the

5   vault on March 20th of 2020?

6       A.   I believe so, yes.

7       Q.   Thank you.  And so Gail needed to be at the

8   bank if -- well, Gail was the person who needed to be at

9   the bank or one of the people who needed to be at the

10  bank at the Joppa location on March 20th of '20 to

11  actually release the funds as the officer requested, is

12  that right?

13              MR. MARDER:  Objection, form.

14      A.   Yes.

15      Q.   I think that was a yes, is that right?

16      A.   Yes, it would require two people to get into

17  the vault and one being the manager, yes.

18      Q.   And that one on March 20th of 2020 was Gail

19  O'Keefe, is that right?

20      A.   From what I recall, yes.

21      Q.   Okay.  When did you learn that Gail O'Keefe had

22  determined that she suspected the -- Sheira Brown's

23  check to be fraudulent?

24      A.   I don't recall the exact timing.  It was some

25  time that Friday.

1  Q.   It wasn't on her initial call to you when she

2  first reported that the police would need to be in

3  contact with you?

4  A.   Not that I recall, no.  Again, that was a very

5  quick conversation.

6  Q.   And it wasn't when the police followed up and

7  did call you about releasing the check, they -- there

8  was no mention about a fraudulent check in that call

9  either, was there?

10  A.   Again, I don't recall the specifics, it may be

11  in my memo if you have that.  I'm sure I wrote that

12  down.  I don't remember him mentioning that

13  specifically, no.  He just wanted to get the check out

14  of the vault and asked me if that was possible.

15  Q.   Right.  So the first two calls you received,

16  the messages of import to you that you recall now, are

17  that the police are involved and that the check needs to

18  be released from the vault the next day, is that right?

19  A.   Yes.

20  Q.   Let's -- You referenced your report.  I think

21  it's a good time to bring that up.  We are also at the

22  hour mark now.  I'll offer again five, ten minutes if

23  you'd like it.

24  A.   I'm okay for now, thank you.

25  Q.   Okay.  If we can go to Harford Exhibit 18,

Page 77

1    it'll be Exhibit 3 to this deposition, if we can.

2              (Exhibit 3 on screen)

3              And, Mr. Claffee, you referenced in a

4    couple of points that you've prepared a report.  You

5    also reviewed this -- the report with your counsel.  I

6    can let 'ya -- we can scroll up and down on this exhibit

7    here to familiarize it with you.  But just looking at

8    this first page here is this a copy of the report you

9    prepared in this case?

10             MR. MARDER:  Matt, before you ask him to

11   identify the whole thing can you just flip through all

12   of the pages of the exhibit please and go through the

13   Bates numbers also.

14             MR. MC MULLEN:  Yes, sir.

15             (Exhibit 3 scrolled through)

16             MR. MARDER:  Can you go to the last page?

17   I just wanna see that last Bates number.  Thanks.  I see

18   the Bates are Harford 18 through 22.

19        Q.   (BY MR. MC MULLEN)  Mr. Claffee, we just

20   reviewed Harford Exhibits 18 through 22.  Is this a true

21   and correct copy of the report that you prepared with

22   regard to the incident on March 19th of 2020?

23        A.   Yes, it is.

24        Q.   And when did you prepare this report?

25        A.   I started it the day after, so March 20th.  And

1   as more information was gathered over the coming days

2   and maybe even a week to complete the full memo.

3        Q.    When were you able to complete this memo?

4        A.    I don't recall the last day I accessed this --

5   this memo and added anything to it.

6        Q.    Would you estimate that it took longer than a

7   month to prepare this memorandum?

8        A.    No, probably not longer than a month.  No.

9        Q.    How was this -- well, I read up at the top here

10  it says -- I think it's your signature, B. Claffee, is

11  that right?

12       A.    That's me, yes.

13       Q.    And it's directed to Mike Allen, president of

14  Harford Bank.  Was this memorandum sent to Mike Allen?

15       A.    Yes, it was.

16       Q.    Was it sent to anyone other than Mike Allen?

17       A.    I can't recall if he either asked me to send it

18  to someone else or if he shared it.  He asked me to

19  draft it and I sent it to him.

20       Q.    Mr. Allen asked you to prepare this report, is

21  that right?

22       A.    Yes.

23       Q.    Had you prepared a similar report in the past

24  for Mr. Allen about a different incident?

25       A.    Not that I recall.  At this point I'd only been

1  employed with the bank for three-and-a-half, four

2  months.

3      Q.    How did you know to format the report in this

4  fashion?

5      A.    I just gathered facts and started typing.

6      Q.    No one at Harford Bank told you the format to

7  use when you prepared this report?

8      A.    No, sir.

9      Q.    Had you ever prepared a report at Harford Bank

10  involving a check deposit in the past?

11      A.    At the time of this incident?  No.

12      Q.    Have you since?

13      A.    I don't recall anything specific, no.

14      Q.    Have you prepared a report about any incident

15  that you sent to Mike Allen before or after this

16  incident?

17      A.    I don't recall exactly.  It's possible.  I

18  don't recall any specifics, no.

19      Q.    Have you prepared any reports involving checks

20  that were suspected of being fraudulent other than this

21  incident?

22      A.    Not that I can recall, no.

23      Q.    Have you prepared any reports involving

24  allegations that a bank employee has -- well, wherein a

25  bank employee is being accused of racist behavior?

1    A.    I'm sorry, what was the first part of the

2    question?

3    Q.    Have you ever prepared a report to Mike Allen

4    or anyone at Harford Bank wherein you are describing or

5    reporting an event or an incident involving allegations

6    of racism?

7    A.    No.

8    Q.    I'll turn to your report here.

9         MR. MC MULLEN:  Let's go to -- if we can

10   scroll down to where it says incident began around 5

11   p.m. that will be the next page.  (Document scrolled).

12   That'll do.

13   Q.    I'll read the report to you, Mr. Claffee, and

14   if you can help me understand the report a little

15   better.  It says you determined that the incident began

16   around 5 p.m. March 29th, 2020 at the Joppa branch

17   drive-thru.  Does that sound familiar?

18   A.    Yes.

19   Q.    And you also wrote that Sheira Brown presented

20   a check to be cashed by Jasmine.  I assume that's also

21   Jasmine Brown, is that right?

22   A.    Yes.

23   Q.    You write, Jasmine is -- or I'm sorry.  You

24   write, Sheira is not a known person to the bank nor is

25   she a customer.  Can you explain the significance of the

1   phrase Sheira is not a known person to the bank?

2       A.   So she's not a customer, meaning she does not

3   have an account here, nor is she a person who regularly

4   frequents the branch to perhaps cash checks.  So there

5   are people who are not customers who we do see on a

6   regular basis.  She was not one of those -- one of those

7   people either.

8       Q.   Is another way to characterize that she's not a

9   person that anyone at the branch recognized?

10      A.   Sure.

11      Q.   Is that factor -- Is that material to a

12  determination whether the check is fraudulent or not?

13      A.   It's material because we ask for ID in order to

14  cash a check for someone who is not a customer, meaning

15  they don't have a bank account with us.

16      Q.   Is there a policy at Harford Bank that asks

17  that employees recognize the customer personally?

18      A.   It's in our check cashing policy when we need

19  to request ID to cash a check.

20      Q.   I understand when you need to request ID.  But

21  is it significant and in that policy is it described

22  that a person -- that the employee should recognize or

23  not recognize the customer?

24      A.   I don't know that it's in a policy but that's a

25  common practice.  We wanna get to know all of our

1    customers who come in on a regular basis.

2         Q.   It has nothing to do, though, with whether a

3    check is fraudulent or not, isn't that right?

4                   MR. MARDER:  Objection, form.

5         A.   Right, those are two separate issues.

6         Q.   Why is it noted in this report?

7         A.   The statement about not being a known person

8    nor being a customer?

9         Q.   That's right.

10        A.   I think it's relevant because we ask for ID in

11   order to cash this check.

12        Q.   How is that relevant to whether you ask for an

13   ID?

14        A.   Well, because the -- we need to verify the name

15   on the check is the person who is trying to cash it.

16        Q.   But isn't that information -- I just -- how is

17   it relevant whether the bank teller recognizes the

18   customer when it comes to asking them for ID?

19        A.   If -- If you come to the bank every week to

20   cash a paycheck you are a known person to the bank.

21   They would not be asking for that person's ID every

22   single week, unless perhaps it was a floating teller who

23   had never been to that branch and does not know that

24   person.  So it's relevant to the check cashing policy

25   procedure if I don't know who this person is we need to

1    identify them by asking them for ID before we cash the

2    check.

3         Q.   Okay.  And so what I understand your testimony

4    to be is that there are exceptions to checking for ID.

5    And that exception is when you recognize the customer?

6         A.   If it's a known person to our employee, yes.

7         Q.   Is that written down in Harford Bank policy?

8         A.   I don't -- I don't know exactly what is in the

9    check cashing policy in relation to that.

10        Q.   Okay.  Let's see if we can take a look at the

11   check cashing policy.  It'll be -- I think it's gonna be

12   Harford number 2.  And, Brian, I'll just show that to

13   you.  If it's not the policy we're looking for we'll

14   find the other policy.  Before we go on too far into

15   this exhibit, Mr. Claffee, is this the policy -- does

16   this appear to be the policy that you're identifying?

17        A.   Right now it's too small, I can't read it

18   but --

19        Q.   We can zoom in.

20             MR. MARDER:  And, Matt, are you marking

21   this as an exhibit?

22             MR. MC MULLEN:  Not yet.  I just wanna

23   make sure we're on the right page here.

24        A.   Yes, I -- I believe that to be our current

25   process in 2020, yes.

1    Q.    Okay.  Mr. Claffee, can you tell me what we're

2  looking at when we look at this exhibit?

3    A.    This is the check cashing and withdrawal

4  guidelines that we teach in our training process for

5  tellers.

6    Q.    Thank you.

7            MR. MC MULLEN:  I will mark this, I think

8  it's -- correct me if I'm wrong -- we're on Exhibit 4

9  now.

10           THE REPORTER:  I think that's right.

11           MS. TYROCH:  That should be correct, Matt.

12  That should be Exhibit 4.  And this is Bates 000002 to

13  same sequence 03.

14           MR. MC MULLEN:  Let's zoom back into these

15  two -- these two charts here.

16    Q.    (BY MR. MC MULLEN)  And just to clarify,

17  Mr. Claffee, I'll let you review this.  I'm not seeing

18  an exception for incidents wherein a customer

19  recognizes -- is recognized by an employee but I may be

20  missing it.  If you can, just review and let me know

21  where that would be.

22    A.    Can you -- Can you zoom in a little bit more,

23  please.

24           (Exhibit 4 zoomed in on)

25    Q.    And, Mr. Claffee, please feel free to let us

Page 85

1   know where -- where we need to move and -- and how far

2   in we need to zoom at any point.

3       A.   And I'm sorry, what is your question now?

4       Q.   Where does this policy tell us that if an

5   employee recognizes the customer that ID is not required

6   for cashing a check?

7       A.   That specific statement I don't -- I don't see

8   in this procedure, no.

9       Q.   This procedure doesn't have that exception, is

10  that accurate?

11      A.   Right.  I'm looking under both account holder

12  guidelines and non-account holder guidelines.

13      Q.   Would Ms. Brown -- Ms. Sheira Brown be a

14  non-account holder?

15      A.   She is a non-account holder, correct.

16      Q.   We have -- This is the procedure or the policy

17  that was provided in discovery to us from Harford Bank.

18  Some of the items that are in black up there --

19      A.   Yeah.

20      Q.   -- are a little difficult to read.  I think

21  down here at the bottom it says acceptable information,

22  here right before where it says primary.  Do you see

23  what I'm referring to there?

24      A.   Yes.

25      Q.   Are you able to -- to summarize how someone

1  should read this -- this guideline in general?  In other

2  words, what are these different box categories, can

3  you -- can you familiarize us with the -- with this

4  document?

5      A.   Just reading under -- under the first column

6  primary it would mean that to mean primary

7  identification, being a US drivers license, passport,

8  state ID card, military, or alien registration card.

9  That -- Those are acceptable forms of ID when validating

10  the person cashing the check.

11      Q.   Excellent.  So safe to say we can't exactly

12  read what it says above primary, but it likely says

13  acceptable identification, is that fair to say?

14               MR. MARDER:  Objection, form.

15      A.   I can't read it but that seems reasonable.

16      Q.   And in any event, whether it says that or not,

17  what it's identifying is acceptable forms of

18  identification for bank tellers, is that right?

19      A.   Yes, it references one form of primary ID in

20  the box above.

21      Q.   Right.

22      A.   The primary indicates what those are, yes.

23      Q.   And so when we say primary this is not -- my

24  understanding, and you can correct me if I'm wrong --

25  this is not an exhaustive list, but these are five of --

1  of the most common types of primary identification, is

2  that accurate?

3       A.    They are definitely five of the most common and

4  -- and acceptable for a primary form of ID.

5       Q.    And over to the right it says identification

6  should validate the following.  It says name, address,

7  date of birth, signature, physical appearance.  Is that

8  right?

9       A.    That's what it says.

10       Q.    And so what -- when a person provides their ID

11  the teller is instructed to look at those five factors

12  and confirm whether they're present, is that accurate?

13       A.    Yes.

14       Q.    Explain why physical appearance is relevant.

15       A.    I'm not gonna speculate.  If you're looking at

16  a drivers license and the person in front of you, can

17  one reasonably assume that it's the same person?

18       Q.    You check the photo ID, you look at the person

19  and if it looks like the person, is that generally what

20  this is asking?

21       A.    Yes, along with their name, address, date of

22  birth and signature, yes.

23       Q.    Right.  Are there any other specifications in

24  any Harford Bank policy as to what a teller or branch

25  employee should look for when determinating if a person

Page 88

1    resembles their physical appearance in the ID?

2         A.    No.

3         Q.    That is up to the teller themselves or the

4    employee themselves, is that right?

5         A.    It's up to the person who is interacting with

6    that customer.

7         Q.    Does Harford Bank train employees as to how to

8    identify whether an individual matches their ID?

9         A.    Other than following this guideline like in a

10   training procedure not that I'm aware of, no.

11        Q.    So it's up to the individual to figure out what

12   features to look for, for example?

13        A.    Define features.

14        Q.    Well, would you agree that physical appearance

15   includes facial features?

16        A.    It could, sure.

17        Q.    Would it include hairstyles?

18        A.    It should -- it could, yes.

19        Q.    And you would agree that customers' hairstyles

20   could change, for example?

21        A.    Of course.

22        Q.    And so my question is is there any training

23   from Harford Bank as to identify whether a person's

24   change in appearance is either commonplace or rises to

25   the level that we can't identify them any more?

1         MR. MARDER:  Objection, form.

2     A.    Not that I'm aware of, no.

3     Q.    Let's see.  Now, in the third column here what

4 are we looking at next to identification should

5 invalidate the -- or should validate the following.

6 What is this third column referencing?

7     A.    Again, I -- I cannot read what is in the black

8 bar above that.  Does -- Does anybody know what that

9 says?

10     Q.    I'll make a suggestion, you can tell us if it

11 looks consistent with what you're seeing.  It looks like

12 characteristics of a counterfeit.

13     A.    Okay.

14         MR. MARDER:  Objection, form.

15     Q.    Can you review that third column there and let

16 me know if those factors are consistent with this

17 document referencing -- intending those factors to be

18 characteristics of a counterfeit.

19     A.    Yes.  So the endorsement, the signature, the

20 inconsistent font throughout the item, the check number

21 doesn't match the check number located in the maker

22 line, misspelling of our bank name or the account holder

23 name, the address.  Those are all considered

24 characteristics that could indicate a counterfeit check,

25 yes.

1    Q.   And so employees of Harford Bank are instructed
2  to look at these characteristics of a counterfeit as
3  potential signs that the check may be fraudulent, is
4  that accurate?
5    A.   Yes.
6    Q.   Okay.  I'd like to table this exhibit and then
7  return back to your -- your report that we may return to
8  that policy and -- and generally speaking, if you need
9  to refer to it just let me know.
10            MR. MC MULLEN:  If we could return to -- I
11  can't recall our ex -- deposition exhibit but I'm
12  looking for the report, yeah.
13            MR. MARDER:  Number 3.
14            MR. MC MULLEN:  Thank you, sir.
15            (Exhibit 3 on screen)
16    Q.   (BY MR. MC MULLEN)  In the picture -- This
17  report indicates Sheira is not a known person to the
18  bank.  Who provided you with that report, the fact that
19  Sheira was not known to the bank?
20    A.   I can't recall whether it was Gail or Jasmine
21  who gave me that information.
22    Q.   So --
23    A.   They were both -- they were both there at -- at
24  the same time.
25    Q.   Fair to say either Gail O'Keefe or Jasmine

1  Brown reported to you that Sheira was not known to

2  either of them, is that accurate?

3       A.   Yes.

4       Q.   And as we identified in the policy we just

5  reviewed, that would not create an exception to whether

6  she should be asked for ID, at least under the policy,

7  is that right?

8       A.   I'm sorry, could you -- either rephrase that or

9  repeat that.

10      Q.   The policy we just reviewed, which has been

11  marked as Exhibit 4, does not tell us why this statement

12  that Sheira was not known to the bank is important to

13  note, is that true?

14      A.   Correct.

15      Q.   It goes on to say the picture on ID didn't

16  match in her opinion, and there were several small red

17  flags on the check such as mismatched font types and

18  sizes, the written amount was shortened, it was a month

19  old and Sheira was from Owings Mills, an hour south of

20  the bank's trade era -- area.  Jasmine was suspicious

21  and asked for manager to review it.  I'll turn to that

22  last sentence, Jasmine was suspicious.  I interpret, and

23  correct me if I'm wrong, that that statement means that

24  Jasmine was sus -- suspected something of the check or

25  of Sheira, is that right?

1      A.    Yes.  One or the other, yes.

2      Q.    In other words, it doesn't mean Jasmine herself

3   was the suspicious individual, is that right?

4      A.    Correct.

5      Q.    And the manager that she is asking to review

6   this document is -- is Gail O'Keefe, is that right?

7      A.    That's correct.

8      Q.    Okay.  I wanna break down each of these factors

9   that -- that are being identified here, but this entire

10  paragraph we just read -- before we get into that, all

11  of these factors were either identified by Gail O'Keefe

12  or Jasmine Brown, is that right?

13     A.    That's correct.

14     Q.    Were any of these factors identified by only

15  Jasmine Brown but with which Gail O'Keefe did not agree?

16     A.    I was not there.  I can't answer that.

17     Q.    You have no information to suggest that Gail

18  O'Keefe doesn't agree with everything in this paragraph,

19  do you?

20     A.    No, I do not.

21     Q.    We'll look first, it says the picture on ID

22  didn't match.  I assume that means her -- her physical

23  appearance, is that right?

24     A.    That's what I take that to mean, yes.

25     Q.    And it's in her opinion.  The her being

1   referenced there is Jasmine Brown?

2       A.   Yes.

3       Q.   First I want to remind ourselves we agree,

4   though, that the -- as it turns out and as your

5   investigation turned -- turned up, as well as the police

6   investigation, that the person identified or the person

7   we see in the -- the ID photo and the person who

8   actually presented to Sheira Brown who presented herself

9   to Harford Bank, those are, in fact, of the same person.

10  We can agree on that?

11      A.   Yes.

12      Q.   So we can agree that this opinion offered by

13  Jasmine Brown and Gail O'Keefe that Sheira Brown is not

14  the person in this ID, those are incorrect opinions?

15      A.   We -- Well, it turned out to be a fact that it

16  is the same person.

17      Q.   That's right.  So when Jasmine Brown said this

18  is not the right person or she suspected it she was, in

19  fact, wrong?

20      A.   Correct.

21      Q.   And so we now know factually that the image of

22  -- well, that Sheira Brown and the image on this ID are

23  one and the same person.  We can agree on that?

24      A.   Yes.

25      Q.   Do you agree -- And your report here up at the

1   top has an image of Sheira Brown next to the photo ID.

2   Do you see that?

3        A.   Yes.  The image on the right, yes.

4        Q.   And is that a screen capture of video footage?

5        A.   Yes, it is.

6        Q.   When was that video footage taken?

7        A.   The footage was from the evening of the 19th.

8        Q.   And so it's included in this report I -- I

9   deduct it's been included as a way to juxtapose

10  Ms. Brown's appearance on the 19th with her photo ID, is

11  that right?

12       A.   Yes, because Jasmine's opinion was they did not

13  match so I put them both on this report.

14       Q.   I'll let you review the photo ID we have here

15  and the image that was provided in this report of

16  Ms. Brown on -- on March 19th of 2020.  Do you believe

17  that these two faces do not match?

18       A.   I could go either way.  Looking at them very

19  quickly there are things that you could look at,

20  specifically the hair, that does not match.

21       Q.   Okay.  You've identified the hair.  How does

22  the hair not match?

23       A.   It appears to me the image on the left, on the

24  drivers license, the hair is white and curly.  That does

25  not match the image on the right.

Page 95

1    Q.   Does that image on the left appear to be a wig?

2    A.   I would have no idea.

3    Q.   In what other ways does the image on the left

4  not match with the image on the right?

5    A.   Nothing else specifically that I can see.

6    Q.   Right.  Her eyes match, right?

7    A.   The rest of her face is close enough, yes.

8    Q.   The only distinguishing characteristic, in

9  other words, between the left image and the right image

10  is that her hair is different, is that correct?

11    A.   In my opinion, yes.

12    Q.   Right.  We can't identify looking at these two

13  images what else might have been different, is that

14  right?

15              MR. MARDER:  Objection, form.

16    A.   That's right.

17    Q.   And, in fact, Gail O'Keefe nor -- well, Gail

18  O'Keefe did not tell you in what ways they didn't match,

19  did she?

20    A.   She did not.

21    Q.   Gail O'Keefe did not tell you which particular

22  feature she felt was this -- the reason she didn't think

23  these two things matched, is that right?

24    A.   She did not.

25    Q.   Did Jasmine Brown provide any information to

1  you?

2      A.   Which information, what -- what she thought did

3  not match?

4      Q.   Yeah, I'll clean that question up for you.

5  Jasmine Brown, like Gail O'Keefe, did not identify for

6  you why she felt the image on the left and the image on

7  the right did not match?

8                  MR. MARDER:   Objection, form.

9      A.   No, I just wrote down in my memo that she said

10  that the picture didn't match in her opinion.   That's

11  all I wrote.

12      Q.   Right.   She didn't provide you with the

13  information as to why they didn't match in her opinion,

14  right?

15      A.   That's right.

16      Q.   And if it -- if she had you likely would have

17  included it in your report?

18      A.   If she gave me specifics yes, I would've.

19      Q.   But she did not give you specifics, correct?

20      A.   Correct.

21      Q.   We did not see -- We just reviewed the Harford

22  Bank policy as to identifying -- taking a look at an ID

23  to determine whether the ID itself is counterfeit --

24  well, let me -- and you can clarify for me.   The portion

25  of that exhibit that we looked at identifying

1  counterfeit, that had to do -- or counterfeit items,

2  that had to do with checks, right, that didn't have to

3  do with ID.  Am I correct about that?

4      A.   Yes, the items in the right-hand column that

5  talk about counterfeit, that's correct.

6      Q.   And it's not anyone's allegation here, I don't

7  believe, that the ID itself that we see in this report

8  is itself counterfeit, right?

9      A.   No.

10     Q.   It goes -- The report goes on to say, there

11 were several red flags on the check such as mismatched

12 font types and sizes.  And I believe actually in this

13 report we have -- lower down we have an image of the

14 check there.

15              MR. MC MULLEN:  If we could zoom in on

16 that check, please.

17     Q.   (BY MR. MC MULLEN)  Focusing on mismatched font

18 types and sizes, please identify for us where you see

19 mismatched font types.

20     A.   Or more specifically the size.  So the name

21 paid to the order of Sheira Brown is a much larger.  I

22 can't tell if it's a different font, I'm not an expert

23 in fonts, but Sheira Brown is larger than the row below

24 it, ninety and 94/100.

25     Q.   And that's a -- a difference in the size,

Page 98

1    correct?

2        A.   Yes.

3        Q.   So the report identifies mismatched fonts,

4    types and sizes.  Is it your testimony that it's only

5    mismatched sizes?

6        A.   No, I'm not a font expert but the font for Pay

7    To The Order Of and the line below this amount do not

8    appear to be the same font.

9        Q.   The Sheira Brown up at the top right above 90

10   and 94/100 and Sheira Brown at the bottom, you think

11   those are two different fonts?

12       A.   Those appear to be the same font just a

13   different size.  Her name specifically.

14       Q.   Right.  And the number over in the right where

15   it says numeral 90.94, is that a different font type?

16       A.   It looks different to me.  Again, it's hard to

17   tell.  That one's bolded and it's a little bit larger.

18       Q.   Right.

19       A.   The ninety and the 94, the written words.

20       Q.   We can't determine that this is a different

21   font type, though, from looking at it, can we?

22                MR. MARDER:  Objection, form.

23       A.   I cannot determine that, no.

24       Q.   And the Harford Bank employees don't have

25   additional training that you do not have in terms of

Page 99

1    identifying font types do -- do they?

2         A.    No, they don't.

3         Q.    Gail O'Keefe wouldn't have had that type of

4    training to your knowledge?

5         A.    No.

6         Q.    It's very possible from looking at this check,

7    at least in your opinion, that all of the font types

8    here are the same but there are different sizes and

9    perhaps some of them are in bold, isn't that true?

10                  MR. MARDER:  Objection, form and

11   foundation.

12        A.    That's my opinion today, yes.

13        Q.    Thank you.  It goes on to your report -- I'm

14   sorry, it goes on to say, the written amount was

15   shortened.  Is that because underneath Sheira Brown it

16   says 90 and 94/100?

17        A.    I believe that's what she was referencing, yes.

18        Q.    That isn't in Harford Bank's policy to

19   identify, is it?

20        A.    Well, it's one of the things that you should be

21   looking at.

22        Q.    Let's take a look back at the policy that was,

23   I believe, marked as Exhibit 4 to this deposition.

24                  (Exhibit 4 on screen)

25                  I don't identify in this policy where it

1    says that a shortening of the description of the amount

2    of the check is a factor to be considered -- considered

3    when looking at characteristics of a counterfeit.  Do

4    you see anything in your policy, in Harford Bank policy

5    to identify that?

6         A.   It's not that specific, no.  It's just the

7    amount of the check.  And the amount of the check is in

8    two places.

9         Q.   So, for example, if the amount of the check

10   differs in the two different places, that could create

11   an issue or raise a red flag, right?

12        A.   Absolutely.

13        Q.   In Sheira Brown's case this check does not have

14   two different amounts, does it?

15        A.   They're not different amounts, no.

16        Q.   And where it indicates a number where you

17   traditionally would on a check it indicates a number, is

18   that right?

19        A.   On the right-hand side of the check with the

20   dollar sign?

21        Q.   Correct.

22        A.   That's a number, correct.

23        Q.   And where it indicates the written roman

24   description of the check amount that's where you would

25   traditionally write that in that fashion, is that right?

1    A.    You write the full worded amount of the check,

2    yes.

3    Q.    So those two things are not equal in your

4    experience in retail banking on customer checks?

5              MR. MARDER:  Objection, form.

6    A.    We see all sort of different ways in which

7    people write them.  I personally have not written checks

8    for -- for years but some people will write the word

9    dollars, some people won't.  But as long as the two --

10   the -- the written description and the number match

11   that's what we need to verify.

12   Q.    Exactly.  The -- What -- What we notice here --

13   well, actually, let's return back to your report, if we

14   could.

15             MR. MARDER:  And, Matt, whenever it's a

16   good time for a break I'd like to take one.

17             MR. MC MULLEN:  I would too.  Thank you

18   for bringing it up.  It is a good time now.  We can

19   certainly do that now.  Say ten minutes.

20             MR. MARDER:  Sounds good.  Okay, thank

21   you.

22             VIDEOGRAPHER:  Okay, we're off the record.

23   The time is 11:37 a.m. eastern time.

24             (Recess from 11:37 to 11:52

25             VIDEOGRAPHER:  Okay, we are back on the

1   record.  The time is 11:52 a.m. eastern time.

2                    MR. MC MULLEN:  We can go back to Harford

3   No. 2.

4                    (Document on screen)

5        Q.   In this -- Mr. Claffee, in this document where

6   do we see --

7                    MR. MC MULLEN:  Well, actually if we could

8   go up to the -- pull up to the corner of this, the top

9   right-hand corner.  I'm sorry, down a little bit here

10  where it says number 4 it'll say any item or combination

11  of items over employees check cashing limit.

12       Q.   (BY MR. MC MULLEN)  Mr. Claffee, in this

13  instance I can't read what's above that.  But it says

14  any item or combination of items over employees check

15  cashing limit.  And then it says items are stale dated

16  or post dated.  Do you have an idea what the

17  significance of those two items might be in the context

18  of this -- of these guidelines?

19       A.   Sure.  We have check cashing limits by

20  position.  So, for instance, a brand-new teller would

21  have a lower limit to cash checks and would need to

22  refer it to your supervisory, I believe that's what

23  number 4 in the black says.  If it was over their check

24  cashing limit they would refer it to the supervisor.

25  Items that are stale dated.  If a check is -- is old,

1   written a long time ago or if it's post dated where

2   someone was trying to cash a check dated Friday and

3   today's Wednesday.

4        Q.   So let's go in order there.  Any -- The

5   employees check cashing limit, was that a contributing

6   factor in any way to the March 19th, 2020 incident

7   involving Sheira Brown?

8        A.   It would not be for a check for $90, no.

9        Q.   Right.  In other words, that is -- that

10  particular section about, in this case, Jasmine Brown's

11  check cashing limit would not have the reason that Gale

12  O'Keefe was reviewing the check in this case, is that

13  right?

14       A.   That's correct.

15       Q.   What does it mean to have a check be stale

16  dated?

17       A.   Generally a check that is written six months

18  ago would be considered stale dated.  And we may refer

19  them back to the maker to get a new check.

20       Q.   And usually checks have an indication on them

21  that, you know, if it's more than 180 days since this

22  was written you're -- the check is expired, is that

23  right?

24            MR. MARDER:  Objection, form.

25       A.   Some checks do yes, not all.

1    Q.   Is the general guideline that -- that stale

2  dating is -- is 180 days or six months?

3    A.   Generally speaking, yes.

4    Q.   It is not common, however, that a check that's

5  one month old is stale dated, is that right?

6    A.   Not unless stated on the check, no.

7    Q.   It would be unusual circumstances, fair to say,

8  that a check is stale dated after only a month?

9    A.   That' s correct.

10    Q.   Post dated means the check is dated for the

11  future, is that right?

12    A.   Yes, that's correct.

13    Q.   Okay.

14          MR. MC MULLEN:   And zooming back out just

15  on this entire first page here.

16    Q.   (BY MR. MC MULLEN)   Is there any other item

17  that you see on this policy or this guideline that

18  indicates the date of the check as an indication that

19  the check may be fraudulent?

20    A.   No, sir.

21    Q.   In fact, the -- the guidelines of Harford Bank

22  do not indicate that the date of the check is

23  dispositive on whether the check is fraudulent?

24    A.   That's correct.

25    Q.   Also, these guidelines do not indicate that the

Page 105

1  customer's home address is dispositive as to whether the

2  check is fraudulent or not?  In other words, the

3  distance that the customer lives from that branch, the

4  guidelines at least do not specify that that's an

5  indication the check is fraudulent, do they?

6      A.   They do not.

7      Q.   And we can return to your report.

8               MS. TYROCH:  I'll try again.

9               (Document on screen)

10     Q.   Okay, we left your report where we had

11  described the font sizes and the writing on the check.

12  Another factor identified by Jasmine Brown and Gail

13  O'Keefe here, as you wrote, your report states it was a

14  month old.  Did I read that correctly?

15     A.   That's correct.

16     Q.   What's the significance of the check being a

17  month old?

18     A.   Other than it being odd, that's all.

19     Q.   The guidelines that Harford Bank provides to

20  its employees do not indicate that a month old check is

21  an indication of counterfeit, is that correct?

22     A.   That's correct.

23     Q.   In what way is it odd?

24     A.   Just that most people don't wait a month to

25  cash their check, that's all.  I can't speculate as --

1   as to what Jasmine was thinking.  That's my opinion

2   based on what she said.

3       Q.   Okay.  And so other than your belief that most

4   people don't wait that long, is there any other reason

5   that waiting a month is odd?

6       A.   No.

7       Q.   It indicates pay date on the check here, it

8   says February 20th of 2020, is that right?  Up in the

9   top right corner of the check?

10       A.   Yes.

11       Q.   That's when -- we presume that's when this

12   check was printed, it's not necessarily when Ms. Brown

13   received it, isn't that right?

14            MR. MARDER:  Objection, form.

15       A.   Yes, normally that's when the check is printed.

16       Q.   How often -- Well, why isn't a month old check

17   an indication of counterfeit?

18            MR. MARDER:  Objection, form.

19       A.   As we talked about earlier, unless it states on

20   the check good for 30 days it would not be -- it

21   wouldn't be stale dated being a month old.

22       Q.   Right.  And it's also not an indication of

23   fraud at least under the drafting of this policy of

24   Harford Bank, isn't that right?

25       A.   That's correct.

1   Q.   And so in the wisdom of Harford Bank that would

2   not be an indication of counterfeit or at least not

3   important enough to identify in its guidelines, is that

4   right?

5             MR. MARDER:  Objection, form.

6   A.   Not in and of itself, no.

7   Q.   In combination with what would a month old

8   check be an indication of counterfeit or fraud?

9   A.   It was just one of the things -- one of the

10  numerous things that Jasmine and/or Gail indicated they

11  looked at when they looked at this check to determine

12  that it was possibly a fraudulent check.

13  Q.   Well it's not -- The date of the check is not

14  indicated on the guidelines, right?

15  A.   No.

16  Q.   Well it's not indicated on any policy of

17  Harford Bank isn't it -- is it?

18  A.   No.

19  Q.   If it's a factor to be considered in

20  determining if a check is fraudulent or counterfeit, why

21  isn't it on a Harford Bank policy?

22  A.   I can't answer that question.  I didn't write

23  the policy.

24  Q.   Right.  If you were consulting with, as you

25  indicated, you occasionally consult on bank policies.

1   If you were to be asked to do that in this case what

2   would you tell them about a check that's a month old?

3   Is it a -- is it a dispositive factor when determining

4   if a check is fraudulent or counterfeit?

5       A.   Not unless the check indicated that it should

6   be cashed within 30 days.  I think stale dated in our

7   policy is just perfectly fine.

8       Q.   The other thing mentioned on this report is

9   that Sheira Brown was outside of the Joppa location

10  trade area, is that right?

11      A.   That's correct.

12      Q.   It actually notes her neighborhood.  It says

13  she is from Owings Mills.  Are you familiar with that

14  neighborhood?

15      A.   I know generally where Owings Mills is, yes.

16      Q.   Who identified to you that -- well, did either

17  Jasmine Brown or Gail O'Keefe identify to you that

18  Owings Mills was Jasmine's neighborhood?

19      A.   I believe that's her address on the -- her ID.

20           MR. MC MULLEN:  And I -- the reason I ask

21  is this is, Scott, I believe purporting to be a report

22  prepared by the reasons that Gail O'Keefe and Jasmine

23  Brown thought this check was fraudulent.

24      Q.   (BY MR. MC MULLEN)  So they told you that that

25  was a factor they considered, isn't that true?

1        MR. MARDER:   Objection, form.

2    A.   I was just taking down all of the facts that

3  they presented to me why they looked at this check --

4    Q.   Right.

5    A.   -- correct.

6    Q.   It's not significant to you one way or the

7  other that she's from Owings Mills, that's -- you are

8  simply reciting what either Gail O'Keefe or Jasmine

9  Brown told you about the things they considered when

10 determining this check was fraudulent, is that accurate?

11       MR. MARDER:   Objection, form.

12   A.   Yes.

13   Q.   We -- We covered this earlier.   The bank does

14 not prefer only to do business with folks outside it's

15 trade area -- or inside its trade area, is that

16 accurate?

17   A.   Prefer is an interesting way to put it.   I

18 don't think we would turn away business if someone

19 wanted to come open an account and they wanted to drive

20 a half hour to each one of our branches, if that's what

21 you're talking about.

22   Q.   Is it cause for concern that a -- that a

23 customer from Owings Mills comes to the bank in Joppa to

24 cash a check?

25   A.   In and of itself, no.

Page 110

1    Q.   And, in fact, would it -- independently that --

2    that raises no concern whatsoever to you, does it?

3    A.   No.

4    Q.   Have you been to Owings Mills?

5    A.   Yes.

6    Q.   And I assume you've been to Joppa as well?

7    A.   Yes.

8    Q.   Are you familiar with the racial demographics

9    in Joppa --

10   A.   No.

11   Q.   -- of the population?  Are you familiar with

12   the racial demographics in Owings Mills?

13   A.   No.

14   Q.   I believe we have some data on that.  Let's --

15            MR. MC MULLEN:  Leslie, if we can look at

16   the demographics of Joppa first.

17            MR. MARDER:  Are you marking this as an

18   exhibit?

19            MR. MC MULLEN:  Yes, please.

20            MS. TYROCH:  I believe this will be

21   Exhibit No. 5 to be titled Joppa demographics.

22   Q.   (BY MR. MC MULLEN)  Mr. Claffee, this chart

23   shows that Joppatowne -- and Joppatowne is -- is what

24   we're referring to when we say the Joppa location, is

25   that right Mr. -- Mr. Claffee?

1      A.    Yes.

2      Q.    The population is approximately 13,668.  Does

3   that sound consistent with your knowledge of the area?

4               MR. MARDER:  Objection, form and

5   foundation.

6      A.    I really have no idea.

7      Q.    But you don't have any independent knowledge

8   that Joppatowne has a population of roughly 13 to

9   14,000?

10              MR. MARDER:  Objection, form and

11  foundation.

12     A.    Not until I just saw this graph and -- and you

13  showed it to me, no.

14     Q.    But you don't have any reason to think this is

15  inaccurate, do you?

16              MR. MARDER:  Same objection.

17     A.    No, I do not.

18              MR. MC MULLEN:  If we can go to the racial

19  demographics.

20     Q.    (BY MR. MC MULLEN)  Now, Mr. Claffee, at least

21  according to this source of information Joppatowne has a

22  population which is 79.49 percent White and a

23  14 percent -- 14.77 percent Black or African American.

24  Assuming this is an accurate representation of the

25  demographics -- Well, first of all, did I read that

1    correctly?

2        A.    Yes.

3        Q.    Fair to say that if this source of information

4    is accurate and, in fact, Joppatowne has a population of

5    79.49 percent White folks, it's fair to say that

6    Joppatowne is a predominantly White area, isn't that

7    true?

8              MR. MARDER:  Objection, form and

9    foundation.

10       A.    If that's what the data says then yes, I agree.

11       Q.    Right.  And we can look at the same data for

12   Owings Mills.

13             MR. MC MULLEN:  If we can pull that up

14   that'll be the next exhibit.

15             MS. TYROCH:  We'll submit this as Exhibit

16   6 titled Owings Mills demographics.

17             (Exhibit 6 on screen)

18       Q.    And it's the same representation to you,

19   Mr. Claffee.  These are -- purport to be demographic

20   information for the Owings Mills neighborhood.  We can

21   see here that according to this chart that neighborhood

22   has a populate -- a Black population or African American

23   population of, at least as of 2020, 59.47 percent.  Is

24   that accurate?

25             MR. MARDER:  Objection, form and

1   foundation.

2       A.   You read that correctly, yes.

3       Q.   And so we can also assume that this data is

4   accurate, that we would -- it would be fair to

5   characterize Owings Mills as a predominantly Black

6   neighborhood, isn't that true?

7                MR. MARDER:   Objection, form and

8   foundation.

9       A.   If that's what the data says then yes, it

10  appears so.

11      Q.   Right.

12               MR. MC MULLEN:   We can pull that -- pull

13  that down.

14      Q.   So we can agree then as it pertains to factors

15  that Gail O'Keefe and Jasmine Brown identified, of those

16  primary factors in determining that Sheira Brown's check

17  was fraudulent two factors appear.  Isn't the first

18  factor that Sheira -- Sheira Brown's appearance, would

19  you agree?

20               MR. MARDER:   Objection, form.

21      A.   Yeah, and you cut out.  I did not hear the

22  whole question, sorry.

23      Q.   Sure and -- if I cut out I'll restate it.  We

24  agree that there were two -- at least two primary

25  factors in Gail O'Keefe's and Jasmine Brown's

Page 114

1   determination that Sheira Brown's check was fraudulent,

2   can we agree?

3               MR. MARDER:  Objection, form.

4       A.   Those were two of the things that we mentioned

5   that I put in my memo, yes.

6       Q.   One of them was Sheira Brown's appearance,

7   correct?

8       A.   Yes.

9       Q.   And one of them was the fact that Sheira Brown

10  was not from the neighborhood where the Joppa branch was

11  located?

12      A.   Yes.

13      Q.   And, in fact, Sheira Brown was from a

14  predominantly Black neighborhood, isn't that true?

15              MR. MARDER:  Objection, form and

16  foundation.

17      A.   I don't know that to be certain.

18      Q.   If the data that we provided you is true and

19  Sheira Brown is, in fact, from Owings Mills, Sheira

20  Brown is, in fact, from a predominantly Black

21  neighborhood, isn't that true?

22              MR. MARDER:  Objection, form and

23  foundation.

24      A.   Yes, if she lived in Owings Mills and that data

25  supports that then yes, I agree.

1    Q.   And if the data we provided you is true and --

2  well, if the data provided -- we provided you is true

3  Joppa is, in fact, in a predominantly White

4  neighborhood, isn't that true?

5              MR. MARDER:   Same objection.

6    A.   Yes.

7    Q.   Are you aware of whether Ms. Brown's employer

8  is from the Joppa area?

9    A.   Her -- Where she worked?

10   Q.   Correct.

11   A.   I believe it's in or near Owings Mills.

12   Q.   From the report you -- we've looked at today it

13 doesn't specify whether Gail O'Keefe or Jasmine Brown

14 asked Sheira Brown why she was using the Joppa location,

15 does it?

16   A.   If it's not in my commentary then no.

17   Q.   So based on your report we have no information

18 that either of them asked her why she was using that

19 branch location, do we?

20             MR. MARDER:   Objection, form.

21   A.   Not that I'm aware of, no.

22   Q.   Were there other factors that -- that Gail

23 O'Keefe and Jasmine Brown could have looked to to verify

24 whether the check was, in fact, fraudulent?

25   A.   The physical check?

Page 116

1    Q.   Correct.

2    A.   I don't think so.

3    Q.   Could they have asked Sheira Brown for more

4 information about herself or about the employer to

5 confirm or deny whether the check is fraudulent?

6              MR. MARDER:  Objection, form.

7    A.   Yes, they probably could have dug further.

8 Yes.

9    Q.   In what ways could they have dug further?

10             MR. MARDER:  Objection, form.

11   A.   They could have asked for the name of her boss

12 and where she worked, assuming that's who wrote the

13 check.

14   Q.   And what else could they have asked her?

15   A.   That's the most important thing to identify

16 whether this check was valid or not and who wrote it to

17 her.

18   Q.   And they didn't do that, did they?

19             MR. MARDER:  Objection, form.

20   A.   They told me they called our customer who is

21 the owner of the bank account.  That's in my report.

22   Q.   But they didn't ask Sheira Brown, did they?

23   A.   I don't know.

24   Q.   And you -- but you didn't write it in your

25 report if they did, did you?

1      A.    That's correct.

2      Q.    And you would've likely reported that as an

3   important factor when you wrote your report?

4               MR. MARDER:   Objection, form.

5      A.    Yes, I included all the facts that they told me

6   about, yes.

7      Q.    You -- Your intention was to include all of the

8   pertinent and important information when you -- when you

9   generated your report, I assume?

10     A.    Yes, of course.

11     Q.    The -- You've identified that the Joppa

12  employees involved did not ask Sheira Brown why she was

13  in that location, they did not ask her why -- for any

14  information about her employer.  Are those two things

15  true?

16     A.    To my knowledge, yes.  If they did ask her they

17  did not tell me about it.

18     Q.    Right.  They also didn't ask her why her hair

19  was different than her ID, did they?

20              MR. MARDER:   Objection, form.

21     A.    They did not tell me that, no.

22     Q.    And we previously identified that that is the

23  only distinguishing characteristic or difference between

24  the ID and Sheira Brown's appearance on that day, isn't

25  that true?

1          MR. MARDER:  Objection, form.

2     A.   That was my opinion today as we looked at it

3  together, yes.

4     Q.   Right.  Why did Gail O'Keefe decide to

5  confiscate Sheira Brown's check?

6          MR. MARDER:  Objection, form.

7     A.   She kept the check after calling our customer

8  Nick who owns the business.  And Nick told her to keep

9  the check.

10     Q.   What is Nick's last name?

11     A.   Kapsis, K-a-p-s-i-s, I believe.

12     Q.   Ms. O'Keefe did not actually speak with an

13  individual named Sam Fakhoury -- and I'll provide the

14  spelling, I'm not sure if I have his name pronounced

15  correctly, but it's F-a-k-h-o-u-r-y.  Are you aware that

16  Gail O'Keefe did not call that individual?

17          MR. MARDER:  Objection, form.

18     A.   She did not tell me that she called that --

19  that individual, no.

20     Q.   Are you aware that that is, in fact, the owner

21  of that restaurant?

22     A.   From what I know --

23          MR. MARDER:  Objection, form.

24     A.   Sorry.  From what I know he is not the owner of

25  that location, no.

1    Q.    Would he have knowledge as to why the check

2    looks the way it does, as far as you know?

3    A.    He may if he cut the checks, yes.

4    Q.    Okay.  In fact, the following day, isn't it

5    true, that another employee of that same employer was

6    able to successfully cash her check, and that's written

7    in your report, isn't that true?

8    A.    That's correct.

9          MR. MC MULLEN:  And if we could pull up

10   the report for reference.

11         (Document on screen)

12         MR. MC MULLEN:  If you could zoom in to

13   the top where -- where we see the check.  I'm sorry, the

14   check that Brittney provided.

15   Q.    (BY MR. MC MULLEN)  Mr. Claffee, this is also

16   in your report.  Can you explain why this is included,

17   Ms. Brittney M. Braiford, it appears to be a check from

18   her.  Why is this included in the report?

19   A.    Gail sent it to me after Brittney and Sheira

20   both returned to the branch that day and cashed those

21   checks.  So she sent us a copy of those as well.

22   Q.    And as it turns out Brittney -- Brittney's

23   check appears to be the same font, the same font type as

24   Sheira Brown's check?

25   A.    Yes, it does.

1   Q.   And so to be clear, there is no policy at least

2   in -- in the policy we've reviewed today or that you've

3   identified for us today that indicates a bank employee

4   should confiscate the check, isn't that true?

5           MR. MARDER:  Objection, form.

6   A.   In the policy we -- we reviewed together, no.

7   Q.   Is there a different policy that would indicate

8   that a -- that a -- an employee should confiscate the

9   check?

10  A.   I don't recall.  Was there more to that -- that

11  policy, is there a separate page?

12  Q.   And I'll -- I'll represent to you I'm not

13  hiding something from you.  I'm not aware of any such

14  policy.  If you are I'm just asking whether you know.

15  A.   Not that I'm aware of, no.

16  Q.   If you needed to find out who would you ask?

17  A.   I would refer to our policy and procedures.

18  Q.   There isn't an individual you would look to?

19  A.   No, we would refer to policy and procedure.

20  Q.   And as far as you're aware, those policies and

21  procedures have been provided to plaintiff in discovery

22  in this matter?

23  A.   Yes, sir.

24          MR. MARDER:  Hey, Matt, do you mind if we

25  take a two or three minute break?  I apologize.

1          MR. MC MULLEN:  Yeah, no problem.

2          MR. MARDER:  Thanks, I'll be back --

3          VIDEOGRAPHER:  We're off the record, the

4   time is 12:21 p.m. eastern time.

5               (Recess from 12:21 to 12:29)

6          VIDEOGRAPHER:  We are back on the record,

7   the time is 12:29 p.m. eastern time.

8      Q.   I have some questions about this individual, I

9   think you said his name is Nick Kop -- Kopsis, is that

10  right?

11     A.   Kapsis, yes.

12     Q.   Kapsis.  How did Gail identify that Nick Kapsis

13  was the person they called?

14     A.   On the system when you're looking up an account

15  you know who the owners were -- of the account are.  And

16  their contact information appears there.

17     Q.   And Ms. Gail O'Keefe reported to you that she

18  called Nick -- Nick Kapsis?

19     A.   Yes.

20     Q.   Is there any way we know what was said by Gail

21  to Mr. Kapsis?

22     A.   Other than her word, no.

23     Q.   And what was her word as to what she said?

24     A.   She told me she asked Nick if he knew who

25  Sheira Brown was.  He said no and asked her to hold the

1    check.

2        Q.    Was there any other item that she told

3    Mr. Kapsis?

4        A.    Not that I'm aware of.

5        Q.    Do you know how many employees that restaurant

6    or that company has?

7        A.    I do not know.

8        Q.    So to summarize, Ms. O'Keefe called Nick Kapsis

9    and asked him if she -- if he knows Sheira Brown and he

10   said no, is that right?

11       A.    Yes.

12       Q.    Was there any other piece of information Gail

13   told you that she told Mr. Kapsis?

14       A.    Not that I'm aware of, no.

15       Q.    That was the only factor that she identified to

16   Mr. Kapsis as to whether that check should be

17   confiscated?

18               MR. MARDER:  Objection, form.

19       A.    I imagine she relayed her name and where the

20   check was written from, which is his account.  Does that

21   make sense?

22       Q.    And did she identify -- well, how did the topic

23   of con -- confiscation come up?  He orig -- he brought

24   it up or she brought it up, what is your understanding?

25               MR. MARDER:  Objection, form.

1    A.   I don't know the order in which that -- that

2  happened.  After she re -- relayed the information to

3  Nick about this check and he said I don't know who that

4  person is, you should probably hold that check or you

5  should hold that check.  That's what she told me.

6    Q.   Heading back to your report, I think it's on

7  page 2 of your report.

8              (Document on screen)

9              And that's the third marker down.  It says

10  at 5:34 p.m. Deputy Corteel called Brian.  I assume that

11  is you, Mr. Claffee, the Brian here?

12    A.   Yes.

13    Q.   He said what could be done to retrieve the

14  check for Sheira since he also called over to the

15  restaurant, and they verified that Sheira was known to

16  have worked at another location they owned in

17  Reistertown, Maryland.  Did I read that correctly?

18    A.   Yes.

19    Q.   What information or what ability to investigate

20  that reality did Deputy Corteel have that Gail O'Keefe

21  did not?

22              MR. MARDER:  Objection, form.

23    A.   Authority was your word?  I -- I think either

24  one of them could've -- could've called.

25    Q.   Right, that's what I'm asking.  And I apologize

1  if the question was clumsy.  In other words, Deputy

2  Corteel had the same access to information that Gail

3  O'Keefe had when she determined that the check was --

4  she believed the check was fraudulent, isn't that true?

5       A.   That's --

6            MR. MARDER:  Objection, form.

7       A.   And that's not completely true because Deputy

8  Corteel would not know who the owner of that bank

9  account is.  He would not know who our customer is that

10 we are obligated to.

11      Q.   Okay.  But Deputy Corteel's representation to

12 Gail O'Keefe that the check was not, in fact, fraudulent

13 was sufficient to release the check, isn't that true?

14      A.   The check was not released 'til the next day.

15 And I don't know if there was additional information

16 that Gail went through to verify that these checks were

17 not fraudulent.  I assume she -- I can't assume, but

18 she -- she obviously determined that they were real.

19      Q.   And you don't have any information about how

20 she determined that?

21      A.   I don't know, no.  She did not indicate that to

22 me.

23      Q.   She didn't provide that to you when you were

24 preparing your report that she -- that she obtained any

25 new information?

1      A.    Not that I'm aware of, no.

2      Q.    And, in fact, in your report Deputy Corteel's

3   representation that he had done an investigation as to

4   the check, his representation was sufficient for

5   purposes of your report as a justification to return the

6   check to Ms. Brown, isn't that true?

7                  MR. MARDER:   Objection, form.

8      A.    No, 'cause I was not -- I was not there the

9   next day when Sheira came back to cash the check or get

10   the check and Brittney to cash the check so it wasn't

11   that information.

12      Q.    How do we determine what information Harford

13   Bank relied upon in determining that the check could be

14   released to Sheira Brown?

15      A.    Well, as indicated before the amount on the

16   check fell below the dollar amount threshold in that

17   check cashing policy.   So even in the moment she

18   could've cashed it and then followed up later with our

19   customer.   That's one option she could've pursued the

20   night of the check.

21      Q.    That's right.   And so it had always been an

22   option for Gail O'Keefe to -- to release this check to

23   Ms. Brown, isn't that right?

24                  MR. MARDER:   Objection, form.

25      A.    For her to cash the check.

1    Q.   Yes, isn't that true, check or cash?  I'm

2    sorry.  Cash the check or release it to her.  Both of

3    those things were an option to Gail O'Keefe on

4    March 19th of 2020, isn't that true?

5              MR. MARDER:  Matt -- Matt, in fairness

6    repeat the question.  You broke up a little bit.

7              MR. MC MULLEN:  I'm sorry.

8    Q.   We'll start back over on that.  I believe your

9    testimony was that Gail O'Keefe had the option to return

10   the check to Ms. Brown on March 19th of 2020, correct?

11   A.   Prior to it being locked in the vault, yes.

12   Q.   And she had the option actually to cash the

13   check prior to it being locked in the vault on

14   March 19th of 2020, correct?

15   A.   Well, that's true until she called Nick and he

16   asked her to hold the check.

17   Q.   And Nick asked her to hold the check, right?

18   Ultimately, though, the check was released to Ms. Brown,

19   isn't that true?

20   A.   On the following day, that's correct.

21   Q.   And what new information did Harford Bank

22   obtain in order to release the check to Ms. Brown?

23   A.   I don't have that information.

24   Q.   It's not written in your report, correct?

25   A.   That's correct.

1    Q.   In fact, the only information that we could

2  interpret as leaning in favor of releasing the check to

3  Ms. Brown is what Deputy Corteel is noted as having

4  investigated here on your report, is that right?

5              MR. MARDER:  Objection, form.

6    A.   I can't answer that.

7    Q.   Why not?

8    A.   Well, I was not there the next day.  I don't

9  know what Gail or who Gail called or what other steps

10  she took to verify that.  That was her decision as the

11  branch manager to release that check or to cash that

12  check the next day.

13    Q.   And in your -- And so to be clear, in your

14  report here do you specify at any point why the check

15  could be released out of the vault to Ms. Sheira Brown?

16    A.   No, there's nothing in this report that says

17  that.

18    Q.   Gail O'Keefe didn't provide you with

19  anything -- any information as to why the check could be

20  released to Ms. Brown?

21    A.   Not that I recall, no.

22    Q.   And Jasmine Brown didn't provide you with any

23  information as to why the check could be released to

24  Ms. Brown?

25    A.   Not that I recall, no.

1    Q.   Deputy Corteel, the police officer, did however

2    identify a potential reason why the check could be

3    released to Ms. Brown, isn't that true?

4    A.   I only know what he told me.  I don't know who

5    he called, who he spoke to or what that conversation

6    was.

7    Q.   Right.  And if you believed what Deputy Corteel

8    was telling you he told you that the check could, in

9    fact, be released to Sheira because he had verified that

10   Sheira was known to have worked for that restaurant,

11   isn't that true?

12             MR. MARDER:  Objection, form.

13   A.   That's true.  Ultimately that is absolutely

14   true, she worked for that restaurant, yes.

15   Q.   Right.  And Deputy Corteel was able with his

16   own investigation to confirm that information?

17   A.   That's what I documented.  Again, I don't know

18   who he spoke with or what that conversation was.

19   Q.   Was the check ultimately released to Sheira

20   Brown?

21   A.   Yes, the following day when she came back.

22   Q.   I believe you touched on this already, but we

23   agree the check that Sheira Brown brought to Harford

24   Bank on March 19th of 2020 was a valid check, right?

25   A.   Yes.  Excuse me, yes.

1    Q.   It was a valid payroll check that Sheira Brown

2  should've been able to cash, isn't that true?

3    A.   It was determined it was a valid check --

4    Q.   Okay.

5    A.   -- yes.

6    Q.   And she should've been able to cash it, isn't

7  that true?

8              MR. MARDER:  Objection, form.

9    A.   Yes, she could've -- she should've been able to

10  cash it.

11    Q.   Right.  Why did Harford Bank fail to identify

12  that this was a valid check presented by Sheira Brown?

13    A.   In the moment all of the indicators that

14  Jasmine and Gail looked at on the check, and the fact

15  that they called our customer who did not recognize the

16  name, and asked us to hold the check, those are the

17  reasons.

18    Q.   Right.  And those are the reasons -- you wrote

19  up all of the reasons in your report, right?

20    A.   I did, yes.

21    Q.   And let's summarize those reasons just so I'm

22  not missing any.

23              MR. MC MULLEN:  If we can go to the top

24  there.

25    Q.   And I'm gonna take notes and I'll show you my

1  notes at the end of this.  I think -- I wanna try to

2  identify all the reasons that Gail O'Keefe and Jasmine

3  Brown identified to you just so we can keep them

4  straight.

5            The first reason that I have noted here on

6  your report is that Sheira is not a known person to the

7  bank.  Is that the first reason you've identified?

8      A.    That's the first reason listed, yes.

9      Q.    And whether or not Sheira Brown is a known

10  person to the bank, that factor is not contemplated by

11  any Harford Bank policy that we've identified today,

12  isn't that true?

13      A.    Yes.

14      Q.    The second factor in this report is that Sheira

15  Brown is not a customer.  Is that a -- a factor

16  identified in your report?

17      A.    Yes, it is.

18      Q.    And whether or not a person is a customer is

19  not indicated in the -- the policy you've reviewed as to

20  whether a check was fraudulent or not, isn't that true?

21      A.    No, that is in the policy whether they're a

22  customer or not to pull up their account.

23      Q.    Is it a poli -- is it a factor that is

24  determinative as to whether a person -- as to whether a

25  check is fraudulent?

1          MR. MARDER:  Objection, form.

2      A.   No.

3      Q.   And the third factor you've identified is that

4  the picture ID of Sheira Brown, which is in your report,

5  and Ms. Brown's appearance do not match.  Is that

6  accurate as the third factor?

7      A.   Based on what Jasmine and Gail told me, yes.

8      Q.   Okay.  And we can agree that the policy does,

9  in fact, ask that that be looked at, whether or not the

10  picture ID matches, right?

11      A.   I'm sorry, you said it does indicate that?

12      Q.   Yes, it is in the policy --

13      A.   Yes.

14      Q.   -- to look for that, correct?

15      A.   Yes, it is.

16      Q.   But what we identified is that the only factor

17  at least you were able to determine was different or the

18  only -- I'm sorry, I'm gonna repeat that because I

19  jumbled it.  Earlier in your deposition you testified

20  after having reviewed both of these images the only

21  difference in this -- in these two images that you can

22  determine is that Ms. Brown's hair was different, isn't

23  that true?

24          MR. MARDER:  Objection, form.

25      A.   That's my opinion today, yes.

1      Q.   Okay.  The fourth factor is -- as identified in

2  this report is that there were mismatched font types and

3  sizes, is that accurate?

4      A.   Yes.

5      Q.   We were not able to when you and I reviewed

6  this to identify determinative -- let me -- let me try

7  it again.  You and I reviewed the check and we're not

8  able to identify with any reliability whether the font

9  type is, in fact, different?

10               MR. MARDER:  Objection, form.

11      A.   Yes.

12      Q.   We do agree that the font size changes in that

13  check, is that true?

14      A.   Yes.

15      Q.   The fifth factor we've identified is that the

16  written amount was shortened, is that accurate?

17      A.   Yes.

18      Q.   But this factor was not identified in the

19  policy as to whether it is determinative that a check

20  may be counterfeit or a fraud, is that true?

21               MR. MARDER:  Objection, form.

22      A.   Yes.

23      Q.   The sixth factor that we've identified is that

24  the check is a month old, is that right?

25      A.   Yes, we did.

1    Q.    And this factor also was not in Harford Bank's

2  policy as determinative of whether the check is

3  fraudulent or counterfeit, is that true?

4              MR. MARDER:  Objection, form.

5    A.    In the policy it says stale dated not specific

6  to 30 days or a month, correct.

7    Q.    The policy identifies stale dated, correct?

8    A.    Yes.

9    Q.    But Ms. Brown's check was, in fact, not stale

10  dated?

11    A.    It was not.

12    Q.    And finally, as a factor it was identified that

13  Sheira Brown is from Owings Mills, is that true?

14    A.    Yes.

15    Q.    And Sheira Brown's home address or the

16  neighborhood she's from is not indicated in the policy

17  as being determinative of whether the check was

18  counterfeit or fraudulent, is that true?

19              MR. MARDER:  Objection, form.

20    A.    Yes.

21    Q.    Are there any other factors that I did not add

22  in as to Gail O'Keefe and Jasmine Brown's decision to --

23  well, let me -- let me rephrase that.  Did I miss any

24  other factors that led to -- or that Gail O'Keefe and

25  that Jasmine Brown specified to you that they -- that

1    caused them to believe that the check was counterfeit?

2       A.   No, sir.

3       Q.   I'm gonna show you my notes here and I'm going

4    to --

5             MR. MARDER:  Matt, can I just jump in?

6    'Cause we're kind of running long.  Your notes are not

7    -- are you making your notes an exhibit?

8             MR. MC MULLEN:  I am.

9             MR. MARDER:  You're making your notes an

10   exhibit?

11            MR. MC MULLEN:  The notes I prepared that

12   mimic the testimony of the witness, yes.

13            MR. MARDER:  Okay.  What exhibit number is

14   that?

15            MR. MC MULLEN:  I think we're on 6.

16            MR. MARDER:  7.

17            MS. TYROCH:  This will be 7.

18      Q.   (BY MR. MC MULLEN)  And, Mr. Claffee, I'll give

19   you an opportunity to correct my notes if I've misstated

20   your testimony.

21            (Exhibit 7 on screen)

22      Q.   Mr. Claffee, I've done my best to create

23   shorthand notes for the fact -- the seven factors we've

24   identified.  And I wanna read them through with you

25   quickly, and then we will highlight which of these items

1    was actually found in the policy.  First did I -- I

2    write this correctly, the first factor was that Sheira

3    Brown is not a known person to the bank.  This factor

4    was not identified in the policy, is that true?

5                    MR. MARDER:  Objection, form.

6         A.    Yes.

7         Q.    The second factor is that Sheira Brown was not

8    a known customer.  This factor was also not identified

9    in the policy, is that true?

10                   MR. MARDER:  Objection, form.

11        A.    I believe our policy does talk about customers'

12   accounts in the check cashing policy.  But --

13        Q.    Is it relevant -- I'm sorry, go ahead.

14        A.    But Sheira does not have an account with us.

15   She's not a customer.

16        Q.    Right.  And it's not determinative in the

17   policy as to whether the check she presented was

18   counterfeit or fraudulent, is that true?

19                   MR. MARDER:  Objection, form.

20        A.    Yes.

21        Q.    Number three, the picture ID does not match.

22   We agreed that this is in the policy.  We also agreed

23   that the only factor you could identify is that

24   Ms. Brown's hair was different in the two photographs,

25   is that true?

1          MR. MARDER:  Objection, form.

2     A.   Yes.

3     Q.   I've highlighted this as being in the policy.

4 Number four, the font size and font type on Sheira

5 Brown's check, this is in the policy.  We could not

6 identify how the font type is different but we agreed

7 that the font size is different in some places.  Did I

8 accurately write that?

9          MR. MARDER:  Objection, form.

10    A.   Yes, and my name has two F's.

11    Q.   I apologize, sir.  I knew that.  We will

12 highlight that as being in the policy.  The written

13 amount on the check is shortened.  We identified that

14 this is a not a factor determinative of fraud or

15 counterfeit, isn't that right?

16         MR. MARDER:  Objection, form.

17    A.   Yes.

18    Q.   And number six, the check being a month old is

19 also not in the policy.  The policy does discuss stale

20 dated checks but Ms. Brown's -- Ms. Brown's check was,

21 in fact, not stale dated, is that accurate?

22         MR. MARDER:  Objection, form.

23    A.   Yes.

24    Q.   And finally, Sheira Brown is from Owings Mills

25 but, however, Sheira Brown being from Owings Mills is a

1    factor that is not in the policy, is that accurate?

2                MR. MARDER:  Objection, form.

3        A.    Correct.

4        Q.    Thank you.  I will mark this as Exhibit 7.

5    Mr. Claffee, we can agree that because Ms. Brown's check

6    was, in fact, valid there was a period of time in

7    which -- between March 19th of 2020 and March 20th of

8    2020 that Sheira -- that Harford Bank had wrongfully

9    confiscated Ms. Brown's check.  Can we agree on that?

10               MR. MARDER:  Objection, form.

11       A.    No, our customer told us to hold the check.

12       Q.    And that was bad information, wasn't it?

13               MR. MARDER:  Objection, form.

14       A.    It turned out to be that the check was valid,

15   if that's what you mean, yes.

16       Q.    That is what I mean.  And so --

17       A.    I agree.  You cut out.  Say again -- say that

18   again.

19       Q.    I'm sorry.  I asked if you agree then that, in

20   fact, that was bad information.

21               MR. MARDER:  Objection, form.

22       A.    Yes.

23       Q.    There was no legal justification as it turns

24   out to hold Ms. Brown's check?

25               MR. MARDER:  Objection, form.

1     A.   We held the check because our customer told us

2  to hold the check.

3     Q.   And, in fact, Harford Bank is culpable for

4  exactly what they suspected Ms. Brown to be culpable

5  for, which is depriving Ms. Brown of property that was,

6  in fact, hers?

7           MR. MARDER:  Objection, form.

8     A.   When the check is presented to us and our

9  customer says to hold the check we're obligated to honor

10  our customer's request.  That's who we're bound by.

11     Q.   I have one last area for questions on this

12  before the next break.  Are you familiar with Harford

13  Bank's diversity training policy?

14     A.   We have a policy that we don't discriminate, if

15  that's what you mean.

16     Q.   Right.  And I'm referring to --

17           MR. MC MULLEN:  We can pull up your report

18  on page 5, if we could.

19           (Document on screen)

20     Q.   So what I'm identifying here, Mr. Claffee,

21  is -- tell me if I'm reading this correctly.  It says

22  this is an assessment that you provided to the president

23  of Harford Bank.  You're telling him what -- what

24  training we have or Harford Bank has at the time of your

25  report for new employees, is that right?

1      A.    Yes, this is a list of classes that all

2  employees are required to take.

3      Q.    Among them is a diversity in the workplace

4  training.  Do you see that?

5      A.    Yes, sir.

6      Q.    And have you undertaken training?

7      A.    I did when I first joined, yes.

8      Q.    It's something that everyone at Harford Bank is

9  intended to do within 90 days of employment?

10      A.    That's correct.

11      Q.    I wanna scroll down a bit to -- So these were

12  the trainings in place at the time?

13      A.    Uh-huh.

14      Q.    And I understand this report to mean that

15  the -- the ones that follow below here are trainings

16  that were being recommended after this report was done,

17  is that right?

18      A.    That's correct.

19      Q.    And we can go through them.  It looks like

20  Customer First Series, Creating Valuable Customer

21  Relationships.  So -- and I believe there's another page

22  after this here trainings.  So to summarize, there were,

23  it looks like, two customer facing trainings that were

24  implemented after this report was created, is this

25  right?

1    A.    That's correct.

2              MR. MARDER:  Objection, form.

3    A.    Yes.

4    Q.    Were these policies created as a reaction to

5  the incident on March 19th of 2020?

6    A.    They were added to beef up our customer service

7  training.

8    Q.    Why were they added after March 19th of 2020?

9    A.    As a -- Part of our discussion that Mike and I

10  had with our HR director we felt that there could

11  absolutely be more customer service training in order to

12  handle difficult situations, we were in the middle of a

13  pandemic.  There were a lot of reasons why we felt like

14  our customer facing employees needed additional customer

15  service training.

16    Q.    Right.

17              MR. MC MULLEN:  If we could take a short

18  break.  And I don't think I have too many more questions

19  for you, sir.  Just say five minutes.

20              THE WITNESS:  Okay.

21              VIDEOGRAPHER:  Okay, we're off the record.

22  The time is 12:58 p.m. eastern time.

23              (Recess from 12:58 to 1:06)

24              VIDEOGRAPHER:  We are back on the record.

25  The time is 1:06 p.m. eastern time.

1      Q.   Mr. Claffee, just one more area for inquiry.

2   We identified -- If I'm understanding your testimony we

3   identified that Gail O'Keefe called Nick Kapsis because

4   she believed that the check presented by Sheira Brown

5   was fraudulent, is that right?

6      A.   That's correct.

7      Q.   We also identified all of the reasons why Ms.

8   O'Keefe believed that, is that right?

9                MR. MARDER:  Objection, form.

10     A.   As far as we know, yes.

11     Q.   Right.  That is the seven factors that you and

12  I wrote -- wrote earlier, and that's, I think, Exhibit

13  7.  Those were the seven factors we identified which led

14  to Gail O'Keefe calling Mr. Kapsis, is that right?

15               MR. MARDER:  Objection, form.

16     A.   Yes.

17     Q.   There are no other factors we've identified

18  that caused the call from Ms. O'Keefe to Mr. Kapsis, is

19  that right?

20               MR. MARDER:  Objection, form.

21     A.   Yes.

22     Q.   And it's fair to say that had Ms. O'Keefe not

23  identified these seven factors she would not have called

24  Mr. Kapsis?

25               MR. MARDER:  Objection, form.

1      A.   I can't answer that.

2      Q.   Why can't you?

3      A.   Well, I was not there.

4      Q.   Well, presumably if Gail O'Keefe had identified

5  another reason to call Mr. Kapsis she would have told

6  you that?

7           MR. MARDER:  Objection, form.

8      A.   Yes.

9      Q.   And you were asking her for the reasons why she

10  felt that the check was fraudulent, isn't that true?

11     A.   Yes.

12     Q.   And these are the seven reasons that she

13  provided you, is that right?

14     A.   Yes.

15     Q.   She provided you with no other reasons why she

16  would need to call Mr. Kapsis about the check, right?

17     A.   No.

18           MR. MC MULLEN:  All right.  I have no

19  other questions for you, sir.  Thank you for your

20  testimony this morning.

21                    (1:08)

22                  EXAMINATION

23  By Mr. Marder:

24     Q.   I have a couple or three follow-up questions.

25  Mr. Claffee, do you have the same training as tellers in

identifying a red flag of check fraud?

A. I have not been through the teller training myself, no.

Q. Are you an expert in identifying indicia of fraud on checks?

A. I'm not an expert, no.

Q. And is it the intent of the policies of the bank to identify all possible red flags of check fraud?

A. No.

MR. MARDER: I don't have any other questions.

(1:09)

RE-EXAMINATION

By Mr. McMullen:

Q. Mr. Claffee, in discussing the policy of Harford Bank that we've reviewed do you believe that policy is sufficiently drafted?

MR. MARDER: Objection, form and foundation.

A. I think there's always opportunities to improve any policy process or procedure with new information, sure.

Q. Right. You are aware of no policy performed by Harford Bank -- well, let me rephrase that.

MR. MC MULLEN: You know what,

Page 144

1    Mr. Claffee, I don't think I have any other questions

2    for you so I'll pass the witness.

3                  THE WITNESS:  Thank you.

4                  MR. MARDER:  No questions, we'll read.

5                  VIDEOGRAPHER:  Okay, we are off the

6    record.  The time is 1:10 p.m. eastern time ending the

7    deposition.

8              (Proceedings concluded at 1:10 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CHANGES AND SIGNATURE

2      PAGE LINE   CHANGE                        REASON

3      _____

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____

Page 146

1       I, BRIAN CLAFFEE, have read the foregoing deposition

2   and hereby affix my signature that same is true and

3   correct, except as noted above.

4

5                                    _____

6                                    BRIAN CLAFFEE

7

8   THE STATE OF _____)

9   COUNTY OF _____)

10

11      Before me, _____, on this day

12  personally appeared BRIAN CLAFFEE, known to me or proved

13  to me on the oath of _____ or through

14  _____ (description of identity card

15  or other document) to be the person whose name is

16  subscribed to the foregoing instrument and acknowledged

17  to me that he/she executed the same for the purpose and

18  consideration therein expressed.

19      Given under my hand and seal of office on this _____

20  day of _____, _____.

21

22                                   _____

23                                   NOTARY PUBLIC IN AND FOR

24                                   THE STATE OF _____

25  My Commission Expires: _____

Page 147

1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF MARYLAND
2                          BALTIMORE DIVISION

3    SHEIRA BROWN,                  §
     Plaintiff,                     §
4                                   §
     v.                             § Case No. 1:21-cv-00096-JRR
5                                   §
     HARFORD BANK,                  §
6    Defendants.                    §

7

8                       REPORTER'S CERTIFICATE

9          ORAL VIDEOTAPED DEPOSITION OF BRIAN CLAFFEE

10                        JANUARY 18, 2023

11

12        I, Vanessa P. Pompa, Certified Shorthand Reporter in

13   and for the State of Texas, hereby certify to the

14   following:

15        That the witness, BRIAN CLAFFEE, was duly sworn and

16   that the transcript of the deposition is a true record

17   of the testimony given by the witness;

18        That the deposition transcript was duly submitted on

19   _____ to the witness or to the attorney for

20   the witness for examination, signature, and returned to

21   me by _____, 2023.

22        That pursuant to information given to the deposition

23   officer at the time said testimony was taken, the

24   following includes counsel for all parties of record:

25

**Gwendolyn Parker & Associates**
**214-747-8007**

Page 148

```
 1        Mr. Matthew McMullen,
              Attorney for Plaintiff;
 2
          Mr. Scott H. Marder
 3            Attorney for Defendant;

 4        I further certify that I am neither counsel for,

 5   related to, nor employed by any of the parties or

 6   attorneys to the action in which this proceeding was

 7   taken, and further that I am not financially or

 8   otherwise interested in the outcome of the action.

 9        Further certification requirements pursuant to Rule

10   30 of FRCP will be certified to after they have

11   occurred.

12        Certified to by me on this _____ day of

13   _____, _____.

14

15                        /S/ Vanessa P. Pompa
                          Vanessa P. Pompa, CSR
16                        Texas CSR 2670
                          Expiration:  01/31/24
17

18

19

20

21

22

23

24

25
```

**Gwendolyn Parker & Associates**
**214-747-8007**

1           FURTHER CERTIFICATION UNDER FRCP RULE 30

2       The original deposition was/was not returned to the

3  deposition officer on _____.

4       If returned, the attached Changes and Signature

5  page(s) contain(s) any changes and the reasons therefor.

6       If returned, the original deposition was delivered

7  to Mr. Matthew McMullen, Custodial Attorney.

8       $_____ is the deposition officer's charges to the

9  Plaintiff for preparing the original deposition and any

10  copies of exhibits;

11       The deposition was delivered in accordance with Rule

12  30, and a copy of this certificate, served on all

13  parties shown herein, was filed with the Clerk.

14       Certified to by me on this _____ day of

15  _____, _____.

16

17

18                        /S/ Vanessa P. Pompa
                           Vanessa P. Pompa, CSR

19                        Texas CSR 2670
                           Expiration:  01/31/24

20

21

22

23

24

25